UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

KOREA SECURITIES FINANCE CORP.,

      Plaintiff,

vs.                            Case No.

VISION SANTA MARIA MIAMI, INC.,
and SANTA MARIA ON BRICKELL
CONDOMINIUM ASSOCIATION, INC.

      Defendants.

_____/

## COMPLAINT TO FORECLOSE MORTGAGE AND SECURITY INTEREST

Plaintiff, Korea Securities Finance Corp. ("KSFC"), by and through its attorneys, Reizes Law Firm, Chartered, as and for its Complaint to foreclose a mortgage and security interest, respectfully shows this Court and alleges:

1.  Plaintiff files this Complaint to Foreclose the Mortgage and Security Interest hereinafter described.

2.  Jurisdiction of this Court is based on diversity of citizenship, 28 U.S.C. 1332. There is complete diversity and the matters in controversy, exclusive of interest and costs, exceed the sum of $75,000.00.

3.  Venue is proper in this District because the mortgage at issue is secured by property located in this District and because a substantial part of the events or omissions giving rise to the

claim occurred here, 18 U.S.C. § 1391.

4. Plaintiff is a corporation organized and existing under the laws of the Republic of Korea with its principal place of business in Korea.

5. Defendant Vision Santa Maria Miami, Inc. ("Vision") is a corporation organized and existing under and by virtue of the State of Florida, with its principal place of business at Coral Gables, Florida.

6. Defendant Santa Maria on Brickell Condominium Association ("the Association") is a non-profit corporation organized and existing under the laws of the State of Florida with its principal place of business in Miami, Florida.

7. Plaintiff has elected to declare the whole of the principal sum remaining unpaid under the Loan Agreement, Deed of Guarantee, and Collateral Security First Mortgage hereinafter described, together with interest thereon, immediately due and payable. Plaintiff confirms this election by the filing of this Complaint.

8. Any pre-suit notice requirements have been met, and any and all grace periods have expired or have been waived.

9. Attached as "EXHIBIT A" is a true copy of the Collateral Security First Mortgage which incorporates a Loan Agreement dated October 25, 2010, in the amount of Six Million Dollars ($6,000,000.00) and a Deed of Guarantee of the indebtedness by Defendant Vision to Plaintiff dated April 27, 2011. The terms of the Collateral Security First Mortgage and all its exhibits are incorporated herein by reference.

10. The Collateral Security First Mortgage was recorded June 10, 2011, in Official Records of Miami-Dade County in Book 27717, at pages 4545-4653. The proper mortgage

documentary tax and intangible tax were paid at that time. A financing statement as to the personal property pledged to Plaintiff under the mortgage was filed in the Official Records of Miami-Dade County on June 10, 2011, and in the Office of the Florida Secretary of State on June 13, 2011. Copies of the financing statements are annexed as EXHIBITS "B" AND "C," and incorporated by reference.

11.   The mortgagor's interest at the time of execution of the mortgage was owner of the fee simple interest thereto.

12.   The amount of original Indebtedness under the underlying Loan Agreement was $6,000,000.00.

13.   The legal description of the mortgaged premises is: **UNIT NO. 4901 OF SANTA MARIA, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM RECORDED IN O.R. BOOK 17781, PAGE 4242, PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

14.   The premises are commonly known as Apartment 4901, 1643 Brickell Avenue, Miami, FL 33129.

15.   The monthly installments of principal and interest for the month of December, 2010, and all subsequent months have not been paid.

16.   The total unpaid principal balance is $5,829,319.05, exclusive of attorneys' fees, costs, late charges, advances, and expenses incurred by the mortgagee as a result of the default, plus interest at the current per diem of $2011.61.

17.   The name of another person which is joined as Defendant and whose interest in or lien on the mortgaged real estate is subordinate to that of Plaintiff and is sought to be terminated

is the Association.

18.   The name of Defendant claimed to be personally liable for deficiency, if any, is Vision.

19.   The capacity in which Plaintiff brings this foreclosure is as the legal holder of the indebtedness, owner of the mortgage, and beneficiary of the deed of guarantee.

20.   Pursuant to the terms of the Loan Agreement and Mortgage, the mortgagee is entitled to recover reasonable attorneys' fees, court costs, title costs, and other expenses which Plaintiff has been and will be required to expend in the prosecution of this foreclosure in addition to those items provided for in the Loan Agreement and Deed of Guarantee.

21.   Pursuant to Rule 44.1, Fed. R. Civ. Pro., Plaintiff gives notice to the Defendants that it intends to raise issues about a foreign country's laws, to wit, the obligations of Vision under the Deed of Guarantee, the waiver of defenses contained therein, the provision therein that Vision has primary liability under the Guarantee and that it does not have the ordinary rights of a surety, the effectiveness of the choice of law provision, the validity of the choice of forum provision contained in the Deed of Guarantee secured by the mortgage being foreclosed in this action, and that English law provides that the guarantee, as it was executed as a deed, needs no consideration. All legal rights under the Deed of Guarantee are governed by the laws of England.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

1.   A judgment to foreclose the Collateral Security First Mortgage and security interest granted therein.

2.      A deficiency judgment against only those Defendants/Obligors, who have not received an order discharging the subject debt in bankruptcy proceedings, or who are not currently involved in bankruptcy proceedings in which the stay has been modified for the sole purpose of foreclosing the subject lien.

3.      An order granting possession, if sought.

4.      An order placing the mortgagee in possession or appointing a receiver, if sought.

5.      A judgment including an award of attorneys's fees, costs and expenses, including but not limited to, payments for taxes, insurance, securing, inspections and other expenses of the mortgagee.

6.      A finding that the interests of any and all named Defendants are junior and subservient to the mortgage lien being foreclosed herein and the termination of leaseholds, if any.

7.      An order enforcing its assignment of rents derived from said real estate, if applicable.

8.      A sale by public auction.

9.      A cash sale by open bid, in the form of a cashier's check, certified funds, or other good bank funds, with Plaintiff permitted to credit bid any judgment in its favor in this case.

10.     A provision that the Marshal shall conduct the sale for the statutory fee, or if a special master or commissioner be appointed to conduct the sale that it be conducted for a reasonable fee, which fee in any case shall be recoverable by Plaintiff.

11.     An order that title in the real estate may be subject, at the sale, to exceptions including general real estate taxes for the current year, subsequent years, and for preceding years whether or not due and payable as of the date of entry of judgment of foreclosure, and special

Page 5 of 6

assessments upon the real estate and easements and restrictions of record.

      12.    For such other and further relief as the Court deems just, including but not limited

to, declaratory and injunctive relief.

DATED:  Boynton Beach, FL
              September 4, 2011

                                REIZES LAW FIRM, CHARTERED

                                By:_____

                                    Leslie N. Reizes
                                    Florida Bar No. 208108
                                Attorneys for Plaintiff
                                1200 S. Federal Highway, Suite 301
                                Boynton Beach, FL 33435
                                Tel: (561) 736-2600
                                Fax: (561) 736-2700
                                E-mail: reizes@bellsouth.net

CFN 2011R0380147
OR Bk 27717 Pss 4545 - 4653; (109p;

RECORDED 06/10/2011 10:15:13
MTG DOC TAX 21,000.00
INTANG TAX 12,000.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by:

> Leslie N. Reizes, Esq.
> Reizes Law Firm, Chartered
> 1200 South Federal Highway, Suite 301
> Boynton Beach, FL 33435

Record and Return to:

> Daniel Haggerty, Esq.
> Mariner Title Co.
> 100 S.W. Albany Ave. #310
> Stuart, FL 34994
> 772-283-2881
> File Number: 11-80049
> Will Call No.:

## COLLATERAL SECURITY FIRST MORTGAGE

**MORTGAGE**, dated May 17, 2011, made by Vision Santa Maria Miami, Inc., a Florida corporation, having an address at 25 S.E. 2nd Avenue No. 730, Miami, FL 33131 ("Mortgagor"), to and for the benefit of Korea Securities Finance Corp., a Korean corporation, having an address at 34-9 Yeouidodong, Yeongdeungpo-gu, Seoul, Korea ("Mortgagee").

### Recital

Weisbaden Technical Dredging Corp. And Regensburg Shipping SA as borrowers are justly indebted to Mortgagee in the sum of Six Million Dollars ($6,000,000.00), which is evidenced by a loan agreement dated October 25, 2010, in said principal amount (the "Loan Agreement"). Mortgagor, in order to secure the payment of the amount due under the Loan Agreement, has duly executed and delivered a guarantee of payment by deed of guarantee dated ~~May , 2011,~~ and this Mortgage.

W/A April 27, 2011

### Definitions

Mortgagor and Mortgagee agree that, unless the context hereof otherwise specifies or requires, the following terms shall have the meanings herein specified. Said definitions shall be applicable equally to the singular and the plural forms of such terms.



EXHIBIT
**A**

"Chattels" shall mean all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and replacements thereof, other than those owned by lessees, now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, occupancy or operation of the Improvements on the Premises.

"Event of Default" shall mean any event and circumstance described as an Event of Default in Section 2.01 hereof.

"Improvements" shall mean all structures or buildings now or hereafter located upon the Premises or any part thereof, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Property" shall mean the Premises, the Improvements, the Chattels and all other property, rights and interests described in the Granting Clause of this Mortgage.

"Premises" shall mean:

> **ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Miami, the County of Miami-Dade, and the State of Florida, being more particularly described as:

> > **UNIT NO. 4901 OF SANTA MARIA, A CONDO-MINIUM, ACCORDING TO THE DECLARA-TION OF CONDOMINIUM RECORDED IN O.R. BOOK 17791, PAGE 4242, AND ALL EX-HIBITS AND AMENDMENTS THEREOF, PUB-LIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

> **TOGETHER** with all right, title and interest, if any, of Mortgagor in and to any streets and roads abutting the above described premises to the center lines thereof,

> **TOGETHER** with the appurtenances and all the estate and rights of Mortgagor in and to said premises.

> **Said premises are Parcel I.D. Number 01 413906203 40.**

2

All terms in this Mortgage which are not defined above shall have the meanings set forth in this Mortgage.

## Granting Clause

NOW, THEREFORE, in consideration of the premises, and in order to secure the payment of the principal, interest and any other sums payable under the Loan Agreement and this Mortgage, and the observance and performance of the provisions hereof and of the Loan Agreement, Mortgagor hereby mortgages to the Mortgagee all estate, right, title and interest of Mortgagor in, to and under any and all of the following described property (the "Property"), whether now owned or hereafter acquired:

(a)  the Premises;

(b)  the Improvements;

(c)  the Chattels;

(d)  all leases of the Premises, now or hereafter entered into and all right, title and interest of Mortgagor thereunder, including without limitation cash or securities deposited thereunder to secure the payment or performance by the lessees of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, and including the right, upon the happening of an Event of Default, to receive and collect the rents thereunder; and

(e)  all proceeds of the conversion, voluntary or involuntary, of any of the forego-ing into cash or liquidated claims, including without limitation insurance proceeds and condemnation awards.

A copy of the Loan Agreement is annexed as Exhibit "A." A copy of the Deed of Guaranty is annexed as Exhibit "B."

3

## ARTICLE I

### Covenants of Mortgagor

**Mortgagor covenants and agrees as follows:**

1.01.  Mortgagor shall punctually pay the principal, interest and all other sums to become due under the Loan Agreement and Deed of Guarantee, at the time and place and in the manner specified in the Loan Agreement and Deed of Guarantee, in the coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

1.02.  Mortgagor represents and warrants that it has good and marketable title to the Premises; that the Premises are subject to no lien, claim or encumbrance except as set forth herein; that Mortgagor now and hereafter will own the Chattels free and clear of all liens, claims and encumbrances;  and that this Mortgage is and will remain a valid and enforceable first lien on the Property subject only to the exceptions referred to herein; and that Mortgagor has full power and lawful authority to mortgage the Property as herein provided.  Mortgagor forever shall preserve, warrant and defend such title to Mortgagee, and forever shall preserve, warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.  The Board of Directors of Mortgagor has duly authorized the execution and delivery of this Mortgage and the Loan Agreement, and there is no provision in the certificate of incorporation or bylaws of Mortgagor requiring that its shareholders consent to such action.

1.03.  Mortgagor, at Mortgagor's sole cost and expense, shall do, execute, acknowledge and deliver all and every such further acts, deeds, mortgages, assignments, transfers and assurances as Mortgagee from time to time shall require, for the better assuring, mortgaging, assigning, transferring and confirming unto Mortgagee the property and rights hereby mortgaged, assigned, transferred or intended now or hereafter to be mortgaged, assigned or transferred, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage.  All right, title and interest of Mortgagor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Premises, now owned by, hereafter acquired by, or released to Mortgagor, or constructed, assembled or placed by Mortgagor on the Premises, and all conversions of the security of this Mortgage, immediately upon such acquisition, release, construction, assembling, placement or conversion, without any further mortgage, conveyance, assignment or other act by Mortgagor, shall become subject to the lien of this Mortgage as fully and completely, and with the same effect, as though now owned by Mortgagor and specifically described in the granting clause hereof.  Mortgagor, on demand, shall execute and deliver to Mortgagee any and all such further assurances, mortgages, conveyances or assignments thereof as Mortgagee may require for the purpose of expressly and specifically subjecting the same to the lien of this Mortgage.  Mortgagor, upon the execution and delivery of this Mortgage, and thereafter on demand, at Mortgagor's sole cost and expense shall cause this Mortgage and any security

4

instrument creating or evidencing a lien upon the Chattels or any other property to be secured hereby, and any other instrument of further assurance or instrument supplemental hereto or given in connection herewith, to be filed, registered or recorded in such manner and in such place or places as may be required by any present or future law in order to publish notice of and fully to protect the lien hereof upon, and the interest of Mortgagee in, the Property. On demand Mortgagor shall execute and deliver, and Mortgagor hereby authorizes Mortgagee, and irrevocably appoints Mortgagee as its attorney-in-fact, to execute and deliver in the name of and on behalf of Mortgagor, to the extent permitted by applicable law, one or more financial statements, chattel mortgages or comparable security instruments to evidence more effectively the lien hereof upon the Chattels.

1.04. Mortgagor, if a corporation, shall, so long as it is owner of the Property, do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation under the laws of the state of its incorporation, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental authority or court applicable to Mortgagor or to the Property or any part thereof.

1.05. Mortgagor shall keep the Property free from statutory liens of every kind or nature, and shall pay and discharge when due all taxes of every kind or nature, general and special assessments, levies, permits, inspection and license fees, water and sewer rents and charges, and other governmental or public charges, fines and impositions, whether of a like or different nature, which are or may be levied or imposed upon, or assessed against, the Property or any part thereof, or upon the revenues, income, rents, issues and profits of the Property or arising in respect of the occupancy, use or possession thereof. Mortgagor, upon the request of Mortgagee, shall deliver to Mortgagee receipts evidencing the payment of all such taxes, assessments, levies, fees, rents, charges, fines and impositions. For purposes of this Mortgage, assessments which have been made payable in installments at the application of Mortgagor nevertheless shall be deemed due and payable in their entirety on the earlier of the day the first installment becomes due or payable or a lien.

1.06. Mortgagee, at the option of Mortgagee, to be exercised by ten days notice to Mortgagor, may require the deposit by Mortgagor, monthly or at the time of each payment of an installment of principal or interest under the Loan Agreement, of additional amounts sufficient to pay and discharge thirty days prior to the date when due all taxes, assessments and other obligations under Section 1.05 above. The determination of the amounts to be deposited with Mortgagee, so that the aggregate of such deposits shall be sufficient to pay such obligations, shall be made by Mortgagee in its sole discretion. Such amounts shall be held by Mortgagee, without interest, and shall be applied to the payment of such obligations in respect to which such amounts were deposited or, at the option of Mortgagee, to the payment of said obligations in such order or priority as Mortgagee shall determine, when and as payable, provided Mortgagor is not in default hereunder. Mortgagor shall furnish to Mortgagee bills for all of the obligations for which deposits are to be made hereunder and such other documents and information as may be needed for the payment of such obligations, at least thirty days prior to the date on which such obligations

5

first become payable. If thirty days prior to the due date of any of the aforesaid obligations the amounts then on deposit therefor shall be insufficient to pay and discharge such obligations in full, Mortgagor on demand shall deposit the amount of the deficiency with Mortgagee. In the event of any default by Mortgagor under any provision of this Mortgage, Mortgagee at Mortgagee's option may apply any amounts deposited pursuant to this Section 1.06 to the payment of principal, interest or other obligations secured hereby, in lieu of applying such amounts for the payment of the obligations for which such amounts were deposited. Nothing herein contained shall be deemed to affect any other rights or remedies of Mortgagee under any other provisions of this Mortgage, or under any statute or rule of law, including without limitation the right to pay any such amount and to add the amount so paid to the indebtedness hereby secured.

1.07. Mortgagor shall pay all filing, registration or recording fees; all federal, state, county and municipal taxes, duties, imposts, assessments and charges; and all expenses incident to the execution, acknowledgment, delivery and recording of this Mortgage, the Loan Agreement, any security instrument with respect to the Chattels, any instrument of further assurance and any other instrument supplemental hereto or to be given in connection herewith. Mortgagor shall pay any and all taxes, charges, excises and levies imposed on Mortgagee by reason of the ownership or holding of this Mortgage or the Loan Agreement, and shall pay all corporate stamp taxes and other taxes required to be paid on this Mortgage or the Loan Agreement. If Mortgagor fails to make any such payment within five days after demand, Mortgagee in addition to its other rights and remedies, may pay the amount due, and Mortgagor on demand shall reimburse Mortgagee for said amount. The amount so advanced by Mortgagee shall be a part of the indebtedness secured by this Mortgage. In the event of the passage of any law deducting from the value of the Premises, for purposes of taxation, the amount of any lien thereon or changing in any way the laws for the taxation of Mortgages or debts secured by Mortgages or the manner of the collection of any such taxes, so as to effect this Mortgage; then the indebtedness secured hereby, at the option of Mortgagee and upon thirty days notice to Mortgagor, immediately shall become due and payable, provided, however, that said option shall be unavailing and the Loan Agreement and this Mortgage shall remain in effect if, without violating such law or any applicable usury or other law, Mortgagor lawfully pays when due such taxes, including any interest or penalties thereon, to or for Mortgagee.

1.08. Mortgagor shall pay, from time to time when due, all lawful claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in, or permit the creation of, a lien on the Property or any part thereof, or on the revenues, income, rents, issues and profits arising therefrom. Mortgagor shall do or cause to be done everything necessary so that the lien hereof shall be fully preserved, at the cost of Mortgagor, without expense to Mortgagee.

1.09. Mortgagor shall not be required to pay the obligations imposed upon Mortgagor by Sections 1.05, 1.07 or 1.08 hereof so long as Mortgagor, in good faith and at its own expense, shall contest the validity or amount of such obligation by appropriate legal proceedings, provided such proceedings shall prevent the collection thereof or other realization

thereon and shall not result in the sale or forfeiture of the Property or any part thereof to satisfy the same. During any such contest Mortgagor, at the option of Mortgagee, shall provide security satisfactory to Mortgagee assuring the discharge of Mortgagor's obligations hereunder and of any additional charge, penalty or expense arising from or incurred as a result of such contest. If at any time the payment of any obligation imposed upon Mortgagor under Section 1.05 shall become necessary to prevent the delivery of a tax deed conveying the Premises or any portion thereof because of nonpayment, then Mortgagor shall pay such obligation in sufficient time to prevent the delivery of such tax deed.

1.10.  Mortgagor shall keep the Improvements and Chattels insured for the benefit of Mortgagee against loss by fire, casualty and such other hazards as may be specified by Mortgagee. Mortgagor shall maintain war risk insurance, if obtainable. Mortgagor shall also maintain rent insurance in an amount equal to 100% of the rents collectible from the Property for a period of not less than one year. All insurance to be maintained by Mortgagor hereunder shall be written in forms, amounts and by companies satisfactory to Mortgagee, naming Mortgagee as insured. Mortgagor shall pay when due all premiums for such insurance. The policy or policies of such insurance, and renewals thereof, shall be delivered to Mortgagee, and shall have attached thereto a standard noncontributing mortgagee endorsement in favor of and entitling Mortgagee to collect any and all proceeds payable under all such insurance, as well as a standard waiver of subrogation endorsement, and shall contain provisions for ten days notice to Mortgagee prior to any cancellation thereof, all in form and substance satisfactory to Mortgagee. Mortgagor shall reimburse Mortgagee on demand for any premiums for insurance paid by Mortgagee on Mort-gagor's default in maintaining any insurance required hereunder or in delivering the insurance policies to Mortgagee as provided herein. Mortgagor shall give Mortgagee prompt notice of any loss covered by such insurance. Mortgagee is hereby authorized to collect, adjust and compro-mise all losses covered by such insurance. Mortgagor shall have the right to join Mortgagee in adjusting any loss not in excess of $50,000. Any moneys received as payment for any loss under any such insurance shall be paid over to Mortgagee to be applied, at the option of Mortgagee, either to the prepayment of the Loan Agreement, without premium, or to the reimbursement of Mortgagor for expenses incurred by it in the restoration of the Improvements. Mortgagor shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained hereunder, unless such insurance names Mortgagee as insured, with any and all proceeds payable to Mortgagee under a standard mortgage endorsement of the character above described. Mortgagor promptly shall deliver to Mortgagee the policy or policies of such insurance.

1.11  Mortgagor shall keep adequate records and books of account in accordance with generally accepted accounting principles and shall permit Mortgagee, and the agents, accountants and attorneys of Mortgagee, to visit and inspect the Premises and examine the records, books of account and papers of Mortgagor which reflect upon its financial condition, the income and expenses of the Property or the business conducted thereat, and to discuss the affairs, finances and accounts of Mortgagor with the officers, agents, accountants and attorneys of Mortgagor, at such reasonable times as Mortgagee may request. Mortgagor promptly shall deliver

7

to Mortgagee such other information with respect to Mortgagor and the Property as Mortgagee from time to time reasonably may request.

1.12. Mortgagor shall not commit, suffer or permit any waste on or to the Property. Mortgagor at all times shall maintain the Improvements in good operating order and condition, and promptly shall make all repairs, renewals, replacements, additions and improvements in connection therewith which are necessary or desirable to such end. The Improvements shall not be removed, demolished or altered without the prior written consent of Mortgagee in each instance. None of the Chattels shall be removed without the prior written consent of Mortgagee in each instance, except where appropriate replacements free of superior title, liens, claims and encumbrances are immediately made having a value at least equal to the value of the Chattels removed. Mortgagor shall not make any change in the use of the Property which will in any way increase the risk of damage to the Property by fire or other hazard.

1.13. Mortgagor represents and warrants that no hazardous substance has been released, stored, spilled or otherwise deposited on the Premises, or used in the construction of the Premises, nor has any part of the Premises been used for a landfill, the result of which could impose any liability on Mortgagee under applicable federal or state laws or regulations. Mortgagor shall not permit the release, storage, spilling or deposit on the Premises of any hazardous substance, and shall not permit the use of the Premises in violation of any applicable environmental law. As used herein, a hazardous substance shall mean any substance listed as hazardous or toxic in the regulations implementing the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., or other applicable environmental law. Mortgagor shall indemnify and hold Mortgagee harmless from and against all liability, claim, loss, damage or expense, including reasonable attorneys' fees, arising in connection with the representations, warranties and covenants herein.

1.14. Mortgagor shall not sell, transfer, assign or convey the Property or any part thereof or any interest therein, or enter into a lease of all or substantially all of the Property, without the prior written consent of Mortgagee in each instance. A sale or other transfer of majority or controlling interest in any stock of Mortgagor, unless Mortgagor is a publicly held corporation, shall constitute a sale within the meaning of this Section 1.14. Mortgagor shall not further mortgage, pledge or otherwise encumber the Property or any part thereof or any interest therein without the prior written consent of Mortgagee in each instance.

1.15. All awards and compensation payable to Mortgagor as a result of any condemnation or other taking, or of any purchase in lieu thereof, of all or any portion of the Premises, are hereby assigned to and shall be paid to Mortgagee. Mortgagor hereby authorizes Mortgagee to collect and receive such awards and compensation, to give proper receipts and acquittances therefor, and to apply the same to the indebtedness evidenced by the Loan Agreement, notwithstanding that such indebtedness may not then be due and payable. If any portion of such awards or compensation shall be applied to reduce the indebtedness evidenced by the Loan

Agreement, the same shall be applied to the then unpaid installments of principal under the Loan Agreement in the inverse order of their maturity, so that the regular payments under the Loan Agreement shall not be reduced or altered in any manner. Mortgagee shall be under no obligation to question the amount of any such award or compensation, and may accept the same in the amount in which the same shall be paid. Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation or taking of the Premises or any portion thereof, shall notify Mortgagee of the pendency of such proceedings. Mortgagee may participate in any such proceedings and Mortgagor from time to time shall deliver to Mortgagee all instruments requested by Mortgagee to permit such participation. Mortgagor, upon request by Mortgagee, shall execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid awards and compensation to Mortgagee free and clear of all liens, claims or encumbrances. Mortgagee shall not be limited to the interest paid on any award or compensation, but shall be entitled to the payment of interest by Mortgagor at the applicable rate provided in the Loan Agreement and herein.

    1.16. Mortgagor, without the prior written consent of Mortgagee in each instance, shall not (a) execute an assignment of the rents or any part thereof from the Premises unless such assignment shall provide that it is subordinate to the assignment contained in this Mortgage, and all modifications, extensions and other amendments hereof, and any assignment of rents executed pursuant thereto, or (b) terminate or consent to the cancellation or surrender of any lease of the Premises or any part thereof, now existing or hereafter to be made, except where the lessee is in default thereunder, or (c) modify any such lease so as to shorten the unexpired term thereof or decrease the amount of the rents payable thereunder, or (d) accept prepayments of any installments of rents to become due under such leases, except prepayments in the nature of security for the performance of the lessees thereunder, or (e) commingle any lease security deposits of lessees with any other funds of Mortgagor, or (f) in any other manner impair the value of the Property or the security of this Mortgage. Mortgagor shall at all times promptly and faithfully pay and perform, or cause to be paid and performed, all of the terms, covenants and conditions contained in all leases of the Premises now or hereafter existing, on the part of the lessor thereunder to be paid or performed, and shall at all times do all things necessary to compel the payment and performance by the lessee under each lease of all of the terms, covenants and conditions by such lessee to be paid or performed thereunder. If any of such leases provide for the giving by the lessee of certificates with respect to the status of such leases, Mortgagor shall exercise its right to request such certificates within ten days after any request therefor by Mortgagee. Mortgagor shall furnish to Mortgagee, within ten days after any request therefor by Mortgagee, a statement certified by Mortgagor containing the names of all lessees of the Premises, the terms of their respective leases, the space occupied and the rentals payable thereunder, and shall deliver to Mortgagee copies of all leases not theretofore delivered to Mortgagee. To the extent not so provided by applicable law, each lease of the Premises, or any part thereof, shall provide that, in the event of the enforcement by Mortgagee of the remedies provided by law or by this Mortgage, the lessee thereunder, upon request of Mortgagee or any person succeeding to the interest of Mortgagee as a result of such endorsement, automatically will become the lessee of said successor in interest, without change in the provisions of such lease; provided, however, that Mortgagee and

9



said successor in interest shall not be bound by (a) any payment of rent or additional rent for more than one month in advanced, except prepayments in the nature of security for the performance by said lessee of its obligations under said lease, or (b) any amendment or modification of the lease made without the prior written consent of Mortgagee or such successor in interest. Each lease also shall provide that, upon request by Mortgagor or said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment.

   1.17.  Mortgagor shall pay all costs and expenses, including reasonable attorneys' fees, incurred by Mortgagee in connection with the enforcement of this Mortgage, the Deed of Guaranty, or the Loan Agreement, the curing of any default by Mortgagor thereunder, or the defense or asserting of any rights, remedies or claims of Mortgagee in respect thereof, by litigation or otherwise.  If any action or proceeding is commenced to which Mortgagee is made a party or in which, in the judgment of Mortgagee, it is necessary to defend the lien of this Mortgage or to protect the Property, Mortgagee may appear in such action or proceeding, in the name of Mortgagor or otherwise.  Mortgagor shall pay to Mortgagee on demand all costs and expenses, including reasonable attorneys' fees, incurred by Mortgagee in connection with any such action or proceeding, and such costs and expenses shall be a part of the indebtedness secured by this Mortgage.

   1.18.  If Mortgagor shall fail to pay or perform any term, covenant or condition of this Mortgage, including without limitation the provisions of Sections 1.05, 1.07,1.08, and 1.20 hereof, Mortgagee may make advances to pay or perform the same on behalf of Mortgagor.  All sums so advanced shall be paid by Mortgagor to Mortgagee on demand and shall be a lien upon the Property secured by this Mortgage.  The provisions of this Section 1.18 shall not prevent any default in the payment, observance or performance of any term, covenant or condition of this Mortgage from constituting an Event of Default, and shall not be deemed to extend or otherwise modify or amend the date when any payments are due hereunder.

   1.19.  Mortgagor, within five days after request therefor by Mortgagee, shall furnish a written statement, certified and duly acknowledged by Mortgagor, setting forth the amount due on this Mortgage, the terms of payment and the maturity date of the Loan Agreement, the date to which interest has been paid, and whether any offsets or defenses exist against any of the indebtedness secured hereby.  If any offset or defense is alleged to exist, the nature thereof shall be set forth in detail in said statement.

   1.20.  The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as Santa Maria on Brickell (the "Condominium Project").  If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Mortgagor's interest in the Owners Association and the uses, proceeds and benefits of Mortgagor's interest.

**A. Condominium Obligations.** Mortgagor shall perform all of Mortgagor's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Mortgagor shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 1.10 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Mortgagor's obligation under Section 1.10 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Mortgagee requires as a condition of this waiver can change during the term of the loan. Mortgagor shall give Mortgagee prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Mortgagor are hereby assigned and shall be paid to Mortgagee for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Mortgagor.

**C. Public Liability Insurance.** Mortgagor shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Mortgagee.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Mortgagor in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Mortgagee. Such proceeds shall be applied by Mortgagee to the sums secured by the Security Instrument as provided in Section 1.15.

**E. Mortgagee's Prior Consent.** Mortgagor shall not, except after notice to Mortgagee and with Mortgagee's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Mortgagee; (iii) termination of professional management and assumption of self-management

11

of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Mortgagee.

**F. Remedies.** If Mortgagor does not pay condominium dues and assessments when due, then Mortgagee may pay them. Any amounts disbursed by Mortgagee under this paragraph F shall become additional debt of Mortgagor secured by the Security Instrument. Unless Mortgagor and Mortgagee agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Mortgagee to Mortgagor requesting payment.

## ARTICLE II

### Events of Default and Remedies

2.01. The whole of the principal indebtedness evidenced by the Loan Agreement and all accrued interest immediately shall become due and payable, at the option of Mortgagee or the legal representatives, successors or assigns of Mortgagee, upon the happening of any one or more of the following Events of Default:

(a) If default shall be made in the payment of any principal or interest to be paid under the Loan Agreement, when and as the same shall become due and payable, or if default shall be made, and shall have continued for a period of ten (10) days, in the payment of any other amount due under the Loan Agreement or this Mortgage, when and as the same shall become due and payable as in the Loan Agreement or this Mortgage provided; or

(b) If default shall be made in the due observance or performance of any term, covenant or condition on the part of Mortgagor contained in Sections 1.02, 1.03, 1.05, 1.07, 1.08, 1.10, 1.14 or 1.20 of this Mortgage, and such default shall have continued for a period of ten (10) days after written notice thereof shall have been given by Mortgagee to Mortgagor; or

(c) If Mortgagor sells, transfers, assigns or conveys the Premises or any part thereof or any interest therein, or enters into a lease of all or substantially all of the Premises, without the prior written consent of Mortgagee; or Mortgagor further mortgages, pledges or otherwise encumbers the Premises or any part thereof or any interest therein, without the prior written consent of Mortgagee; or

(d) If default shall be made in the due payment, observance or performance of any other term, covenant or condition on the part of Mortgagor in the Loan Agreement or in this Mortgage contained, and such default shall have

12

continued for a period of thirty (30) days after written notice thereof shall have been given by Mortgagee to Mortgagor, or if any representation made by Mortgagor in this Mortgage shall be incorrect; or

(e)  If final judgment for the payment of money shall be rendered against Mortgagor and Mortgagor shall not cause the same to be discharged within sixty days from the entry thereof, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted and secure a stay of execution thereof pending such appeal; or

(f)  If Mortgagor shall file or consents to the filing of a petition in bankruptcy, or commences or consents to the commencement of any proceeding pursuant to the federal Bankruptcy Code or any similar federal or state law, now or hereafter in effect, relating to the reorganization of Mortgagor or the arrangement or readjustment of the debts of Mortgagor; or if a petition in bankruptcy, insolvency proceeding or petition for reorganization shall be filed against Mortgagor and is not withdrawn or dismissed within sixty days; or if, by decree of a court of competent jurisdiction, Mortgagor shall be adjudicated a bankrupt or be declared insolvent, or a petition for the reorganization of Mortgagor is granted; or if Mortgagor shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or if Mortgagor shall consent to the appointment of a receiver, liquidator or trustee of Mortgagor or of all or any part of Mortgagor's property; or if, by the order of a court of competent jurisdiction, a receiver, liquidator or trustee of the Property or any part thereof, or of Mortgagor or any of Mortgagor's property, shall be appointed and such order shall not be dis-charged or dismissed within sixty days after such appointment; or if there is an attachment or sequestration of any of the property of Mortgagor and the same is not discharged or bonded in full within ten days.

2.02.  Upon the occurrence of any such Event of Default, Mortgagee, personally or by its agents, employees, nominees or attorneys, at the expense of Mortgagor may: (a) enter into and upon the Property, and each and every part thereof, and may dispossess and exclude Mortgagor and its agents and servants therefrom; (b) use, operate, manage, control, insure, maintain, restore and otherwise deal with the Property and conduct the business thereat; (c) make all necessary or proper repairs, renewals and replacements and such useful alterations, additions, betterments and improvements thereto and thereon as Mortgagee may deem advisable; and (d) exercise all rights and powers of Mortgagor with respect to the Property, including without limitation the right to enter into, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Premises, in the name of Mortgagor or otherwise.

13

2.03.  Upon the occurrence of any such Event of Default, Mortgagee shall be entitled to collect and receive all earnings, revenues, income, rents, issues and profits of the Property and every part thereof.  After deducting the costs and expenses of conducting the operations and business at the Property, and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements, and amounts necessary to pay for taxes, assessments, insurance and any other proper charges upon the Property or any part thereof, and just and reasonable compensation for the services of Mortgagee and for all agents, nominees, attorneys and other employees by it properly engaged and employed; then Mortgagee shall apply the moneys arising as aforesaid, first, to the payment of the principal of the Loan Agreement and the interest thereon, when and as the same shall become payable and, second, to the payment of any other sums required to be paid by Mortgagor under this Mortgage or the Loan Agreement.

2.04.  Upon the occurrence of any such Event of Default, Mortgagee, with or without entry, personally or by the agents, employees, nominees or attorneys of Mortgagee, may:

(a)  sell the Property or any part thereof pursuant to any procedures provided by applicable law, and all estate, right, title, interest, claim and demand therein, and right of redemption thereof, as one parcel or in parcels, pursuant to the procedures provided by law, at one or more sale or sales, at such time and place upon such terms and after such notice thereof as may be required or permitted by law; and/or

(b)  institute proceedings for the complete or partial foreclosure of this Mortgage; and/or

(c)  take such steps to protect and enforce its rights whether by suit, action or proceeding in equity or at law for the specific performance of any term, covenant or condition in the Loan Agreement or in this Mortgage, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as Mortgagee shall elect.

2.05.  Upon the occurrence of any such Event of Default, Mortgagee or the agents, successors or assigns of Mortgagee may foreclose this Mortgage in the manner provided by law, and have the premises sold to satisfy or apply on the indebtedness secured hereby.

2.06.  Mortgagor, for itself and all who may claim under it, hereby waives, to the extent that it lawfully may, all right to have the Property marshaled upon any foreclosure hereof, and waives trial by jury and the right to impose any defense, setoff or counterclaim to any action brought by the holder of this Mortgage to enforce its rights hereunder. Mortgagor releases and relinquishes all rights of homestead in and to the premises. After the

14

happening of any Event of Default, and immediately upon the commencement of any suit, action or proceeding by Mortgagee to obtain judgment for the principal of, or interest on, the Loan Agreement and other sums required to be paid by Mortgagor pursuant to any provisions of the Loan Agreement or this Mortgage, or of any other nature in aid of the enforcement of the Loan Agreement or this Mortgage, Mortgagor (a) shall waive the issuance and service of process and enter its voluntary appearance in such suit, action or proceeding, and (b) if required by Mortgagee, shall consent to the appointment of a receiver or receivers of the Property and of all the earnings, revenues, income, rents, issues and profits thereof. After the happening of any Event of Default, or upon the commencement of any proceedings to foreclose this Mortgage or to enforce the specific performance hereof or in aid thereof, or upon the commencement of any other judicial proceeding to enforce any right of Mortgagee; Mortgagee shall be entitled, as matter of right, without the giving of notice to any other party and without regard to the adequacy or inadequacy of any security for the Mortgage indebtedness or the solvency or insolvency of Mortgagor, forthwith either before or after declaring the unpaid principal of the Loan Agreement to be due and payable, to the appointment of a receiver or receivers of the Property and of all the earnings, revenues, income rents, issues and profits thereof. Mortgagee may be appointed as such receiver. Notwithstanding the appointment of any receiver, liquidator or trustee of Mortgagor, or of any of its property, or of the Property or any part thereof, Mortgagee shall be entitled to retain possession and control of all property now or hereafter held under this Mortgage. During the continuance of any Event of Default and pending the exercise by Mortgagee of the right to exclude Mortgagor from any and all part of the Property, Mortgagor agrees to pay the fair and reasonable rental value for the use and occupancy of the Property or any portion thereof which are in its possession for such period and, upon default of any such payment, shall vacate and surrender possession of the Property to Mortgagee or to a receiver, if any, and in default thereof may be evicted by any summary action or proceeding for the recovery or possession of premises for nonpayment of rent, however designated. Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement, at the time and place appointed for such sale or any adjournment thereof, of the new time and place of the adjourned sale or sales. Except as otherwise provided by any applicable provision of law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

2.07. Upon the completion of any sale or sales made by Mortgagee under or by virtue of this Article II, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagor hereby irrevocably appoints Mortgagee the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold. Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power. Mortgagor hereby ratifies and confirms all that its said attorney or such substitute or substitutes shall lawfully do by

15

virtue hereof. Nevertheless, Mortgagor, if so requested by Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Mortgagee, for the purpose as may be designated in such request. Any such sale or sales made under or by virtue of this Article II, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming through or under Mortgagor.

2.08. The purchase money, proceeds or avails of any sale made under or by virtue of this Article II, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this Article II or otherwise, shall be applied as follows:

First, to the payment of the costs and expenses of such sale, including reasonable compensation to Mortgagee, and the agents and counsel of Mortgagee, and of any judicial proceedings wherein the same may be made, and of all expenses, liabilities and advances made or incurred by Mortgagee under this Mortgage, and all taxes or assessments, other than those subject to which the Property shall have been sold.

Second, to the payment of the whole amount then due, owing or unpaid upon the Loan Agreement for principal or interest.

Third, to the payment of any other sums required to be paid by Mortgagor pursuant to any provisions of this Mortgage or of the Loan Agreement, including all expenses, liabilities and advances made or incurred by Mortgagee under this Mortgage or in connection with the enforcement thereof.

Fourth, to the payment of the surplus, if any, to whosoever may be lawfully entitled to receive the same.

2.09. Upon any sale made under or by virtue of this Article II, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Mortgagee may bid for and acquire the Property or any part thereof. In lieu of paying cash for the Property may make settlement for the purchase price for the Property by crediting the indebtedness secured by this Mortgage against the net purchase price, after deducting therefrom the expenses of the sale and the costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage. In the event of any such sale, the entire principal of, and interest on, the Loan Agreement, if not previously due and payable, and all other sums required to be paid by Mortgagor pursuant to

16



this Mortgage, immediately shall become due and payable. In the event Mortgagor shall fail forthwith to pay such amounts on demand, Mortgagee shall be entitled and empowered to institute such action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against Mortgagor and collect out of the property of Mortgagor wherever situated, as well as out of the Property, in any manner provided by law, moneys adjudged or decreed to be payable. Mortgagee shall be entitled to recover judgment as aforesaid either before or after or during the pendency of any proceedings for the enforcement of the provisions of this Mortgage; and the right of Mortgagee to recover such judgment shall not be affected by any entry or sale hereunder, or by the exercise of any other right, power or remedy for the enforcement of the provisions of this Mortgage, or the foreclosure of the lien hereof. In the event of a sale of the Property, and of the application of the proceeds of sale, as in this Mortgage provided, to the payment of the debt hereby secured, Mortgagee shall be entitled to enforce payment of, and to receive all amounts then remaining due and unpaid upon, the Loan Agreement, and to enforce payment of all other charges, payments and costs due under this Mortgage, and shall be entitled to recover judgment for any portion of the debt remaining unpaid. No recovery of any judgment by Mortgagee and no levy of any execution under any judgment upon the Property or upon any other property of Mortgagor shall affect in any manner or to any extent, the lien of this Mortgage upon the Property or any part thereof, of any liens, rights, powers or remedies of Mortgagee hereunder, and such liens, rights, powers or remedies shall continue unimpaired as before.

2.10. No right or remedy herein conferred upon or reserved to Mortgagee is intended to be exclusive of any other rights or remedies. All rights and remedies of Mortgagee shall be cumulative, may be exercised singly or concurrently, and shall be in addition to every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute. No delay or omission of Mortgagee to exercise any right or remedy under this Mortgage shall impair any such right or remedy or shall be construed to be a waiver of any Event of Default or any acquiescence therein. Every right, remedy and power given by this Mortgage to Mortgagee may be exercised from time to time as often as may be deemed expedient by Mortgagee. No waiver by Mortgagee shall be effective unless in writing and then only to the extent specifically stated. Without limiting the generality of the foregoing, any payment by Mortgagee for insurance premiums, real estate taxes, assessments, water charges or sewer rents or other charges affecting the Premises, or payments made in connection with any lien superior to the lien of this Mortgage, shall not constitute a waiver of any default by Mortgagor in making such payments and shall not obligate Mortgagee to make any such payments thereafter. No waiver of any right or remedy hereunder shall be deemed to be a waiver of such right or remedy as to any subsequent default hereunder.

2.11. Mortgagor shall not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, or any exemption from execution or sale of the Property or any part thereof, any law now or

17

hereafter in force providing for the valuation or appraisal of the Property, or any part thereof, prior to any sale or sales thereof, wherever enacted and whether now or at any time hereafter in force, which may affect the covenants and terms of performance of this Mortgage. Mortgagor, after any such sale or sales, shall not claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof. Mortgagor hereby expressly waives, to the extent permitted by law, all benefit or advantage of any and all such law or laws. Mortgagor covenants not to hinder, delay or impede the execution of any power herein granted or delegated to Mortgagee, and agrees to suffer and permit the execution of every power and right herein or by law provided to Mortgagee as though no such law or laws had been made or enacted.

## ARTICLE III

### Miscellaneous

3.01. This Mortgage shall be construed in accordance with the laws of the State of Florida. Whenever possible, each provision of this Mortgage shall be interpreted in such manner as to be effective and valid under applicable law. In the event any one or more of the provisions of this Mortgage or in the Loan Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability, at the option of Mortgagee, shall not affect any other provision of this Mortgage, and this Mortgage shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein to the extent of such invalidity, illegality or unenforceability. No provision of this Mortgage or the Loan Agreement shall require or be construed as requiring the payment of, or permit the collection of, interest in excess of the maximum amount permitted by applicable law. Mortgagor shall not be obligated to pay any interest in excess of such maximum amount. Mortgagor acknowledges that it has received a true copy of the Loan Agreement and this Mortgage.

3.02. All notices hereunder shall be in writing and shall be deemed to have been sufficiently given or served for all purposes when presented personally or sent by Federal Express courier or registered or certified mail, return receipt requested, with postage prepaid, to any party hereto at its address above stated. Any party hereto may change the address to which notices are to be mailed by notice given in accordance with this Section 3.02.

3.03. This Mortgage cannot be modified or discharged orally and no agreement shall be effective to modify or discharge this Mortgage in whole or in part unless it is in writing and signed by the party against which enforcement of the modification or discharge is sought.

18

3.04.  All of the terms, covenants and conditions of this Mortgage shall run with the land and shall apply to, bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

**IN WITNESS WHEREOF**, this Mortgage has been duly executed by Mortgagor on the date first above written.

VISION SANTA MARIA MIAMI, INC.

By _____
               President

STATE OF NEW YORK     )
COUNTY OF NEW YORK) SS.:
CITY OF NEW YORK      )

The foregoing instrument was acknowledged before me this 19 day of May, 2011, by Wilmer Jose Ruperti Perdomo, President of Vision Santa Maria Miami, Inc., the corporation described in and which executed the foregoing Mortgage.

_____
Notary Public
My commission expires: Aug. 18, 2011

Personally Known _____  OR Produced Identification ___X___

Type of Identification Produced: Venezuelan Passport # 002405241

**NEIL A QUARTARO**
**Notary Public, State of New York**
**No. 02QU6097471**
**Qualified in New York County**
**Commission Expires August 18, 20 11**

19

# EXHIBIT A

Date   25 October   2010

**WIESBADEN TECHNICAL DREDGING CORP.**
**REGENSBURG SHIPPING S.A.**
as Borrowers

– and –

**THE BANK OR FINANCIAL INSTITUTION LISTED IN SCHEDULE 1**
as Lender

– and –

**KOREA SECURITIES FINANCE CORP.**
as Security Trustee

---

**LOAN AGREEMENT**

---

relating to
a loan facility of up to US$6,000,000 to finance the
tank barge "INMACULADA" and the tug boat "MOROCOTO"

**Watson, Farley & Williams**
**London**

**INDEX**

| Clause | | Page |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | FACILITY | 12 |
| 3 | POSITION OF LENDER | 12 |
| 4 | DRAWDOWN | 12 |
| 5 | INTEREST | 13 |
| 6 | INTEREST PERIODS | 13 |
| 7 | DEFAULT INTEREST | 13 |
| 8 | REPAYMENT AND PREPAYMENT | 13 |
| 9 | CONDITIONS PRECEDENT | 15 |
| 10 | REPRESENTATIONS AND WARRANTIES | 15 |
| 11 | GENERAL UNDERTAKINGS | 17 |
| 12 | CORPORATE UNDERTAKINGS | 21 |
| 13 | INSURANCE | 22 |
| 14 | SHIP COVENANTS | 25 |
| 15 | SECURITY COVER | 29 |
| 16 | PAYMENTS AND CALCULATIONS | 30 |
| 17 | APPLICATION OF RECEIPTS | 31 |
| 18 | APPLICATION OF EARNINGS | 31 |
| 19 | EVENTS OF DEFAULT | 32 |
| 20 | FEES AND EXPENSES | 36 |
| 21 | INDEMNITIES | 37 |
| 22 | NO SET-OFF OR TAX DEDUCTION | 38 |
| 23 | ILLEGALITY, ETC | 39 |
| 24 | INCREASED COSTS | 39 |
| 25 | SET OFF | 40 |
| 26 | THE SECURITY TRUSTEE | 41 |

27    LIMITATIONS ON THE RESPONSIBILITIES OF, AND INDEMNITIES FOR, THE
      SECURITY TRUSTEE                                                          42

28    APPOINTMENT OF A NEW SECURITY TRUSTEE                                     46

29    TRANSFERS AND CHANGES IN LENDING OFFICES                                  47

30    VARIATIONS AND WAIVERS                                                    49

31    NOTICES                                                                   50

32    JOINT AND SEVERAL LIABILITY                                              52

33    SUPPLEMENTAL                                                              52

34    LAW AND JURISDICTION                                                      53

SCHEDULE 1  LENDER                                                             54

SCHEDULE 2  DRAWDOWN NOTICE                                                    55

SCHEDULE 3  CONDITION PRECEDENT DOCUMENTS                                      56

SCHEDULE 4  TRANSFER CERTIFICATE                                              61

SCHEDULE 5   SCHEDULE OF REPAYMENT INSTALMENTS AND INTEREST
             PAYMENTS                                                          65

EXECUTION PAGE                                                                 66

26378423 v12

**THIS LOAN AGREEMENT** is made on 25 October 2010

**BETWEEN:**

(1)  **WIESBADEN TECHNICAL DREDGING CORP.** and **REGENSBURG SHIPPING S.A.** as joint and several **Borrowers**;

(2)  **THE BANK OR FINANCIAL INSTITUTION** listed in Schedule 1, as **Lender**; and

(3)  **KOREA SECURITIES FINANCE CORP.**, as **Security Trustee.**

**BACKGROUND:**

The Lender has agreed to make available to the Borrowers a facility of up to $6,000,000 for the purpose of financing the tank barge "INMACULADA" and the tug boat "MOROCOTO".

**IT IS AGREED** as follows:

**1       INTERPRETATION**

**1.1    Definitions.** Subject to Clause 1.5, in this Agreement:

"**Account Bank**" means Shinhan Bank of GS Tower Corporate Banking Center, 679-Yeoksam-Dong, Gangnam-Gu, Seoul, Korea;

"**Accounts Pledge Agreement**" means, in relation to each of the OTG Account, the Earnings Accounts and the Reserve Accounts, a deed creating security in respect of the OTG Account, the Earnings Accounts and the Reserve Accounts in the Agreed Form;

"**Agreed Form**" means in relation to any document, that document in the form approved in writing by the Security Trustee and the Borrowers or as otherwise approved in accordance with any other approval procedure specified in any relevant provisions of any Finance Document;

"**Approved Manager**" means, in relation to a Ship, Global Shipmanagement C.A. whose registered office is at Avenida Francisco de Miranda, Edificio Parque Cristal, Piso 13, Officina 13-10, Los Palos Grandes, Caracas, Venezuela or any other company which the Lender may approve from time to time as the manager of the Ship;

"**Availability Period**" means the period commencing on the date of this Agreement and ending on:

(a)     the date falling 1 month after the date of this Agreement (or such later date as the Lender may agree with the Borrowers); or

(b)     if earlier, the date on which the total Commitment is fully borrowed, cancelled or terminated;

"**Bareboat Charter**" means in relation to Morocoto, the bareboat charterparty dated 6 October 2010 made between the Borrower which owns Morocoto as owner and the Bareboat Charterer as charterer which provides for, inter alia, the registration of Morocoto in the disponent ownership of the Bareboat Charterer in Venezuela;

"**Bareboat Charterer**" means Suramericana de Transporte Petrolero, C.A., a company incorporated in Venezuela whose registered office is at Avenida Francisco de Miranda, Edificio Parque Cristal, Piso 13, Officina 13-10, Los Palos Grandes, Caracas, Venezuela;

26378423 v12

**"Borrower"** means each of Wiesbaden Technical Dredging Corp. and Regensburg Shipping S.A., each being a company incorporated in the Republic of Panama whose registered office is at World Trade Center, Urbanizacion, Marbella, Calle 53, 5th Floor, Office 502, Panama, Republic of Panama (and includes their respective successors);

**"Business Day"** means a day on which banks are open in London and Seoul and, in respect of a day on which a payment is required to be made under a Finance Document, also in New York City;

**"Collateral Insurances Assignments"** means, in relation to a Collateral Ship, the second priority insurance assignment on the Collateral Ship in the Agreed Form;

**"Collateral Mortgage"** means, in relation to Umay, the second preferred Venezuelan ship mortgage in the Agreed Form and in relation to Mare, the second preferred Panamanian ship mortgage in the Agreed Form;

**"Collateral Owner"** means:

(a)     in relation to Mare, Andes Tug Services Inc., a company incorporated in the Republic of Panama whose registered office is at World Trade Center, 5th Floor, Suite 502, Urbanizacion Marbella, City of Panama; and

(b)     in relation to Umay, Latin American Petroleum International Service de Venezuela S.A., a company incorporated in Venezuela whose registered office is at Avenida Francisco de Miranda, Edificio Parque Cristal, Piso 13, Officina 13-10, Los Palos Grandes, Caracas, Venezuela;

**"Collateral Ships"** means Mare and Umay;

**"Commitment"** means $6,000,000, as that amount may be reduced, cancelled or terminated in accordance with this Agreement;

**"Contractual Currency"** has the meaning given in Clause 21.4;

**"Creditor Party"** means the Security Trustee or the Lender, whether as at the date of this Agreement or at any later time;

**"Dollars"** and **"$"** means the lawful currency for the time being of the United States of America;

**"Drawdown Date"** means the date requested by the Borrowers for the Loan to be made, or (as the context requires) the date on which the Loan is actually made;

**"Drawdown Notice"** means a notice in the form set out in Schedule 2 (or in any other form which the Lender approves or reasonably requires);

**"Earnings"** means, in relation to a Financed Ship, all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Borrower owning that Financed Ship, the Bareboat Charterer, OTG or the Security Trustee and which arise out of the use or operation of that Financed Ship, including (but not limited to):

(a)     except to the extent that they fall within paragraph (b);

      (i)     all freight, hire and passage moneys;

      (ii)     compensation payable to any Borrower or the Security Trustee in the event of requisition of a Financed Ship for hire;

26378423 v12

(iii)    remuneration for salvage and towage services;

(iv)    demurrage and detention moneys;

(v)    damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of a Financed Ship; and

(vi)    all moneys which are at any time payable under any Insurances in respect of loss of hire; and

(b)    if and whenever a Financed Ship is employed on terms whereby any moneys falling within paragraphs (a)(i) to (vi) are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to the Financed Ship;

"**Earnings Account**"  means, in relation to a Financed Ship, an account in the name of the Borrower owning the Financed Ship with the Account Bank in Korea designated "[*name of Borrower*] - Earnings Account";

"**Environmental Claim**" means:

(a)    any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b)    any claim by any other person which relates to an Environmental Incident or to an alleged Environmental Incident,

and "claim" means a claim for damages, compensation, fines, penalties or any other payment of any kind whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**"  means:

(a)    any release of Environmentally Sensitive Material from a Ship; or

(b)    any incident in which Environmentally Sensitive Material is released from a vessel other than a Ship and which involves a collision between a Ship and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Ship and/or any Borrower and/or any Collateral Owner and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)    any other incident in which Environmentally Sensitive Material is released otherwise than from a Ship and in connection with which a Ship is actually or potentially liable to be arrested and/or where any Borrower and/or any Collateral Owner and/or any operator or manager of a Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action;

"**Environmental Law**"  means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

"**Environmentally Sensitive Material**" means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous;

26378423 v12

"**Event of Default**" means any of the events or circumstances described in Clause 19.1;

"**Finance Documents**" means:

(a)     this Agreement;

(b)     the Accounts Pledge Agreements;

(c)     the Guarantee;

(d)     the Tripartite Assignment;

(e)     the Multiparty Assignment;

(f)     the Mortgages;

(g)     the Collateral Mortgages;

(h)     the Collateral Insurances Assignments;

(i)     the Shares Security Deeds; and

(j)     any other document (whether creating a Security Interest or not) which is executed at any time by any Borrower or any other person as security for, or to establish any form of subordination or priorities arrangement in relation to, any amount payable to the Lender under this Agreement or any of the other documents referred to in this definition;

"**Financed Ship**" means each of Inmaculada and Morocoto;

"**Financial Indebtedness**" means, in relation to a person (the "**debtor**"), a liability of the debtor:

(a)     for principal, interest or any other sum payable in respect of any moneys borrowed or raised by the debtor;

(b)     under any loan stock, bond, note or other security issued by the debtor;

(c)     under any acceptance credit, guarantee or letter of credit facility or dematerialised equivalent made available to the debtor;

(d)     under a financial lease, a deferred purchase consideration arrangement or any other agreement having the commercial effect of a borrowing or raising of money by the debtor;

(e)     under any foreign exchange transaction, any interest or currency swap or any other kind of derivative transaction entered into by the debtor or, if the agreement under which any such transaction is entered into requires netting of mutual liabilities, the liability of the debtor for the net amount; or

(f)     under a guarantee, indemnity or similar obligation entered into by the debtor in respect of a liability of another person which would fall within paragraphs (a) to (e) if the references to the debtor referred to the other person;

"**Fixed Rate**" means 12 per cent. per annum;

"**GAAP**" means generally accepted accounting principles in Panama including IFRS;

26378423 v12

"**Guarantee**" means a guarantee from the Guarantor in the Agreed Form;

"**Guarantor**" means Maroil Trading Inc., a company incorporated in the Republic of Panama whose registered office is at World Trade Centre, Marbella 53, 5ᵗʰ Floor, Off. 502, Panama City, Republic of Panama;

"**IFRS**" means international accounting standards within the meaning of the IAS Regulations 1606/2002 to the extent applicable to the relevant financial statements;

"**Inmaculada**" means the double hull tank barge named "INMACULADA", built in 2010 with 30,750 barrels and registered permanently at Microjacket 34188, Document 1777497 in the name of Wiesbaden Technical Dredging Corp. under Panamanian flag;

"**Insurances**" means, in relation to a Financed Ship:

(a)     all policies and contracts of insurance, including entries of the Financed Ship in any protection and indemnity or war risks association, effected in respect of the Financed Ship, its Earnings or otherwise in relation to it whether before, on or after the date of this Agreement; and

(b)     all rights and other assets relating to, or derived from, any of the foregoing, including any rights to a return of a premium and any rights in respect of any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Agreement;

"**Interest Period**" means a period determined in accordance with Clause 6;

"**ISM Code**" means the International Safety Management Code (including the guidelines on its implementation), adopted by the International Maritime Organisation as the same may be amended or supplemented from time to time (and the terms "**safety management system**", "**Safety Management Certificate**" and "**Document of Compliance**" have the same meanings as are given to them in the ISM Code);

"**ISPS Code**" means the International Ship and Port Facility Security Code as adopted by the International Maritime Organisation, as the same may be amended or supplemented from time to time;

"**ISSC**" means a valid and current International Ship Security Certificate issued under the ISPS Code;

"**Lender**" means the bank or financial institution listed in Schedule 1 and acting through its branch indicated in Schedule 1 (or through another branch notified to the Borrowers under Clause 29.10) or its transferee, successor or assign;

"**Loan**" means the principal amount for the time being outstanding under this Agreement;

"**Major Casualty**" means, in relation to a Financed Ship, any casualty to the Financed Ship in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $250,000 or the equivalent in any other currency;

"**Mare**" means the tugboat named "MARE", built in 2000 with 111.63 gross tons and 89.30 net tons and registered permanently at Microjacket 22667, Document 1093827 in the name of Andes Tug Services Inc. under Panamanian flag;

"**Morocoto**" means the tugboat named "MOROCOTO", built in 1999 with 2,100 BHP and registered permanently at Microjacket 29030, Document 937434 in the name of

Regensburg Shipping S.A. under Panamanian flag and bareboat registered in Venezuela with the same name in the name of the Bareboat Charterer;

"**Mortgage**"  means, in relation to a Financed Ship, the first preferred Panamanian ship mortgage on the Financed Ship in the Agreed Form;

"**Multiparty Assignment**" means, in relation to Morocoto, a general assignment by the relevant Borrower of its rights and interests in the Earnings, the Insurances, any Requisition Compensation and the Bareboat Charter, an assignment by the Bareboat Charterer of its rights and interests in the Earnings, the Insurances, any Requisition Compensation and the OTG Time Charter and an assignment by OTG of its rights and interests in the Earnings and the Time Charter;

"**OTG**"  means OTG Shipping Corp., a company incorporated in the Republic of Panama whose registered office is at World Trade Center, 5th Floor, Suite 502, Urbanizacion Marbella, City of Panama;

"**OTG Account**"  means an account in the name of OTG with the Account Bank in Korea designated "OTG Shipping Corp" and having account number 180-005-384918;

"**OTG Time Charters**"  means:

(a)     in relation to Inmaculada, the time charter dated 22 June 2009 made between the Borrower which owns Inmaculada as owner and OTG as charterer; and

(b)     in relation to Morocoto, the time charter dated 22 June 2009 made between the Bareboat Charterer as owner and OTG as charterer;

"**Owner**"  means a Borrower or a Collateral Owner;

"**Payment Currency**"  has the meaning given in Clause 21.4;

"**Permitted Security Interests**"  means:

(a)     Security Interests created by the Finance Documents or with the prior written approval of the Lender;

(b)     terms and rights of set-off securing obligations which are not overdue arising by operation of law in the ordinary and usual course of trading;

(c)     liens for unpaid master's and crew's wages in accordance with usual maritime practice;

(d)     liens for salvage;

(e)     liens arising by operation of law for not more than 2 months' prepaid hire under any charter not prohibited by this Agreement;

(f)     liens for master's disbursements incurred in the ordinary course of trading and any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance, provided such liens do not secure amounts more than 30 days overdue (unless the overdue amount is being contested by the relevant Borrower in good faith by appropriate steps) and subject, in the case of liens for repair or maintenance, to Clause 14.12(g);

(g)     any Security Interest created in favour of a plaintiff or defendant in any proceedings or arbitration as security for costs and expenses while a Borrower is actively prosecuting or defending such proceedings or arbitration in good faith;

26378423 v12

(h)     Security Interests arising by operation of law in respect of taxes which are not overdue for payment or in respect of taxes being contested in good faith by appropriate steps and in respect of which appropriate reserves have been made; and

(i)     first priority mortgages over Mare and Umay in favour of Poliolefinas Internacionales, C.A.;

**"Pertinent Document"** means:

(a)     any Finance Document;

(b)     any policy or contract of insurance contemplated by or referred to in Clause 13 or any other provision of this Agreement or another Finance Document; and

(c)     any document which has been or is at any time sent by, or on behalf of, a Relevant Person to a Creditor Party in connection with any Finance Document or any policy or contract of insurance falling within paragraph (b).

**"Pertinent Jurisdiction"**, in relation to a company, means:

(a)     England and Wales;

(b)     the country under the laws of which the company is incorporated or formed;

(c)     a country in which the company has the centre of its main interests or which the company's central management and control is or has recently been exercised;

(d)     a country in which the overall net income of the company is subject to corporation tax, income tax or any similar tax;

(e)     a country in which assets of the company (other than securities issued by, or loans to, related companies) having a substantial value are situated, in which the company maintains a branch or permanent place of business, or in which a Security Interest created by the company must or should be registered in order to ensure its validity or priority; and

(f)     a country the courts of which have jurisdiction to make a winding up, administration or similar order in relation to the company, whether as a main or territorial or ancillary proceedings, or which would have such jurisdiction if their assistance were requested by the courts of a country referred to in paragraphs (b) or (c);

**"Pertinent Matter"** means any transaction or matter contemplated by, arising out of, or in connection with a Pertinent Document and covers any such transaction, matter or statement, whether entered into, arising or made at any time at or at any time after the signing of this Agreement;

**"Potential Event of Default"** means an event or circumstance which, with the giving of any notice, the lapse of time, a determination of the Lender and/or the satisfaction of any other condition, would constitute an Event of Default;

**"Relevant Person"** has the meaning given in Clause 19.8;

**"Repayment Date"** means a date on which a repayment is required to be made under Clause 8;

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any act or event such as is referred to in paragraph (b) of the definition of "Total Loss";

"**Reserve Account**" means, in relation to each Borrower, an account in the name of the Borrower with the Account Bank in Korea designated "[*name of Borrower*] – Reserve Account";

"**Secured Liabilities**" means all liabilities which the Borrowers, the Security Parties or any of them have, at the date of this Agreement or at any later time or times, under or in connection with any Finance Document or any judgment relating to any Finance Document; and for this purpose, there shall be disregarded any total or partial discharge of these liabilities, or variation of their terms, which is effected by, or in connection with, any bankruptcy, liquidation, arrangement or other procedure under the insolvency laws of any country;

"**Security Interest**" means:

(a)     a mortgage, charge (whether fixed or floating) or pledge, any maritime or other lien or any other security interest of any kind;

(b)     the security rights of a plaintiff under an action in rem; and

(c)     any arrangement entered into by a person (A) the effect of which is to place another person (B) in a position which is similar, in economic terms, to the position in which B would have been had he held a security interest over an asset of A; but this paragraph (c) does not apply to a right of set off or combination of accounts conferred by the standard terms of business of a bank or financial institution;

"**Security Party**" means the Guarantor, the Collateral Owners, the Bareboat Charterer and OTG and any other person (except a Creditor Party) who, as a surety or mortgagor, as a party to any subordination or priorities arrangement, or in any similar capacity, executes a document falling within the last paragraph of the definition of "Finance Documents";

"**Security Period**" means the period commencing on the date of this Agreement and ending on the date on which the Lender notifies the Borrowers and the Security Parties that:

(a)     all amounts which have become due for payment by any Borrower or any Security Party under the Finance Documents have been paid;

(b)     no amount is owing or has accrued (without yet having become due for payment) under any Finance Document;

(c)     neither any Borrower nor any Security Party has any future or contingent liability under Clause 20, 21 or 22 or any other provision of this Agreement or another Finance Document; and

(d)     the Lender acting reasonably does not consider that there is a significant risk that any payment or transaction under a Finance Document would be set aside, or would have to be reversed or adjusted, in any present or possible future bankruptcy of a Borrower or a Security Party or in any present or possible future proceeding relating to a Finance Document or any asset covered (or previously covered) by a Security Interest created by a Finance Document;

"**Security Trustee**"  means Korea Securities Finance Corp., acting in such capacity through its office at 34-9 Yeouidodong, Yeongdeungpo-gu, Seoul, Korea, or any successor of it appointed under Clause 26;

"**Shares Security Deed**"  means, in relation to a Borrower, a deed creating security over the share capital of that Borrower in the Agreed Form;

"**Ships**"  means the Financed Ships and the Collateral Ships;

"**Time Charter**"  means the time charterparty dated 22 June 2009 and made between the Bareboat Charterer as disponent owner and the Time Charterer for a period at least the duration of the Security Period in respect of the Financed Ships;

"**Time Charterer**"  means PDVSA Petroleo S.A., a company incorporated in Venezuela whose registered office is at Edificio Petroleos de Venezuela, La Campina Av. Libertador, Caracas, Venezuela;

"**Total Loss**"  means, in relation to a Ship:

(a)     actual, constructive, compromised, agreed or arranged total loss of the Ship;

(b)     any expropriation, confiscation, requisition or acquisition of the Ship, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding 1 year without any right to an extension) unless it is within 1 month redelivered to the full control of the Borrower owning the Ship; and

(c)     any arrest, capture, seizure or detention of the Ship (including any hijacking or theft) unless it is within 1 month redelivered to the full control of the Borrower owning the Ship;

"**Total Loss Date**"  means, in relation to a Ship:

(a)     in the case of an actual loss of the Ship, the date on which it occurred or, if that is unknown, the date when the Ship was last heard of;

(b)     in the case of a constructive, compromised, agreed or arranged total loss of the Ship, the earliest of:

(i)      the date on which a notice of abandonment is given to the insurers; and

(ii)     the date of any compromise, arrangement or agreement made by or on behalf of the Borrower owning the Ship with the Ship's insurers in which the insurers agree to treat the Ship as a total loss; and

(c)     in the case of any other type of total loss, on the date (or the most likely date) on which it appears to the Lender that the event constituting the total loss occurred;

"**Transfer Certificate**"  has the meaning given in Clause 29.2;

"**Tripartite Assignment**"  means, in relation to Inmaculada, a general assignment by the relevant Borrower of its rights and interests in the Earnings, the Insurances, any Requisition Compensation and the OTG Time Charter in respect of Inmaculada and an assignment by OTG of its rights and interests in the Earnings and the Time Charter in the Agreed Form; and

"**Trust Property**" has the meaning given in Clause 26.1; and

"**Umay**" means a tugboat named "UMAY", built in 2000 with 112 gross tons and 89 net tons and registered in the name of Latin American Petroleum International Service de Venezuela S.A. under Venezuelan flag with licence number ARSH-11444 YYV-3751.

1.2 **Construction of certain terms.** In this Agreement:

"**administration notice**" means a notice appointing an administrator, a notice of intended appointment and any other notice which is required by law (generally or in the case concerned) to be filed with the court or given to a person prior to, or in connection with, the appointment of an administrator;

"**approved**" means, for the purposes of Clause 13, approved in writing by the Lender or the Security Trustee;

"**asset**" includes every kind of property, asset, interest or right, including any present, future or contingent right to any revenues or other payment;

"**company**" includes any partnership, joint venture and unincorporated association;

"**consent**" includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration, notarisation and legalisation;

"**contingent liability**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

"**document**" includes a deed; also a letter or fax;

"**excess risks**" means, in relation to a Financed Ship, the proportion of claims for general average, salvage and salvage charges not recoverable under the hull and machinery policies in respect of the Financed Ship in consequence of its insured value being less than the value at which the Financed Ship is assessed for the purpose of such claims;

"**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable value added or other tax;

"**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any regulation or resolution of the Council of the European Union, the European Commission, the United Nations or its Security Council;

"**legal or administrative action**" means any legal proceeding or arbitration and any administrative or regulatory action or investigation;

"**liability**" includes every kind of debt or liability (present or future, certain or contingent), whether incurred as principal or surety or otherwise;

"**months**" shall be construed in accordance with Clause 1.3;

"**obligatory insurances**" means, in relation to a Financed Ship, all insurances effected, or which the Borrower owning the Financed Ship is obliged to effect, under Clause 13 or any other provision of this Agreement or another Finance Document;

"**parent company**" has the meaning given in Clause 1.4;

"**person**" includes any company; any state, political sub-division of a state and local or municipal authority; and any international organisation;

26378423 v12

"**policy**",  in relation to any insurance, includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

"**protection and indemnity risks**"  means the usual risks covered by a protection and indemnity association managed in London, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Hull Clauses (1/11/02 or 1/11/03), clause 8 of the Institute Time Clauses (Hulls) (1/11/95) or clause 8 of the Institute Time Clauses (Hulls) (1/10/83) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

"**regulation**"  includes any regulation, rule, official directive, request or guideline whether or not having the force of law of any governmental, intergovernmental or supranational body, agency, department or regulatory, self regulatory or other authority or organisation;

"**subsidiary**"  has the meaning given in Clause 1.4;

"**tax**"  includes any present or future tax, duty, impost, levy or charge of any kind which is imposed by any state, any political sub-division of a state or any local or municipal authority (including any such imposed in connection with exchange controls), and any connected penalty, interest or fine; and

"**war risks**"  includes the risk of mines and all risks excluded by clause 29 of the International Hull Clauses (1/11/02 or 1/11/03), clause 24 of the Institute Time Clauses (Hulls)(1/11/95) or clause 23 of the Institute Time Clauses (Hulls) (1/10/83).

1.3     **Meaning of "month".**  A period of one or more "**months**" ends on the day in the relevant calendar month numerically corresponding to the day of the calendar month on which the period started ("**the numerically corresponding day**"), but:

(a)     on the Business Day following the numerically corresponding day if the numerically corresponding day is not a Business Day or, if there is no later Business Day in the same calendar month, on the Business Day preceding the numerically corresponding day; or

(b)     on the last Business Day in the relevant calendar month, if the period started on the last Business Day in a calendar month or if the last calendar month of the period has no numerically corresponding day,

and "**month**" and "**monthly**" shall be construed accordingly.

1.4     **Meaning of "subsidiary".**  A company (S) is a subsidiary of another company (P) if:

(a)     a majority of the issued shares in S (or a majority of the issued shares in S which carry unlimited rights to capital and income distributions) are directly owned by P or are indirectly attributable to P; or

(b)     P has direct or indirect control over a majority of the voting rights attaching to the issued shares of S; or

(c)     P has the direct or indirect power to appoint or remove a majority of the directors of S; or

(d)     P otherwise has the direct or indirect power to ensure that the affairs of S are conducted in accordance with the wishes of P,

and any company of which S is a subsidiary is a parent company of S.

1.5     **General Interpretation.**  In this Agreement:

(a)     references to, or to a provision of, a Finance Document or any other document are references to it as amended or supplemented, whether before the date of this Agreement or otherwise;

(b)     references to, or to a provision of, any law include any amendment, extension, re-enactment or replacement, whether made before the date of this Agreement or otherwise;

(c)     words denoting the singular number shall include the plural and vice versa; and

(d)     Clauses 1.1 to 1.5 apply unless the contrary intention appears.

1.6     **Headings.** In interpreting a Finance Document or any provision of a Finance Document, all clause, sub-clause and other headings in that and any other Finance Document shall be entirely disregarded.

**2       FACILITY**

2.1     **Amount of facility.** Subject to the other provisions of this Agreement, the Lender shall make available to the Borrowers a loan facility not exceeding the lower of (a) $6,000,000 and (b) 50 per cent. of the aggregate of the market values (determined as provided in Clause 15.3) of the Financed Ships.

2.2     **Purpose of Loan.** The Borrowers undertake with the Lender to use the Loan only for the purpose stated in the preamble to this Agreement.

**3       POSITION OF LENDER**

3.1     **Individual Lender's right of action.** The Lender shall be entitled to sue for any amount which has become due and payable by the Borrowers to it under this Agreement without joining the Security Trustee as an additional party in the proceedings.

**4       DRAWDOWN**

4.1     **Request for Loan.** Subject to the following conditions, the Borrowers may request the Loan to be made by ensuring that the Lender receives a completed Drawdown Notice not later than 11.00 a.m. (Korean time) 5 Business Days prior to the intended Drawdown Date.

4.2     **Availability.** The conditions referred to in Clause 4.1 are that:

(a)     a Drawdown Date has to be a Business Day during the Availability Period; and

(b)     the amount of the Loan shall not exceed the Commitment.

4.3     **Drawdown Notice irrevocable.** A Drawdown Notice must be signed by an officer or authorised signatory of a Borrower; and once served, a Drawdown Notice cannot be revoked without the prior consent of the Lender.

4.4     **Disbursement of Loan.** Subject to the provisions of this Agreement, the Lender shall on the Drawdown Date advance the Loan to the Borrowers and that payment to the Borrowers shall be made to the account which the Borrowers specify in the Drawdown Notice.

4.5     **Disbursement of Loan to third party.** The payment by the Lender under Clause 4.4 shall constitute the making of the Loan and the Borrowers shall at that time become indebted, as principal and direct obligors, to the Lender in an amount equal to the Loan.



**5        INTEREST**

5.1      **Payment of normal interest.** Interest in respect of each Interest Period shall be paid by the Borrowers on the last day of that Interest Period and shall be paid together with each monthly repayment instalment as set out in Clause 8.1. The aggregate amount of interest and the repayment instalment payable each month shall be $282,441.

5.2      **Normal rate of interest.** Subject to the provisions of this Agreement, the rate of interest on the Loan in respect of an Interest Period shall be the Fixed Rate for that Interest Period.

**6        INTEREST PERIODS**

6.1      **Commencement of Interest Periods.** The first Interest Period applicable to the Loan shall commence on the Drawdown Date and each subsequent Interest Period shall commence on the expiry of the preceding Interest Period.

6.2      **Duration of normal Interest Periods.** Each Interest Period shall be 1 month.

**7        DEFAULT INTEREST**

7.1      **Payment of default interest on overdue amounts.** The Borrowers shall pay interest in accordance with the following provisions of this Clause 7 on any amount payable by the Borrowers under any Finance Document which the Lender or the other designated payee does not receive on or before the relevant date, that is:

(a)      the date on which the Finance Documents provide that such amount is due for payment; or

(b)      if a Finance Document provides that such amount is payable on demand, the date on which the demand is served; or

(c)      if such amount has become immediately due and payable under Clause 19.4, the date on which it became immediately due and payable.

7.2      **Default rate of interest.** Interest shall accrue on an overdue amount from (and including) the relevant date until the date of actual payment (as well after as before judgment) at the rate per annum determined by the Lender to be 2 per cent. above the Fixed Rate.

7.3      **Payment of accrued default interest.** Subject to the other provisions of this Agreement, any interest due under this Clause shall be paid on the last day of the period by reference to which it was determined.

7.4      **Compounding of default interest.** Any such interest which is not paid at the end of the period by reference to which it was determined shall thereupon be compounded.

**8        REPAYMENT AND PREPAYMENT**

8.1      **Amount of repayment instalments.** The Borrowers shall repay the Loan by 24 equal consecutive monthly instalments each of amounts as set out in Schedule 5. On each Repayment Date the Borrowers shall also pay interest each month in the amounts set out in Schedule 5, such repayment instalments and interest payments to be made together. The aggregate amount of interest and repayment instalment payable each month shall be $282,441.

8.2 **Repayment Dates.** The first instalment shall be repaid on the date falling 1 month after the Drawdown Date and the last instalment on the date falling 24 months after the Drawdown Date.

8.3 **Final Repayment Date.** On the final Repayment Date, the Borrowers shall additionally pay to the Lender all other sums then accrued or owing under any Finance Document.

8.4 **Voluntary prepayment.** Subject to the following conditions, the Borrowers may prepay the whole or any part of the Loan on the last day of an Interest Period.

8.5 **Conditions for voluntary prepayment.** The conditions referred to in Clause 8.4 are that:

(a) a partial or total prepayment shall be made no earlier than a date falling 6 months after the Drawdown Date;

(b) the Lender has received from the Borrowers at least 45 days' prior written notice specifying the amount to be prepaid and the date on which the prepayment is to be made; and

(c) the Borrowers have provided evidence satisfactory to the Lender that any consent required by any Borrower or any Security Party in connection with the prepayment has been obtained and remains in force, and that any official regulation relevant to this Agreement which affects any Borrower or any Security Party has been complied with.

8.6 **Effect of notice of prepayment.** A prepayment notice may not be withdrawn or amended without the consent of the Lender and the amount specified in the prepayment notice shall become due and payable by the Borrowers on the date for prepayment specified in the prepayment notice.

8.7 **Mandatory prepayment.** The Borrowers shall be obliged to prepay the relevant proportion of the Loan if a Financed Ship is sold or becomes a Total Loss:

(a) in the case of a sale, on or before the date on which the sale is completed by delivery of the Financed Ship to the buyer; or

(b) in the case of a Total Loss, on the earlier of the date falling 180 days after the Total Loss Date and the date of receipt by the Security Trustee of the proceeds of insurance relating to such Total Loss;

and in this Clause 8.7, **"relevant proportion"** means the greater of:

(i) in the case of Inmaculada two-thirds and in the case of Morocoto one-third if that Financed Ship is the first to be sold and/or to become a Total Loss; or

(ii) 100 per cent., if the Financed Ship is the second to be sold and/or to become a Total Loss.

8.8 **Amounts payable on prepayment.** A prepayment shall be made together with accrued interest (and any other amount payable under Clause 21 or otherwise) in respect of the amount prepaid and, if the prepayment is not made on the last day of an Interest Period together with any sums payable under Clause 21.1(b) but without premium or penalty.

8.9 **Application of partial prepayment.** Each partial prepayment shall be applied against the repayment instalments specified in Clause 8.1 in inverse order of maturity.

8.10 **No reborrowing.** No amount prepaid may be reborrowed.

26378423 v12

**9      CONDITIONS PRECEDENT**

**9.1    Documents, fees and no default.** The Lender's obligation to advance the Loan is subject to the following conditions precedent:

(a)     that, on or before the service of the Drawdown Notice, the Lender receives the documents described in Part A of Schedule 3 in form and substance satisfactory to it and its lawyers;

(b)     that, on the Drawdown Date but prior to the making of the Loan, the Lender receives or is satisfied that it will receive on the making of the Loan the documents described in Part B of Schedule 3 in form and substance satisfactory to it and its lawyers;

(c)     that both at the date of the Drawdown Notice and at the Drawdown Date:

     (i)     no Event of Default or Potential Event of Default has occurred or would result from the borrowing of the Loan; and

     (ii)    the representations and warranties in Clause 10.1 and those of any Borrower or any Security Party which are set out in the other Finance Documents would be true and not misleading if repeated on each of those dates with reference to the circumstances then existing; and

(d)     that, if the ratio set out in Clause 15.1 were applied immediately following the making of the Loan, the Borrowers would not be obliged to provide additional security or prepay part of the Loan under that Clause.

**9.2    Waiver of conditions precedent.** If the Lender at its discretion, permits the Loan to be borrowed before certain of the conditions referred to in Clause 9.1 are satisfied, the Borrowers shall ensure that those conditions are satisfied within 5 Business Days after the Drawdown Date (or such longer period as the Lender may specify).

**10     REPRESENTATIONS AND WARRANTIES**

**10.1   General.** Each Borrower represents and warrants to each Creditor Party as follows.

**10.2   Status.** Each Borrower is duly incorporated and validly existing and in good standing under the laws of the Republic of Panama.

**10.3   Share capital and ownership.** Each Borrower has an authorised share capital of $10,000 divided into 100 registered shares of $100 each, all of which shares have been issued fully paid, and the legal title and beneficial ownership of all those shares is held, free of any Security Interest or other claim, by the Guarantor.

**10.4   Corporate power.** Each Borrower has the corporate capacity, and has taken all corporate action and obtained all consents necessary for it:

(a)     to execute the Bareboat Charter or the OTG Time Charter to which it is a party;

(b)     to execute the Finance Documents to which that Borrower is a party; and

(c)     to borrow under this Agreement and to make all the payments contemplated by, and to comply with, those Finance Documents.

**10.5   Consents in force.** All the consents referred to in Clause 10.4 remain in force and nothing has occurred which makes any of them liable to revocation.

26378423 v12

10.6   **Legal validity; effective Security Interests.** The Finance Documents to which each Borrower is a party, do now or, as the case may be, will, upon execution and delivery (and, where applicable, registration as provided for in the Finance Documents):

(a)   constitute that Borrower's legal, valid and binding obligations enforceable against that Borrower in accordance with their respective terms; and

(b)   create legal, valid and binding Security Interests enforceable in accordance with their respective terms over all the assets to which they, by their terms, relate,

subject to any relevant insolvency laws affecting creditors' rights generally.

10.7   **No third party Security Interests.** Without limiting the generality of Clause 10.6, at the time of the execution and delivery of each Finance Document:

(a)   each Borrower which is a party to that Finance Document will have the right to create all the Security Interests which that Finance Document purports to create; and

(b)   no third party will have any Security Interest (except for Permitted Security Interests) or any other interest, right or claim over, in or in relation to any asset to which any such Security Interest, by its terms, relates.

10.8   **No conflicts.** The execution by each Borrower of the Bareboat Charter and each Finance Document to which it is a party, and the borrowing by that Borrower of the Loan, and its compliance with each Finance Document to which it is a party will not involve or lead to a contravention of:

(a)   any law or regulation; or

(b)   the constitutional documents of that Borrower; or

(c)   any contractual or other obligation or restriction which is binding on that Borrower or any of its assets.

10.9   **No withholding taxes.** All payments which each Borrower is liable to make under the Finance Documents to which it is a party may be made without deduction or withholding for or on account of any tax payable under any law of any Pertinent Jurisdiction.

10.10  **No default.** No Event of Default or Potential Event of Default has occurred.

10.11  **Information.** All information which has been provided in writing by or on behalf of the Borrowers or any Security Party to any Creditor Party in connection with any Finance Document satisfied the requirements of Clause 11.5; all audited and unaudited accounts which have been so provided satisfied the requirements of Clause 11.7; and there has been no material adverse change in the financial position or state of affairs of any Borrower from that disclosed in the latest of those accounts.

10.12  **No litigation.** No legal or administrative action involving any Borrower (including action relating to any alleged or actual breach of the ISM Code or the ISPS Code) has been commenced or taken or, to any Borrower's knowledge, is likely to be commenced or taken.

10.13  **Validity and completeness of Bareboat Charter, the OTG Time Charters and the Time Charter.** The Bareboat Charter, the OTG Time Charters and the Time Charter constitute valid, binding and enforceable obligations of the Time Charterer, the Bareboat Charterer, OTG and/or the Borrowers respectively in accordance with their terms; and:

26378423 v12



(a)     the copies of the Bareboat Charter, the OTG Time Charters and the Time Charter delivered to the Lender before the date of this Agreement are true and complete copies; and

(b)     no amendments or additions to the Bareboat Charter, either OTG Time Charter or the Time Charter have been agreed nor has either Borrower, the Bareboat Charterer, OTG or the Time Charterer waived any of their respective rights under those documents.

10.14   **Compliance with certain undertakings.** At the date of this Agreement, the Borrowers are in compliance with Clauses 11.2, 11.4, 11.9 and 11.13.

10.15   **Taxes paid.** Each Borrower and each Collateral Owner has paid all taxes applicable to, or imposed on or in relation to that Borrower or that Collateral Owner, its business or the Ship owned by it.

10.16   **ISM Code and ISPS Code compliance.** All requirements of the ISM Code and the ISPS Code as they relate to the Borrowers, the Collateral Owners, the Approved Manager and the Ships have been complied with.

10.17   **No money laundering.** Without prejudice to the generality of Clause 2.2, in relation to the borrowing by the Borrowers of the Loan, the performance and discharge of their obligations and liabilities under the Finance Documents, and the transactions and other arrangements affected or contemplated by the Finance Documents to which a Borrower is a party, the Borrowers confirm (i) that they are acting for their own account; (ii) that they will use the proceeds of the Loan for their own benefit, under their full responsibility and exclusively for the purposes specified in this Agreement; and (iii) that the foregoing will not involve or lead to a contravention of any law, official requirement or other regulatory measure or procedure implemented to combat "money laundering" (as defined in Article 1 of Directive 2005/60/EC of the European Parliament and of the Council).

## 11      GENERAL UNDERTAKINGS

11.1    **General.** Each Borrower undertakes with each Creditor Party to comply with the following provisions of this Clause 11 at all times during the Security Period except as the Lender may otherwise permit.

11.2    **Title; negative pledge.** Each Borrower will (or shall procure that each Collateral Owner will):

(a)     hold the legal title to, and own the entire beneficial interest in the Ship owned by it, and in the case of the Financed Ships in her Insurances and Earnings, free from all Security Interests and other interests and rights of every kind, except for those created by the Finance Documents and the effect of assignments contained in the Finance Documents and except for Permitted Security Interests; and

(b)     not create or permit to arise any Security Interest (except for Permitted Security Interests) over any other asset, present or future;

11.3    **No disposal of assets.** No Borrower will transfer, lease or otherwise dispose of:

(a)     all or a substantial part of its assets, whether by one transaction or a number of transactions, whether related or not; or

(b)     any debt payable to it or any other right (present, future or contingent right) to receive a payment, including any right to damages or compensation,

but paragraph (a) does not apply to any charter of a Financed Ship as to which Clause 14.12 applies.

26378423 v12

**11.4    No other liabilities or obligations to be incurred.**  No Borrower will incur any liability or obligation except liabilities and obligations under the Bareboat Charter and the Finance Documents to which it is a party and liabilities or obligations reasonably incurred in the ordinary course of operating and chartering the Ship owned by it.

**11.5    Information provided to be accurate.**  All financial and other information which is provided in writing by or on behalf of a Borrower under or in connection with any Finance Document will be true in all material respects and not misleading and will not omit any material fact or consideration.

**11.6    Provision of financial statements.**  Each Borrower will send to the Lender or procure that the Guarantor sends to the Lender:

(a)      as soon as possible, but in no event later than 120 days after the end of each financial year of the Guarantor, the audited consolidated accounts of the Guarantor and its subsidiaries;

(b)      as soon as possible, but in no event later than 90 days after the end of each 6 months in each financial year of the Guarantor unaudited consolidated accounts of the Guarantor and its subsidiaries which are certified as to their correctness by the chief financial officer of the Guarantor;

(c)      in respect of each Borrower, as soon as possible, but in no event later than 1 month after the end of each quarter in each financial year, management accounts in a format approved by the Lender which show the results of the operation of the Ship owned by it during the preceding financial quarter and which are certified as to their correctness by the chief financial officer of the Guarantor.

**11.7    Form of financial statements.**  All accounts (audited and unaudited) delivered under Clause 11.6 will:

(a)      be prepared in accordance with all applicable laws and GAAP consistently applied; and

(b)      give a true and fair view of the state of affairs and the financial condition of the Guarantor and its subsidiaries at the date of those accounts and of their profit for the period to which those accounts relate and fully disclose or provide for all significant liabilities of the Guarantor and its subsidiaries.

**11.8    Shareholder and creditor notices.**  Each Borrower will send the Lender, at the same time as they are despatched, copies of all communications which are despatched to that Borrower's shareholders or creditors or any class of them.

**11.9    Consents.**  Each Borrower will maintain and shall procure that each Collateral Owner maintains in force and promptly obtain or renew, and will promptly send certified copies to the Lender of, all consents required:

(a)      for that Borrower or that Collateral Owner to perform its obligations under any Finance Document to which it is a party;

(b)      for the validity or enforceability of any Finance Document to which it is a party;

(c)      for that Borrower or that Collateral Owner to continue to own and operate the Ship owned by it,

and that Borrower and that Collateral Owner will comply with the terms of all such consents.

**11.10   Maintenance of Security Interests.**  Each Borrower will:

26378423 v12

(a)     at its own cost, do all that it reasonably can to ensure that any Finance Document validly creates the obligations and the Security Interests which it purports to create; and

(b)     without limiting the generality of paragraph (a), at its own cost, promptly register, file, record or enrol any Finance Document with any court or authority in all Pertinent Jurisdictions, pay any stamp, registration or similar tax in all Pertinent Jurisdictions relating to a Relevant Person in respect of any Finance Document, give any notice or take any other step which may be or has become necessary or desirable for any Finance Document to be valid, enforceable or admissible in evidence or to ensure or protect the priority of any Security Interest which it creates.

11.11   **Notification of litigation.**  Each Borrower will, to the extent it is permitted to by any applicable law or regulation, provide the Lender with details of any legal or administrative action involving that Borrower, any Security Party, the Approved Manager or any Ship, the Earnings or the Insurances in respect of a Financed Ship as soon as such action is instituted or it becomes apparent to that Borrower that it is likely to be instituted, unless it is clear in the reasonable opinion of that Borrower that the legal or administrative action cannot be considered material in the context of any Finance Document.

11.12   **No amendment to Bareboat Charter.**  No Borrower will agree to any amendment or supplement to, or waive or fail to enforce, the Bareboat Charter to which it is a party or any of its provisions other than with the approval of the Lender such approval not be unreasonably withheld.

11.13   **Principal place of business.**  Each Borrower will maintain its place of business, and keep its corporate documents and records, at the address stated at the commencement of this Agreement; and no Borrower will establish, or do anything as a result of which it would be deemed to have, a place of business in any country other than the Republic of Panama.

11.14   **Confirmation of no default.**  Each Borrower will, within 2 Business Days after service by the Lender of a written request, serve on the Lender a notice which is signed by 2 directors of that Borrower and which:

(a)     states that no Event of Default or Potential Event of Default has occurred; or

(b)     states that no Event of Default or Potential Event of Default has occurred, except for a specified event or matter, of which all material details that the Borrower is aware of are given.

11.15   **Notification of default.**  Each Borrower will notify the Lender as soon as that Borrower becomes aware of the occurrence of an Event of Default or a Potential Event of Default and will keep the Lender fully up to date with all developments.

11.16   **Provision of further information.**  Each Borrower will, as soon as practicable after receiving the request, provide the Lender with any additional financial or other information relating:

(a)     to that Borrower, any Ship, the Earnings or the Insurances of a Financed Ship; or

(b)     to any other matter relevant to, or to any provision of, a Finance Document,

        which may be reasonably requested by the Security Trustee or the Lender at any time.

11.17   **Collateral Mortgages and Collateral Insurances Assignments.**  The Borrowers shall procure that the Collateral Owners shall deliver to the Lender, within 4 months from the Drawdown Date, the Collateral Mortgages and the Collateral Insurances Assignments, a

favourable opinion from an independent insurance consultant acceptable to the Lender on such matters relating to the insurances for the Collateral Ships as the Lender may require and legal opinions relevant to the Collateral Mortgages and the Collateral Insurances Assignments and their execution and registration (where relevant) together with evidence that:

(i)    each Collateral Ship is definitively and permanently registered in the name of the relevant Collateral Owner under the Venezuelan flag or Panamanian flag as the case may be;

(ii)    each Collateral Ship is in the absolute, total and unencumbered ownership of the relevant Collateral Owner save as contemplated by the Finance Documents;

(iii)    each Collateral Ship maintains the highest class for vessels of a similar age and type as the Collateral Ship with American Bureau of Shipping free of all overdue recommendations and conditions of such Classification Society;

(iv)    the Collateral Mortgage relating to each Collateral Ship has been duly registered against that Collateral Ship as a valid second preferred Venezuelan or Panamanian flag (as the case may be) ship mortgage in accordance with the laws of Venezuela or Panama (as the case may be); and

(v)    each Collateral Ship is insured in accordance with the provisions of this Agreement and all requirements therein in respect of insurances have been complied with.

**11.18   Registration of Inmaculada in Venezuela.**   The Lender agrees that the Owner of Inmaculada may bareboat register Inmaculada in Venezuela in the name of the Bareboat Charterer or such other entity as the Lender may in its absolute discretion approve provided that the Lender has received the documents or evidence described in Part C of Schedule 3 in form and substance satisfactory to it and its lawyers.

**11.19   Flag waiver for Inmaculada.**   If the Inmaculada has not been bareboat registered on Venezuelan flag in accordance with Clause 11.18 by 23 March 2011, the Borrowers undertake to provide evidence to the Lender on 23 March 2011 (or before to the extent such evidence is available before that date) that the authorisation for coastal navigation issued by the National Institute of the Aquatic Spaces has been extended or renewed.

**11.20   Extension of Time Charter and OTG Time Charters.**   The Borrowers shall procure that they deliver to the Lender within 2 months from the date of this Agreement evidence that the Time Charter and the OTG Time Charters have been extended so that they expire no earlier than the date falling 24 months after the Drawdown Date.

**11.21   "Know your customer" checks.**   If:

(a)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(b)    any change in the status of the Borrowers or any Security Party after the date of this Agreement; or

(c)    a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Lender (or, in the case of paragraph (c), any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances



where the necessary information is not already available to it, the Borrowers shall promptly upon the request of the Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Lender (for itself or, in the case of the event described in paragraph (c), on behalf of any prospective new Lender) in order for the Lender or, in the case of the event described in paragraph (c), any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 12   CORPORATE UNDERTAKINGS

12.1   **General.** Each Borrower also undertakes with each Creditor Party to comply with the following provisions of this Clause 12 at all times during the Security Period except as the Lender may otherwise permit and in the case of Clauses 12.3(e) and (f) such permission not to be unreasonably withheld.

12.2   **Maintenance of status.** Each Borrower will maintain its separate corporate existence and remain in good standing under the laws of the Republic of Panama.

12.3   **Negative undertakings.** No Borrower will:

(a)   carry on any business other than the ownership, chartering and operation of the Ship owned by it; or

(b)   effect any form of redemption, purchase or return of share capital; or

(c)   provide any form of credit or financial assistance to:

    (i)   a person who is directly or indirectly interested in that Borrower's share or loan capital; or

    (ii)   any company in or with which such a person is directly or indirectly interested or connected,

or enter into any transaction with or involving such a person or company on terms which are, in any respect, less favourable to that Borrower than those which it could obtain in a bargain made at arms' length; or

(d)   open or maintain any account with any bank or financial institution except its Earnings Accounts and Reserve Accounts; or

(e)   issue, allot or grant any person a right to any shares in its capital or repurchase or reduce its issued share capital; or

(f)   acquire any shares or other securities other than US or UK Treasury bills and certificates of deposit issued by major North American or European banks, or enter into any transaction in a derivative; or

(g)   enter into any form of amalgamation, merger or de-merger or any form of reconstruction or reorganisation.

12.4   **Dividends.** Provided the Borrowers have met all their repayment obligations under this Agreement and the provisions of Clause 18 are met and provided no Event of Default or Potential Event of Default has occurred or would occur from such action the Borrowers may pay dividends or make other forms of distribution.

26378423 v12

13      **INSURANCE**

13.1    **General.** Each Borrower also undertakes with each Creditor Party to comply with the following provisions of this Clause 13 at all times during the Security Period except as the Lender may otherwise permit.

13.2    **Maintenance of obligatory insurances.** Each Borrower shall keep the Ship owned by it insured at the expense of that Borrower against:

(a)     fire and usual marine risks (including hull and machinery, excess risks, increased value and marine disbursements);

(b)     war risks (including terrorist acts including blocking and trapping, confiscation and expropriation);

(c)     protection and indemnity risks (including freight, demurrage and defence cover); and

(d)     risk of loss of Earnings; and

(e)     any other risks against which the Lender considers, having regard to practices and other circumstances prevailing at the relevant time, it would in the opinion of the Lender be reasonable for that Borrower to insure and which are specified by the Lender by notice to that Borrower.

13.3    **Terms of obligatory insurances.** Each Borrower shall effect such insurances:

(a)     in Dollars;

(b)     in the case of fire and usual marine risks and war risks, in an amount on an agreed value basis being, in the case of the Ship owned by it, at least the greater of (i) an amount which when aggregated with the insured value for the other Financed Ship is not less than 120 per cent. of the Loan and (ii) the market value of the Ship owned by it;

(c)     in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market;

(d)     in relation to protection and indemnity risks in respect of the full tonnage of the Ship owned by it;

(e)     in the case of risk of loss of Earnings insurance, such insurance to be placed by Wiesbaden Technical Dredging Corp. in respect of both Ships, with no more than 21 days waiting and in an amount of at least $10,000 per day to cover a period of at least 90 days of off-hire;

(f)     on approved terms; and

(g)     through approved brokers and with approved insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations.

13.4    **Further protections for the Creditor Parties.** In addition to the terms set out in Clause 13.3, each Borrower shall procure that the obligatory insurances effected by it shall:

(a)     whenever the Security Trustee requires, name (or be amended to name) the Security Trustee as additional named assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Security Trustee, but

26378423 v12

without the Security Trustee thereby being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(b) name the Security Trustee as loss payee with such directions for payment as the Security Trustee may specify;

(c) provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Trustee shall be made without set off, counterclaim or deductions or condition whatsoever;

(d) provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Trustee or any other Creditor Party; and

(e) provide that the Security Trustee may make proof of loss if that Borrower fails to do so.

**13.5    Renewal of obligatory insurances.** Each Borrower shall:

(a) at least 21 days before the expiry of any obligatory insurance effected by it:

   (i) notify the Security Trustee of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom that Borrower proposes to renew that obligatory insurance and of the proposed terms of renewal; and

   (ii) obtain the Security Trustee's approval to the matters referred to in paragraph (i);

(b) at least 14 days before the expiry of any obligatory insurance effected by it, renew that obligatory insurance in accordance with the Security Trustee's approval pursuant to paragraph (a); and

(c) procure that the approved brokers and/or the war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Security Trustee in writing of the terms and conditions of the renewal.

**13.6    Copies of policies; letters of undertaking.** Each Borrower shall ensure that all approved brokers provide the Security Trustee with pro forma copies of all policies relating to the obligatory insurances which they are to effect or renew and of a letter or letters or undertaking in a form required by the Security Trustee and including undertakings by the approved brokers that:

(a) they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment complying with the provisions of Clause 13.4;

(b) they will hold such policies, and the benefit of such insurances, to the order of the Security Trustee in accordance with the said loss payable clause;

(c) they will advise the Security Trustee immediately of any material change to the terms of the obligatory insurances;

(d) they will notify the Security Trustee, not less than 14 days before the expiry of the obligatory insurances, in the event of their not having received notice of renewal instructions from that Borrower or its agents and, in the event of their receiving instructions to renew, they will promptly notify the Security Trustee of the terms of the instructions; and

(e) they will not set off against any sum recoverable in respect of a claim relating to the Ship owned by that Borrower under such obligatory insurances any premiums or other



amounts due to them or any other person whether in respect of that Ship or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts, and they will not cancel such obligatory insurances by reason of non payment of such premiums or other amounts, and will arrange for a separate policy to be issued in respect of that Ship forthwith upon being so requested by the Security Trustee.

13.7 **Copies of certificates of entry.** Each Borrower shall ensure that any protection and indemnity and/or war risks associations in which the Ship owned by it is entered provides the Security Trustee with:

(a) a certified copy of the certificate of entry for that Ship;

(b) a letter or letters of undertaking in such form as may be required by the Security Trustee; and

(c) a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to that Ship.

13.8 **Deposit of original policies.** Each Borrower shall ensure that all policies relating to obligatory insurances effected by it are deposited with the approved brokers through which the insurances are effected or renewed.

13.9 **Payment of premiums.** Each Borrower shall punctually pay all premiums or other sums payable in respect of the obligatory insurances effected by it and produce all relevant receipts when so required by the Security Trustee.

13.10 **Guarantees.** Each Borrower shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

13.11 **Compliance with terms of insurances.** No Borrower shall do nor omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part; and, in particular:

(a) each Borrower shall take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in Clause 13.6(c)) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Security Trustee has not given its prior approval;

(b) no Borrower shall make any changes relating to the classification or classification society or manager or operator of the Ship owned by it approved by the underwriters of the obligatory insurances;

(c) each Borrower shall make (and promptly supply copies to the Lender of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Ship owned by it is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

(d) no Borrower shall employ the Ship owned by it, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

26378423 v12

**13.12    Alteration to terms of insurances.**  No Borrower shall either make or agree to any alteration to the terms of any obligatory insurance nor waive any right relating to any obligatory insurance.

**13.13    Settlement of claims.**  No Borrower shall settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a Major Casualty, and shall do all things necessary and provide all documents, evidence and information to enable the Security Trustee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

**13.14    Provision of copies of communications.**  Each Borrower shall provide the Security Trustee, at the time of each such communication, copies of all written communications between that Borrower and:

(a)    the approved brokers;

(b)    the approved protection and indemnity and/or war risks associations; and

(c)    the approved insurance companies and/or underwriters, which relate directly or indirectly to:

      (i)    that Borrower's obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

      (ii)    any credit arrangements made between that Borrower and any of the persons referred to in paragraphs (a) or (b) relating wholly or partly to the effecting or maintenance of the obligatory insurances.

**13.15    Provision of information.**  In addition, each Borrower shall promptly provide the Security Trustee (or any persons which it may designate) with any information which the Security Trustee (or any such designated person) requests for the purpose of:

(a)    obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(b)    effecting, maintaining or renewing any such insurances as are referred to in Clause 13.16 or dealing with or considering any matters relating to any such insurances,

and the Borrowers shall, forthwith upon demand, indemnify the Security Trustee in respect of all fees and other expenses incurred by or for the account of the Security Trustee in connection with any such report as is referred to in paragraph (a).

**13.16    Mortgagee's interest insurance.**  The Security Trustee shall be entitled from time to time to effect, maintain and renew a mortgagee's interest marine insurance in such amounts, on such terms, through such insurers and generally in such manner as the Security Trustee may from time to time consider appropriate and the Borrowers shall upon demand fully indemnify the Security Trustee in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any such insurance or dealing with, or considering, any matter arising out of any such insurance.

**14    SHIP COVENANTS**

**14.1    General.**  Each Borrower also undertakes with each Creditor Party to comply with and to procure that each Collateral Owner complies with the following provisions of this Clause 14 at all times during the Security Period except as the Lender may otherwise permit.



14.2    **Ship's name and registration.** Each Owner shall keep the Ship owned by it registered in its name as a Panamanian ship or a Venezuelan ship as the case may be; shall not do, omit to do or allow to be done anything as a result of which such registration might be cancelled or imperilled; and shall not change the name or port of registry of the Ship owned by it **Provided that** the Bareboat Charterer may register the Morocoto in its disponent ownership in the Venezuelan bareboat registry.

14.3    **Repair and classification.** Each Owner shall keep the Ship owned by it in a good and safe condition and state of repair:

(a)     consistent with first class ship ownership and management practice;

(b)     so as to maintain the highest classification for vessels of the same age and type as the Ship with American Bureau of Shipping, free of overdue recommendations and conditions affecting that Ship's class; and

(c)     so as to comply with all laws and regulations applicable to vessels registered at ports in Panama and Venezuela or to vessels trading to any jurisdiction to which that Ship may trade from time to time, including but not limited to the ISM Code and the ISPS Code.

14.4    **Modification.** No Owner shall make any modification or repairs to, or replacement of, any Ship or equipment installed on it which would or might materially alter the structure, type or performance characteristics of that Ship or materially reduce its value.

14.5    **Removal of parts.** No Owner shall remove any material part of any Ship, or any item of equipment installed on, any Ship unless the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any Security Interest or any right in favour of any person other than the Security Trustee and becomes on installation on the relevant Ship the property of the relevant Owner and subject to the security constituted by the relevant Mortgage or Collateral Mortgage **Provided that** an Owner may install equipment owned by a third party if the equipment can be removed without any risk of damage to the Ship owned by it.

14.6    **Surveys.** Each Owner shall submit the Ship owned by it regularly to all periodical or other surveys which may be required for classification purposes and, if so required by the Security Trustee provide the Security Trustee, with copies of all survey reports.

14.7    **Inspection.** Each Borrower shall permit the Security Trustee (by surveyors or other persons appointed by it for that purpose) to board the Ship owned by it at all reasonable times to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections **Provided that** in the absence of an Event of Default or Potential Event of Default the Borrowers shall not be required to pay for more than one such inspection of each Ship in any 12 month period.

14.8    **Prevention of and release from arrest.** Each Owner shall promptly discharge:

(a)     all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against the Ship owned by it, the Earnings or the Insurances in respect of the Financed Ships;

(b)     all taxes, dues and other amounts charged in respect of the Ship owned by it, the Earnings or the Insurances in respect of the Financed Ships; and

(c)     all other outgoings whatsoever in respect of the Ship owned by it, the Earnings or the Insurances in respect of the Financed Ships,

and, forthwith upon receiving notice of the arrest of the Ship owned by it, or of its detention in exercise or purported exercise of any lien or claim, that Owner shall procure its release by providing bail or otherwise as the circumstances may require.

**14.9    Compliance with laws etc.** Each Owner shall:

(a)    comply, or procure compliance with the ISM Code, the ISPS Code, all Environmental Laws and all other laws or regulations relating to the Ship owned by it, its ownership, operation and management or to the business of that Owner;

(b)    not employ the Ship owned by it nor allow its employment in any manner contrary to any law or regulation in any relevant jurisdiction including but not limited to the ISM Code and the ISPS Code; and

(c)    in the event of hostilities in any part of the world (whether war is declared or not), not cause or permit the Ship owned by it to enter or trade to any zone which is declared a war zone by any government or by the Ship's war risks insurers unless the prior written consent of the Security Trustee has been given and that Owner has (at its expense) effected any special, additional or modified insurance cover which the Security Trustee may require.

**14.10   Provision of information.** Each Owner shall promptly provide the Security Trustee with any information which it requests regarding:

(a)    the Ship owned by it, its employment, position and engagements;

(b)    the Earnings and payments and amounts due to the master and crew of the Financed Ship owned by it;

(c)    any expenses incurred, or likely to be incurred, in connection with the operation, maintenance or repair of the Ship owned by it and any payments made in respect of that Ship;

(d)    any towages and salvages; and

(e)    its compliance, the Approved Manager's compliance and the compliance of the Ship owned by it with the ISM Code and the ISPS Code,

and, upon the Security Trustee's request, provide copies of any current charter relating to the Ship owned by it, of any current charter guarantee and copies of the Owner's or the Approved Manager's Document of Compliance.

**14.11   Notification of certain events.** Each Owner shall immediately notify the Security Trustee by fax, confirmed forthwith by letter, of:

(a)    any casualty which is or is likely to be or to become a Major Casualty;

(b)    any occurrence as a result of which the Ship owned by it has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(c)    any requirement or recommendation made by any insurer or classification society or by any competent authority which is not immediately complied with;

(d)    any arrest or detention of the Ship owned by it, any exercise or purported exercise of any lien on that Ship or in the case of a Financed Ship, its Earnings or any requisition of that Ship for hire;

(e)    any intended dry docking of the Ship owned by it;

(f)     any Environmental Claim made against that Owner or in connection with the Ship owned by it, or any Environmental Incident;

(g)     any claim for breach of the ISM Code or the ISPS Code being made against that Owner, the Approved Manager or otherwise in connection with the Ship owned by it; or

(h)     any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with,

and that Owner shall keep the Security Trustee advised in writing on a regular basis and in such detail as the Security Trustee shall require of that Owner's, the Approved Manager's or any other person's response to any of those events or matters.

**14.12**    **Restrictions on chartering, appointment of managers etc.**  No Owner shall in relation to the Ship owned by it:

(a)     other than pursuant to the Bareboat Charter to which it is a party, let that Ship on demise charter for any period;

(b)     other than pursuant to the OTG Time Charter to which it is a party, enter into any time or consecutive voyage charter in respect of that Ship for a term which exceeds, or which by virtue of any optional extensions may exceed, 13 months;

(c)     enter into any charter in relation to that Ship under which more than 2 months' hire (or the equivalent) is payable in advance;

(d)     charter that Ship otherwise than on bona fide arm's length terms at the time when that Ship is fixed;

(e)     appoint a manager of that Ship other than the Approved Manager or agree to any alteration to the terms of the Approved Manager's appointment;

(f)     de activate or lay up that Ship; or

(g)     put that Ship into the possession of any person for the purpose of work being done upon it in an amount exceeding or likely to exceed $250,000 (or the equivalent in any other currency) unless that person has first given to the Security Trustee and in terms satisfactory to it a written undertaking not to exercise any lien on that Ship or its Earnings for the cost of such work or for any other reason.

**14.13**    **Notice of Mortgage.**  Each Owner shall keep the relevant Mortgage or the relevant Collateral Mortgage registered against the Ship owned by it as a valid first or second priority mortgage as the case may be, carry on board that Ship a certified copy of the relevant Mortgage or Collateral Mortgage and place and maintain in a conspicuous place in the navigation room and the Master's cabin of that Ship a framed printed notice stating that that Ship is mortgaged by that Owner to the Security Trustee.

**14.14**    **Sharing of Earnings.**  No Borrower shall enter into any agreement or arrangement for the sharing of any Earnings.

**14.15**    **ISPS Code.**  Each Owner shall comply with the ISPS Code and in particular, without limitation, shall:

(a)     procure that the Ship owned by that Borrower or a Collateral Owner and the company responsible for that Ship's compliance with the ISPS Code comply with the ISPS Code; and

(b)     maintain for that Ship an ISSC;  and

26378423 v12

(c)     notify the Lender immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC.

**15      SECURITY COVER**

15.1    **Minimum required security cover.**  Clause 15.2 applies if the Lender notifies the Borrowers that:

(a)     the aggregate of the market values (determined as provided in Clause 15.3) of the Financed Ships; plus

(b)     the net realisable value of any additional security previously provided under this Clause 15,

is below 120 per cent. of the Loan.

15.2    **Provision of additional security; prepayment.**  If the Lender serves a notice on the Borrowers under Clause 15.1, the Borrowers shall, within 1 month after the date on which the Lender's notice is served, either:

(a)     provide, or ensure that a third party provides, additional security which, in the opinion of the Lender, has a net realisable value at least equal to the shortfall and is documented in such terms as the Lender may approve or require; or

(b)     prepay such part (at least) of the Loan as will eliminate the shortfall.

15.3    **Valuation of Financed Ships.**  The market value of a Financed Ship at any date is that shown by the average of two valuations prepared:

(a)     as at a date not more than 14 days previously;

(b)     by independent sale and purchase shipbrokers which the Lender may have approved or appointed for the purpose;

(c)     with or without physical inspection of the Financed Ship (as the Lender may reasonably require); and

(d)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment.

15.4    **Value of additional vessel security.**  The net realisable value of any additional security which is provided under Clause 15.2 and which consists of a Security Interest over a vessel shall be that shown by a valuation complying with the requirements of Clause 15.3.

15.5    **Valuations binding.**  Any valuation under Clause 15.2, 15.3 or 15.4 shall be binding and conclusive as regards the Borrowers, as shall be any valuation which the Lender makes of any additional security which does not consist of or include a Security Interest.

15.6    **Provision of information.**  The Borrowers shall promptly provide the Lender and any shipbroker or expert acting under Clause 15.3 or 15.4 with any information which the Lender or the shipbroker or expert may request for the purposes of the valuation; and, if the Borrowers fail to provide the information by the date specified in the request, the valuation may be made on any basis and assumptions which the shipbroker or the Lender (or the expert appointed by it) considers prudent.

15.7    **Payment of valuation expenses.**  Without prejudice to the generality of the Borrowers' obligations under Clauses 20.1, 20.2 and 21.3, the Borrowers shall, on demand, pay the

Lender the amount of the fees and expenses of any shipbroker or expert instructed by the Lender under this Clause (subject, in the event that the market value of a Financed Ship is on each occasion found to comply with the requirements of this Clause 15 and all legal and other expenses incurred by any Creditor Party in connection with any matter arising out of this Clause **Provided that** the Borrowers shall not be required to pay for more than one valuation per Financed Ship on each calendar year unless an Event of Default or Potential Event of Default has occurred or if any such additional valuation entitles the Lender to serve a notice pursuant to Clause 15.2.

15.8 **Application of prepayment.** Clause 8 shall apply in relation to any prepayment pursuant to Clause 15.2(b).

16    **PAYMENTS AND CALCULATIONS**

16.1 **Currency and method of payments.** All payments to be made by the Lender or by any Borrower under a Finance Document shall be made to the Lender or to the Security Trustee, in the case of an amount payable to it:

(a)  by not later than 11.00 a.m. (Seoul time) on the due date;

(b)  in same day Dollar funds settled through the New York Clearing House Interbank Payments System (or in such other Dollar funds and/or settled in such other manner as the Lender shall specify as being customary at the time for the settlement of international transactions of the type contemplated by this Agreement);

(c)  to the account of the Lender at Shihan Bank (Account No 180-004-461297), or to such other account with such other bank as the Lender may from time to time notify to the Borrowers and the other Creditor Parties; and

(d)  in the case of an amount payable to the Security Trustee, to such account as it may from time to time notify to the Borrowers and the other Creditor Parties.

16.2 **Payment on non-Business Day.** If any payment by any Borrower under a Finance Document would otherwise fall due on a day which is not a Business Day:

(a)  the due date shall be extended to the next succeeding Business Day; or

(b)  if the next succeeding Business Day falls in the next calendar month, the due date shall be brought forward to the immediately preceding Business Day,

and interest shall be payable during any extension under paragraph (a) at the rate payable on the original due date.

16.3 **Basis for calculation of periodic payments.** All interest and any other payments under any Finance Document which are of an annual or periodic nature shall accrue from day to day and shall be calculated on the basis of the actual number of days elapsed and a 360 day year.

16.4 **Distribution of payments to Creditor Parties.** Any amount received by the Security Trustee under a Finance Document for distribution or remittance to the Lender shall be made available by the Security Trustee to the Lender by payment, with funds having the same value as the funds received, to such account as the Lender shall have notified to the Security Trustee not less than 5 Business Days previously.

16.5 **Creditor Party accounts.** Each Creditor Party shall maintain accounts showing the amounts owing to it by the Borrowers and each Security Party under the Finance Documents and all payments in respect of those amounts made by the Borrowers and any Security Party.

26378423 v12

16.6 **Accounts prima facie evidence.** If any accounts maintained under Clause 16.5 show an amount to be owing by a Borrower or a Security Party to a Creditor Party, those accounts shall be prima facie evidence that that amount is owing to that Creditor Party.

## 17 APPLICATION OF RECEIPTS

17.1 **Normal order of application.** Except as any Finance Document may otherwise provide, any sums which are received or recovered by any Creditor Party under or by virtue of any Finance Document shall be applied:

(a) FIRST: in or towards payment pro rata of any unpaid fees, costs and expenses of the Lender and the Security Trustee under the Finance Documents;

(b) SECONDLY: in or towards payment pro rata of any accrued interest due but unpaid under this Agreement;

(c) THIRDLY: in or towards payment pro rata of any principal due but unpaid under this Agreement;

(d) FOURTHLY: in or towards payment pro rata of any other amounts due but unpaid under any Finance Document;

(e) FIFTHLY: in retention of an amount equal to any amount not then due and payable under any Finance Document but which the Lender, by notice to the Borrowers, the Security Parties and the other Creditor Parties, states in its reasonable opinion will or may become due and payable in the future and, upon those amounts becoming due and payable, in or towards satisfaction of them in accordance with the provisions of Clause 17.1(a), 17.1(b), 17.1(c) and 17.1(d); and

(f) SIXTHLY: any surplus shall be paid to the Borrowers or to any other person appearing to be entitled to it.

17.2 **Variation of order of application.** The Lender may by notice to the Borrowers, the Security Parties and the other Creditor Parties provide for a different manner of application from that set out in Clause 17.1 either as regards a specified sum or sums or as regards sums in a specified category or categories.

17.3 **Notice of variation of order of application.** The Lender may give notices under Clause 17.2 from time to time; and such a notice may be stated to apply not only to sums which may be received or recovered in the future, but also to any sum which has been received or recovered on or after the third Business Day before the date on which the notice is served.

17.4 **Appropriation rights overridden.** This Clause 17 and any notice which the Lender gives under Clause 17.2 shall override any right of appropriation possessed, and any appropriation made, by any Borrower or any Security Party.

## 18 APPLICATION OF EARNINGS

18.1 **Payment of Earnings.** Each Borrower undertakes with each Creditor Party to ensure that, throughout the Security Period (and subject only to the provisions of the Tripartite Assignment or the Multiparty Assignment as the case may be), all the Earnings of the Ship owned by it are paid to the Earnings Account for that Ship.

18.2 **Amounts standing on Earnings Accounts.** Provided no Event of Default or Potential Event of Default has occurred the amounts standing to the credit of the Earnings Accounts shall be freely available to the Borrowers.

26378423 v12