18.3 **Cash reserves.** Subject to Clause 18.4, the Borrowers undertake with each Creditor Party to ensure that there is standing to the credit of each Reserve Account at all times an amount at least equal to $423,661.50.

18.4 **Reserve Accounts.** The Borrowers may instruct the Account Bank to transfer funds on either Reserve Account to the Lender in order to meet the Borrowers' repayment obligations under Clause 8 of this Agreement provided that the Borrowers shall make up any shortfall in either Reserve Account within 30 days of any such transfer to the Lender to ensure the minimum balance referred to in Clause 18.3 is maintained.

18.5 **Borrowers' obligations unaffected.** The provisions of this Clause 18 do not affect:

(a) the liability of the Borrowers to make payments of principal and interest on the due dates; or

(b) any other liability or obligation of the Borrowers or any Security Party under any Finance Document.

## 19    EVENTS OF DEFAULT

19.1 **Events of Default.** An Event of Default occurs if:

(a) any Borrower or any Security Party fails to pay when due or (if so payable) on demand any sum payable under a Finance Document or under any document relating to a Finance Document unless the non-payment is caused by a technical or administrative error and is remedied within 3 Business Days of the due date; or

(b) any breach occurs of Clause 9.2, 11.2, 11.3, 11.17, 11.19, 11.20, 12.2, 12.3, 15.2 or 18.4; or

(c) any breach by any Borrower or any Security Party occurs of any provision of a Finance Document (other than a breach covered by paragraphs (a) or (b)) which, in the opinion of the Lender, is capable of remedy, and such default continues unremedied 10 days after written notice from the Lender requesting action to remedy the same; or

(d) (subject to any applicable grace period specified in any Finance Document) any breach by any Borrower or any Security Party occurs of any provision of a Finance Document (other than a breach falling within paragraphs (a), (b) or (c)); or

(e) any representation, warranty or statement made or repeated by, or by an officer of, a Borrower or a Security Party in a Finance Document or in a Drawdown Notice or any other notice or document relating to a Finance Document is untrue or misleading when it is made or repeated ; or

(f) any of the following occurs in relation to any Financial Indebtedness of a Relevant Person (which exceeds $100,000 (or the equivalent in another currency)):

(i) any Financial Indebtedness of a Relevant Person is not paid when due; or

(ii) any Financial Indebtedness of a Relevant Person becomes due and payable or capable of being declared due and payable prior to its stated maturity date as a consequence of any event of default; or

(iii) a lease, hire purchase agreement or charter creating any Financial Indebtedness of a Relevant Person is terminated by the lessor or owner or becomes capable of being terminated as a consequence of any termination event; or



(iv)    any overdraft, loan, note issuance, acceptance credit, letter of credit, guarantee, foreign exchange or other facility, or any swap or other derivative contract or transaction, relating to any Financial Indebtedness of a Relevant Person ceases to be available or becomes capable of being terminated as a result of any event of default, or cash cover is required, or becomes capable of being required, in respect of such a facility as a result of any event of default; or

(v)    any Security Interest securing any Financial Indebtedness of a Relevant Person becomes enforceable; or

(g)    any of the following occurs in relation to a Relevant Person:

(i)    a Relevant Person becomes, in the opinion of the Lender, unable to pay its debts as they fall due; or

(ii)    any assets of a Relevant Person are subject to any form of execution, attachment, arrest, sequestration or distress in respect of a sum of, or sums aggregating, $100,000 or more or the equivalent in another currency; or

(iii)    any administrative or other receiver is appointed over any asset of a Relevant Person; or

(iv)    an administrator is appointed (whether by the court or otherwise) in respect of a Relevant Person; or

(v)    any formal declaration of bankruptcy or any formal statement to the effect that a Relevant Person is insolvent or likely to become insolvent is made by a Relevant Person or by the directors of a Relevant Person or, in any proceedings, by a lawyer acting for a Relevant Person; or

(vi)    a provisional liquidator is appointed in respect of a Relevant Person, a winding up order is made in relation to a Relevant Person or a winding up resolution is passed by a Relevant Person; or

(vii)    a resolution is passed, an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by (aa) a Relevant Person, (bb) the members or directors of a Relevant Person, (cc) a holder of Security Interests which together relate to all or substantially all of the assets of a Relevant Person, or (dd) a government minister or public or regulatory authority of a Pertinent Jurisdiction for or with a view to the winding up of that or another Relevant Person or the appointment of a provisional liquidator or administrator in respect of that or another Relevant Person, or that or another Relevant Person ceasing or suspending business operations or payments to creditors, save that this paragraph does not apply to a fully solvent winding up of a Relevant Person other than the Borrowers or the Guarantor which is, or is to be, effected for the purposes of an amalgamation or reconstruction previously approved by the Lender and effected not later than 3 months after the commencement of the winding up; or

(viii)    an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by a creditor of a Relevant Person (other than a holder of Security Interests which together relate to all or substantially all of the assets of a Relevant Person) for the winding up of a Relevant Person or the appointment of a provisional liquidator or administrator in respect of a Relevant Person in any Pertinent Jurisdiction, unless the proposed winding up, appointment of a provisional liquidator or administration is being contested in good faith, on substantial grounds and not with a view to some other insolvency law procedure being implemented instead and either (aa) the



application or petition is dismissed or withdrawn within 30 days of being made or presented, or (bb) within 30 days of the administration notice being given or filed, or the other relevant steps being taken, other action is taken which will ensure that there will be no administration and (in both cases (aa) or (bb)) the Relevant Person will continue to carry on business in the ordinary way and without being the subject of any actual, interim or pending insolvency law procedure; or

(ix)    a Relevant Person or its directors take any steps (whether by making or presenting an application or petition to a court, or submitting or presenting a document setting out a proposal or proposed terms, or otherwise) with a view to obtaining, in relation to that or another Relevant Person, any form of moratorium, suspension or deferral of payments, reorganisation of debt (or certain debt) or arrangement with all or a substantial proportion (by number or value) of creditors or of any class of them or any such moratorium, suspension or deferral of payments, reorganisation or arrangement is effected by court order, by the filing of documents with a court, by means of a contract or in any other way at all; or

(x)    any meeting of the members or directors, or of any committee of the board or senior management, of a Relevant Person is held or summoned for the purpose of considering a resolution or proposal to authorise or take any action of a type described in paragraphs (iv) to (ix) or a step preparatory to such action, or (with or without such a meeting) the members, directors or such a committee resolve or agree that such an action or step should be taken or should be taken if certain conditions materialise or fail to materialise; or

(xi)    in a Pertinent Jurisdiction other than England, any event occurs, any proceedings are opened or commenced or any step is taken which, in the opinion of the Lender is similar to any of the foregoing; or

(h)    any Borrower ceases or suspends carrying on its business or a part of its business which, in the reasonable opinion of the Lender, is material in the context of this Agreement; or

(i)    it becomes unlawful in any Pertinent Jurisdiction or impossible:

(i)    for any Borrower or any Security Party to discharge any liability under a Finance Document or to comply with any other obligation which the Lender considers material under a Finance Document; or

(ii)    for the Security Trustee or the Lender to exercise or enforce any right under, or to enforce any Security Interest created by, a Finance Document; or

(j)    any consent necessary to enable any Borrower or Collateral Owner to own, operate or charter the Ship owned by it or to enable any Borrower, or any Security Party to comply with any provision which the Lender, acting reasonably, considers material of a Finance Document, a Bareboat Charter, an OTG Time Charter or the Time Charter, is not granted, expires without being renewed, is revoked or becomes liable to revocation or any condition of such a consent is not fulfilled; or

(k)    without its prior consent, a change has occurred after the date of this Agreement in the ultimate beneficial ownership of any of the shares in any Borrower, the Bareboat Charterer, OTG or the Guarantor or in the ultimate control of the voting rights attaching to any of those shares; or

(l)    any provision which the Lender considers material of a Finance Document proves to have been or becomes invalid or unenforceable, or a Security Interest created by a Finance Document proves to have been or becomes invalid or unenforceable or such a Security Interest proves to have ranked after, or loses its priority to, another Security Interest or any other third party claim or interest; or

    26378423 v12

(m)   the security constituted by a Finance Document is in any way imperilled or in jeopardy provided that no such Event of Default shall have occurred if the Borrowers have remedied the circumstances giving rise to the jeopardisation or imperilling of the Security within 5 Business Days of becoming aware of them; or

(n)   an OTG Time Charter, the Time Charter or the Bareboat Charter is amended, varied, cancelled, terminated, rescinded or suspended or otherwise ceases to remain in force for any reason; or

(o)   any other event occurs or any other circumstances arise or develop including, without limitation:

    (i)   a material adverse change in the financial position, state of affairs or prospects of any Relevant Person; or

    (ii)  any accident or other event involving any Ship or another vessel owned, chartered or operated by a Relevant Person,

    in the light of which the Lender reasonably considers that there is a significant risk that the Borrowers, the Bareboat Charterer, OTG or the Guarantor are, or will later become, unable to discharge their liabilities under the Finance Documents as they fall due.

**19.2   Actions following an Event of Default.**  On, or at any time after, the occurrence of an Event of Default:

(a)   The Lender may:

    (i)   serve on the Borrowers a notice stating that all obligations of the Lender to the Borrowers under this Agreement are cancelled; and/or

    (ii)  serve on the Borrowers a notice stating that the Loan, all accrued interest and all other amounts accrued or owing under this Agreement are immediately due and payable or are due and payable on demand; and/or

    (iii) take any other action which, as a result of the Event of Default or any notice served under paragraph (i) or (ii), the Lender is entitled to take under any Finance Document or any applicable law; and/or

(b)   the Security Trustee may, and if so instructed by the Lender, the Security Trustee shall take any action which, as a result of the Event of Default or any notice served under paragraph (a) (i) or (ii), the Security Trustee and/or the Lender are entitled to take under any Finance Document or any applicable law.

**19.3   Termination of Commitment.**  On the service of a notice under Clause 19.2(a)(i), the Commitment and all other obligations of the Lender to the Borrowers under this Agreement shall be cancelled.

**19.4   Acceleration of Loan.**  On the service of a notice under Clause 19.2(a)(ii), the Loan, all accrued interest and all other amounts accrued or owing from the Borrowers or any Security Party under this Agreement and every other Finance Document shall become immediately due and payable or, as the case may be, payable on demand.

**19.5   Multiple notices; action without notice.**  The Lender may serve notices under Clauses 19.2(a)(i) or (ii) simultaneously or on different dates and it and/or the Security Trustee may take any action referred to in Clause 19.2 if no such notice is served or simultaneously with or at any time after the service of both or either of such notices.

      26378423 v12



**19.6** **Notification of Creditor Parties and Security Parties.** The Lender shall send to each Security Party and the Security Trustee a copy or the text of any notice which the Lender serves on the Borrowers under Clause 19.2; but the notice shall become effective when it is served on the Borrowers, and no failure or delay by the Lender to send a copy or the text of the notice to any other person shall invalidate the notice or provide any Borrower or any Security Party with any form of claim or defence.

**19.7** **Exclusion of Creditor Party liability.** No Creditor Party, and no receiver or manager appointed by the Security Trustee, shall have any liability to a Borrower or a Security Party:

(a)    for any loss caused by an exercise of rights under, or enforcement of a Security Interest created by, a Finance Document or by any failure or delay to exercise such a right or to enforce such a Security Interest; or

(b)    as mortgagee in possession or otherwise, for any income or principal amount which might have been produced by or realised from any asset comprised in such a Security Interest or for any reduction (however caused) in the value of such an asset,

except that this does not exempt a Creditor Party or a receiver or manager from liability for direct losses to the extent caused by the negligence, dishonesty or the wilful misconduct of such Creditor Party's own officers and employees or (as the case may be) such receiver's or manager's own partners or employees.

**19.8** **Relevant Persons.** In this Clause 19, a **"Relevant Person"** means a Borrower and a Security Party.

**19.9** **Interpretation.** In Clause 19.1(f) references to an event of default or a termination event include any event, howsoever described, which is similar to an event of default in a facility agreement or a termination event in a finance lease; and in Clause 19.1(g) "petition" includes an application.

**20**    **FEES AND EXPENSES**

**20.1** **Costs of negotiation, preparation etc.** The Borrowers shall pay to the Lender on its demand the amount of all expenses incurred by the Lender or the Security Trustee in connection with the negotiation, preparation, execution or registration of any Finance Document or any related document or with any transaction contemplated by a Finance Document or a related document.

**20.2** **Costs of variations, amendments etc.** The Borrowers shall pay to the Lender on the Lender's demand, for the account of the Creditor Party concerned the amount of all expenses reasonably incurred by a Creditor Party in connection with:

(a)    any amendment or supplement to a Finance Document, or any proposal for such an amendment to be made;

(b)    any consent or waiver by the Lender or the Creditor Party concerned under or in connection with a Finance Document, or any request for such a consent or waiver; or

(c)    the valuation of any security provided or offered under Clause 15.

**20.3** **Costs of enforcement.** The Borrower shall pay to the Lender on the Lender's demand, for the account of the Creditor Party concerned the amount of all expenses incurred by a Creditor Party in connection with any step taken by the Creditor Party concerned with a view to the protection, exercise or enforcement of any right or Security Interest created by a Finance Document or for any similar purpose. There shall be recoverable under this



Clause the full amount of all legal expenses, whether or not such as would be allowed under rules of court or any taxation or other procedure carried out under such rules.

20.4 **Documentary taxes.** The Borrowers shall promptly pay any tax payable on or by reference to any Finance Document, and shall, on the Lender's demand, fully indemnify each Creditor Party against any claims, expenses, liabilities and losses resulting from any failure or delay by the Borrowers to pay such a tax.

20.5 **Certification of amounts.** A notice which is signed by 2 officers of a Creditor Party, which states that a specified amount, or aggregate amount, is due to that Creditor Party under this Clause 20 and which indicates (without necessarily specifying a detailed breakdown) the matters in respect of which the amount, or aggregate amount, is due shall be prima facie evidence that the amount, or aggregate amount, is due.

21 **INDEMNITIES**

21.1 **Indemnities regarding borrowing and repayment of Loan.** The Borrowers shall fully indemnify the Lender on the Lender's demand and the Security Trustee on its demand in respect of all claims, expenses, liabilities and losses which are made or brought against or incurred by that Creditor Party:

(a) the Loan not being borrowed on the date specified in the Drawdown Notice for any reason other than a default by the Lender claiming the indemnity;

(b) the receipt or recovery of all or any part of the Loan or an overdue sum otherwise than on the last day of an Interest Period or other relevant period;

(c) any failure (for whatever reason) by the Borrowers to make payment of any amount due under a Finance Document on the due date or, if so payable, on demand (after giving credit for any default interest paid by the Borrowers on the amount concerned under Clause 7); and

(d) the occurrence of an Event of Default or a Potential Event of Default and/or the acceleration of repayment of the Loan under Clause 19,

and in respect of any tax (other than tax on its overall net income) for which a Creditor Party is liable in connection with any amount paid or payable to that Creditor Party (whether for its own account or otherwise) under any Finance Document.

21.2 **Breakage costs.** Without limiting its generality, Clause 21.1 covers any claim, expense, liability or loss, including a loss of a prospective profit, incurred by a Lender:

(a) in liquidating or employing deposits from third parties acquired or arranged to fund or maintain all or any part of the Loan and/or any overdue amount (or an aggregate amount which includes the Loan or any overdue amount); and

(b) in terminating, or otherwise in connection with, any interest and/or currency swap or any other transaction entered into (whether with another legal entity or with another office or department of the Lender) to hedge any exposure arising under this Agreement or that part which the Lender determines is fairly attributable to this Agreement of the amount of the liabilities, expenses or losses (including losses of prospective profits) incurred by it in terminating, or otherwise in connection with, a number of transactions of which this Agreement is one.

21.3 **Miscellaneous indemnities.** The Borrowers shall fully indemnify each Creditor Party severally on their respective demands in respect of all claims, expenses, liabilities and losses which may be made or brought against or incurred by a Creditor Party, in any country, as a result of or in connection with:

26378423 v12

(a)   any action taken, or omitted or neglected to be taken, under or in connection with any Finance Document by the Lender or the Security Trustee or by any receiver appointed under a Finance Document; or

(b)   any other Pertinent Matter,

other than claims, expenses, liabilities and losses to the extent caused by the dishonesty, wilful misconduct or negligence of the Creditor Party concerned or its officers or employees.

Without prejudice to its generality, this Clause 21.2(b) covers any claims, expenses, liabilities and losses which arise, or are asserted, under or in connection with any law relating to safety at sea, the ISM Code, the ISPS Code or any Environmental Law.

21.4   **Currency indemnity.**  If any sum due from any Borrower or any Security Party to a Creditor Party under a Finance Document or under any order or judgment relating to a Finance Document has to be converted from the currency in which the Finance Document provided for the sum to be paid (the **"Contractual Currency"**) into another currency (the **"Payment Currency"**) for the purpose of:

(a)   making or lodging any claim or proof against any Borrower or any Security Party, whether in its liquidation, any arrangement involving it or otherwise; or

(b)   obtaining an order or judgment from any court or other tribunal; or

(c)   enforcing any such order or judgment,

the Borrowers shall indemnify the Creditor Party concerned against the loss arising when the amount of the payment actually received by that Creditor Party is converted at the available rate of exchange into the Contractual Currency.

In this Clause 21.4 the **"available rate of exchange"** means the rate at which the Creditor Party concerned is able at the opening of business (London time) on the Business Day after it receives the sum concerned to purchase the Contractual Currency with the Payment Currency.

This Clause 21.4 creates a separate liability of the Borrowers which is distinct from their other liabilities under the Finance Documents and which shall not be merged in any judgment or order relating to those other liabilities.

21.5   **Certification of amounts.**  A notice which is signed by 2 officers of a Creditor Party, which states that a specified amount, or aggregate amount, is due to that Creditor Party under this Clause 21 and which indicates (without necessarily specifying a detailed breakdown) the matters in respect of which the amount, or aggregate amount, is due shall be prima facie evidence that the amount, or aggregate amount, is due.

21.6   **Sums deemed due to the Lender.**  For the purposes of this Clause 21, a sum payable by the Borrowers to the Security Trustee for distribution to the Lender shall be treated as a sum due to the Lender.

## 22    NO SET-OFF OR TAX DEDUCTION

22.1   **No deductions.**  All amounts due from the Borrowers under a Finance Document shall be paid:

(a)   without any form of set off, cross-claim or condition; and

(b)      free and clear of any tax deduction except a tax deduction which a Borrower is required by law to make.

**22.2**    **Grossing-up for taxes.** If a Borrower is required by law to make a tax deduction from any payment:

(a)      that Borrower shall notify the Lender as soon as it becomes aware of the requirement;

(b)      that Borrower shall pay the tax deducted to the appropriate taxation authority promptly, and in any event before any fine or penalty arises;

(c)      the amount due in respect of the payment shall be increased by the amount necessary to ensure that each Creditor Party receives and retains (free from any liability relating to the tax deduction) a net amount which, after the tax deduction, is equal to the full amount which it would otherwise have received.

**22.3**    **Evidence of payment of taxes.** Within 1 month after making any tax deduction, the Borrower concerned shall deliver to the Lender documentary evidence satisfactory to the Lender that the tax had been paid to the appropriate taxation authority.

**22.4**    **Exclusion of tax on overall net income.** In this Clause 22 "tax deduction" means any deduction or withholding for or on account of any present or future tax except tax on a Creditor Party's overall net income.

**22.5**    **Sums deemed due to a Lender.** For the purposes of this Clause 21, a sum payable by the Borrowers to the Security Trustee for distribution to the Lender shall be treated as a sum due to the Lender.

**23**      **ILLEGALITY, ETC**

**23.1**    **Illegality.** This Clause 23 applies if the Lender notifies the Borrowers that it has become, or will with effect from a specified date, become:

(a)      unlawful or prohibited as a result of the introduction of a new law, an amendment to an existing law or a change in the manner in which an existing law is or will be interpreted or applied; or

(b)      contrary to, or inconsistent with, any regulation,

for the Lender to maintain or give effect to any of its obligations under this Agreement in the manner contemplated by this Agreement.

**23.2**    **Notification and effect of illegality.** On the Lender notifying the Borrowers under Clause 23.2, the Commitment shall terminate; and thereupon or, if later, on the date specified in the Lender's notice under Clause 23.1 as the date on which the notified event would become effective the Borrowers shall prepay the Loan in full in accordance with Clause 8.

**24**      **INCREASED COSTS**

**24.1**    **Increased costs.** This Clause 24 applies if the Lender notifies the Borrowers that it considers that as a result of:

(a)      the introduction or alteration after the date of this Agreement of a law or an alteration after the date of this Agreement in the manner in which a law is interpreted or applied (disregarding any effect which relates to the application to payments under this Agreement of a tax on its overall net income); or

(b)    complying with any regulation (including any which relates to capital adequacy or liquidity controls or which affects the manner in which it allocates capital resources to its obligations under this Agreement) which is introduced, or altered, or the interpretation or application of which is altered, after the date of this Agreement,

it (or a parent company of it) has incurred or will incur an "increased cost".

**24.2**    **Meaning of "increased cost".**  In this Clause 24, "**increased cost**" means:

(a)    an additional or increased cost incurred as a result of, or in connection with, the Lender having entered into, or being a party to, this Agreement or a Transfer Certificate, of funding or maintaining the Commitment or the Loan or performing its obligations under this Agreement, or of having outstanding all or any part of the Loan or other unpaid sums;

(b)    a reduction in the amount of any payment to the Lender under this Agreement or in the effective return which such a payment represents to the Lender or on its capital;

(c)    an additional or increased cost of funding all or maintaining all or any of the advances comprised in a class of advances formed by or including the Loan or (as the case may require) the proportion of that cost attributable to the Loan; or

(d)    a liability to make a payment, or a return foregone, which is calculated by reference to any amounts received or receivable by the Lender under this Agreement,

but not an item attributable to a change in the rate of tax on the overall net income of the Lender (or a parent company of it) or an item covered by the indemnity for tax in Clause 21.1 or by Clause 22 or an item arising directly out of the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004, in the form existing on the date of this Agreement ("Basel II") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Creditor Party or any of its affiliates.

For the purposes of this Clause 24.2 the Lender may in good faith allocate or spread costs and/or losses among its assets and liabilities (or any class of its assets and liabilities) on such basis as it considers appropriate.

**24.3**    **Payment of increased costs.**  The Borrowers shall pay to the Lender, on the Lender's demand the amounts which the Lender from time to time notifies the Borrowers that it has specified to be necessary to compensate it for the increased cost.

**24.4**    **Notice of prepayment.**  If the Borrowers are not willing to continue to compensate the Lender for the increased cost under Clause 24.1, the Borrowers may give the Lender not less than 14 days' notice of their intention to prepay the Loan at the end of an Interest Period.

**24.5**    **Prepayment; termination of Commitment.**  A notice under Clause 24.4 shall be irrevocable and on the date specified in the notice of intended prepayment, the Borrowers shall prepay (without premium or penalty) the Loan together with accrued interest thereon.

**24.6**    **Application of prepayment.**  Clause 8 shall apply in relation to the prepayment.

**25**    **SET OFF**

**25.1**    **Application of credit balances.**  Each Creditor Party may without prior notice:

    26378423 v12



(a)     apply any balance (whether or not then due) which at any time stands to the credit of any account in the name of a Borrower at any office in any country of that Creditor Party in or towards satisfaction of any sum then due from that Borrower to that Creditor Party under any of the Finance Documents; and

(b)     for that purpose:

(i)     break, or alter the maturity of, all or any part of a deposit of that Borrower;

(ii)    convert or translate all or any part of a deposit or other credit balance into Dollars; and

(iii)   enter into any other transaction or make any entry with regard to the credit balance which the Creditor Party concerned considers appropriate.

**25.2   Existing rights unaffected.**  No Creditor Party shall be obliged to exercise any of its rights under Clause 25.1; and those rights shall be without prejudice and in addition to any right of set off, combination of accounts, charge, lien or other right or remedy to which a Creditor Party is entitled (whether under the general law or any document).

**25.3   No Security Interest.**  This Clause 25 gives the Creditor Parties a contractual right of set-off only, and does not create any equitable charge or other Security Interest over any credit balance of any Borrower.

**26      THE SECURITY TRUSTEE**

**26.1   Definition of "Trust Property".**  In this Clause, **"Trust Property"** means:

(a)     all Security Interests and all rights granted to, or held or exercisable by, the Security Trustee under or by virtue of the Finance Documents, except rights intended for the sole benefit or protection of the Security Trustee;

(b)     all moneys or other assets which are received or recovered by or on behalf of the Security Trustee under or by virtue of any Security Interest or right covered by paragraph (a), including any moneys or other assets  which are received or recovered by it as a result of the enforcement or exercise by it of such a Security Interest or right; and

(c)     all moneys or other assets which may accrue in respect of, or be derived from, any moneys or other assets covered by paragraph (b);

        except any moneys or other assets which the Security Trustee has transferred to the Lender or (being entitled to do so) has retained in accordance with the following provisions of this Clause 27.

**26.2   Holding and dealing with Trust Property.**  The Security Trustee shall:

(a)     hold the Trust Property on trust for the Lender in accordance with the Finance Documents; and

(b)     deal with the Trust Property;

        in accordance with this Clause 27 and the other provisions of the Finance Documents.

**26.3   Absence of express authorisation.**  In connection with the exercise of any right, power or discretion or any other matter not expressly provided for in the Finance Documents, the Security Trustee shall act, and shall be protected in acting, in accordance with any written instructions which it receives from the Lender.

26378423 v12

**26.4**   **Limitation on obligation of Security Trustee to request instructions.** The Security Trustee shall not have any obligation to request the Lender to give it any instructions or to make any determination.

**26.5**   **Supply of copy documents.** The Security Trustee shall promptly send to the Lender a copy of any document which the Security Trustee receives under or in connection with any Finance Document.

**26.6**   **Application of receipts.** Except as expressly stated to the contrary in any Finance Document, any moneys which the Security Trustee receives or recovers and which are Trust Property shall (without prejudice to the rights of the Security Trustee under any Finance Document to credit any moneys received or recovered by it to any suspense account) be transferred to the Lender for application in accordance with Clause 17.

**26.7**   **Deductions from receipts.** Before transferring any moneys to the Lender under Clause 26.7, the Security Trustee may deduct any sum then due and payable under this Agreement or any other Finance Document to the Security Trustee or any receiver, agent or other person appointed by it and retain that sum for itself or, as the case may require, pay it to the other person to whom it is then due and payable; for this purpose if the Security Trustee has become entitled to require a sum to be paid to it on demand, that sum shall be treated as due and payable, even if no demand has yet been served.

**26.8**   **Additional statutory rights.** In addition to its rights under or by virtue of this Agreement and the other Finance Documents, the Security Trustee shall have all of the rights conferred on a trustee by the Trustee Act 1925, the Trustee Delegation Act 1999 and by the Trustee Act 2000 and by general law or otherwise, provided that:

(a)   section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Trustee in relation to the trusts constituted by this Agreement and the other Finance Documents;

(b)   where there are any inconsistencies between (i) the Trustee Acts 1925 and 2000 and (ii) the provisions of this Agreement and any other Finance Document, the provisions of this Agreement and any other Finance Document shall, to the extent allowed by law, prevail and, in the case of any inconsistency with the Trustee Act 2000, such provisions shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000.

**26.9**   **Release of Security Interests.** At the end of the Security Period, the Security Trustee shall release, without any covenants for title or other recourse whatsoever, all the Security Interests created by the Finance Documents and re-assign to the Borrowers any assets then comprised in those Security Interests, whereupon the Security Trustee shall be discharged from all liabilities and obligations which it has under this Agreement and the other Finance Documents; in determining whether, for the purposes of this Clause 26, the Security Period has come to an end there shall be disregarded the liabilities of the Borrowers in respect of the expenses of the Creditor Parties in connection with any such release or re-assignment.

**26.10**   **Perpetuity period.** The trusts hereby constituted are governed by English law and, if the rule against perpetuities applies to any of such trusts, the applicable perpetuity period is 125 years commencing on the date of this Agreement.

**27**   **LIMITATIONS ON THE RESPONSIBILITIES OF, AND INDEMNITIES FOR, THE SECURITY TRUSTEE**

**27.1**   **No obligations beyond those expressly specified.** The Security Trustee shall not, in respect of any Pertinent Matter, have, or be held to have assumed, any obligation to any Borrower, any Security Party or the Lender except:

(a)   an obligation of honesty; and

(b)     those specific obligations, if any, which are expressly imposed on the Security Trustee in connection with that Pertinent Matter by the Pertinent Document concerned.

**27.2    Limits on liability.**  The Security Trustee shall not be liable in respect of any claim, expense, liability or loss made or brought against or incurred by any Borrower, any Security Party or the Lender in respect of any Pertinent Matter and which results from any cause whatsoever (regardless of whether the cause occurred before the date of this Agreement or occurs on or after that date) unless the claim, expense, liability or loss is shown to have been directly and mainly caused by the dishonesty or the wilful misconduct of the Security Trustee's officers or employees; and no Borrower nor any Security Party nor any other Creditor Party shall bring in any country:

(a)     any claim which is inconsistent with this Clause 27; or

(b)     any claim against a current or former officer or employee of the Security Trustee unless there is substantial and specific evidence establishing that, on a balance of probabilities, he was guilty of dishonesty or wilful misconduct.

**27.3    No obligation to check or pass on information in certain areas.**  Without limiting the generality of Clause 27.1, the Security Trustee shall not have any obligation to check or, except as expressly required by a Finance Document, to provide or pass onto the Lender any information about:

(a)     the financial position or the affairs of any Borrower any Security Party or any other person; or

(b)     the truth of any representation, warranty or statement made, or any information provided (whether before the date of this Agreement or otherwise), by any Borrower, any Security Party or any other person which relates or might be relevant to a Pertinent Matter; or

(c)     the title, value or condition of, or any other matter relating to, any asset referred to in any Pertinent Document; or

(d)     whether any Event of Default or Potential Event of Default is imminent, has occurred or is continuing; or

(e)     any other Pertinent Matter.

**27.4    Notification of an Event of Default.**  If the occurrence of an Event of Default is brought to the attention of the officers or employees of the Security Trustee who are directly involved in the performance of the Security Trustee's functions under the Finance Documents, the Security Trustee shall, as soon as reasonably practicable, notify the Lender that the Event of Default has occurred; but this obligation shall not arise if such information would not be of material importance (for example because the Event of Default is purely technical or the Lender already knows that it will occur).

**27.5    No responsibility for legal or tax effectiveness or to disclose or explain risks.**  Without limiting the generality of Clause 27.1, the Security Trustee shall not have an obligation to the Lender or other person referred to in Clause 27.1 to ensure that:

(a)     any Pertinent Document or any right, obligation, liability or Security Interest created by a Pertinent Document is or remains valid, enforceable or effective or has or retains a particular priority or status;

(b)     any Pertinent Document or Pertinent Matter satisfies any requirement, is covered by any exemption, or is treated in any particular way for any purpose connected with banking supervision, tax, subsidies or any other matter, or continues to do any of the foregoing;

(c)     any Pertinent Document or Pertinent Matter is not affected by or does not create a particular risk of any kind or that any risk is insured or covered, reduced or hedged or otherwise dealt with; or

(d)     any risk is disclosed or explained (whether by the Security Trustee or any other person) to the Lender;

and "**risk**" includes an actual or potential adverse factor, whether having financial, legal or tax implications or implications of a different kind.

**27.6**     **No liability for another party's breach.** Without limiting the generality of Clause 27.1, the Security Trustee shall not have a liability to the Lender in respect of any breach (including a misrepresentation) by any Borrower, any Security Party, any other Creditor Party or any other person of any obligation arising under a Pertinent Document or relating to a Pertinent Matter.

**27.7**     **Security Trustee's right to decline to act.** The Security Trustee shall be absolutely entitled to decline to:

(a)     commence, defend or continue as a party to any proceedings or to take or participate in any other action which it considers will or may expose it to any claim or loss unless it has first received security in such amount and on such terms as it may require; or

(b)     commence, defend or continue as a party to any proceedings or to take or participate in any action which the Security Trustee considers is or may be contrary to any Pertinent Document or contrary to or inconsistent with any legal obligation, whether arising under a law or regulation, a contract or otherwise, or the policy of any public authority which regulates or supervises any activity of the Security Trustee or the Lender;

and, without limiting its generality, paragraph (b) entitles the Security Trustee to refuse to disclose any information if it considers that the disclosure would or might be contrary to any obligation of confidentiality affecting it or another person. This Clause 27.7 overrides any obligation which the Security Trustee would otherwise have.

**27.8**     **Advisers and delegation.** The Security Trustee may:

(a)     in relation to any Pertinent Matter, engage lawyers, accountants and other experts, and rely on their advice;

(b)     perform all or any of its functions, including any pursuant to a trust, under or in connection with any Pertinent Document through any office or branch which it may from time to time select and notify to the other parties or through any kind of agent or sub-agent and, in particular, by power of attorney or otherwise delegate the exercise of any of its powers and discretions, including any pursuant to a trust, under and in connection with the Pertinent Documents to any person on such terms (as to duration, sub-delegation, remuneration, exoneration and otherwise) as it may consider appropriate.

**27.9**     **Full freedom to enter into transactions.** Notwithstanding any rule of law or equity to the contrary, the Security Trustee shall be absolutely entitled:

(a)     to enter into and arrange banking, derivative, investment and/or other transactions of every kind with or affecting any Borrower or any Security Party or any other person who is party to, or referred to in, a Pertinent Document (including, but not limited to, any interest or currency swap or other transaction, whether related to this Agreement or not, and acting as syndicate agent and/or security trustee for, and/or participating in, other facilities to any Borrower or any Security Party or any other person who is party to, or referred to in, a Pertinent Document); and

(b)    to deal in and enter into and arrange transactions relating to:

    (i)    any securities issued or to be issued by any Borrower or any Security Party or any such other person; or

    (ii)    any options or other derivatives in connection with such securities;

(c)    to provide advice or other services to any Borrower or any Security Party or any other person who is a party to, or referred to in, a Pertinent Document;

and, in particular, the Security Trustee shall be absolutely entitled, in proposing, evaluating, negotiating, entering into and arranging all such transactions and in connection with all other matters covered by paragraphs (a) to (c), to use (subject only to insider dealing legislation) any information or opportunity, howsoever acquired by it, to pursue its own interests exclusively, to refrain from disclosing such dealings, transactions or other matters or any information acquired in connection with them and to retain for its sole benefit all profits and benefits derived from the dealings transactions or other matters.

**27.10**    **Indemnification of Security Trustee.**  The Lender shall indemnify and hold harmless the Security Trustee on demand against all claims, expenses, liabilities and losses made or brought against or incurred by the Security Trustee in any country in relation to:

(a)    any action taken, or omitted or neglected to be taken, under or in connection with this Agreement or any of the other Pertinent Documents by the Security Trustee;

(b)    any other Pertinent Matter;

unless the claim, expense, liability or loss is shown to have been directly and mainly caused by the dishonesty or the wilful misconduct of the Security Trustee officers or employees.

**27.11**    **Interest.**  Any amount which the Security Trustee demands under Clause 27.10 shall carry interest after the date on which the demand is served until actual payment (as well after as before judgment) in accordance with Clause 7.

**27.12**    **Saving of general law rights; protection cumulative.**  Nothing in this Clause 27 excludes or restricts any right or defence to which the Security Trustee or a representative of the Security Trustee would be entitled apart from this Clause 27. The protective provisions of this Clause 27 are cumulative.

**27.13**    **Extended meaning of certain terms.**  References in this Clause 27 to the Security Trustee include:

(a)    references to it as it has been concerned before the date of this Agreement or is, on or after that date, concerned, whether or not in its capacity as Security Trustee but not in its capacity as the Lender, with the syndication or arranging of the Loan or of any other transaction referred to in or connected with a Pertinent Document, with anything relating to an Event of Default (or Potential Event of Default) or with any other Pertinent Matter; and

(b)    references to any company which is or has at any time been treated for any purpose as belonging to the same group as the Security Trustee and which has been concerned before the date of this Agreement or is, on or after that date, concerned (otherwise than in its capacity as a Lender) with any matter falling within paragraph (a);

and, as regards Pertinent Matters arising before the signing of this Agreement, references to the Lender, the Borrowers and the Security Parties include references to them in their

capacities as persons having to decide whether or not to enter into the transactions to which the Pertinent Documents relate either at all or on the proposed terms of the Pertinent Documents.

27.14   **Retrospective effect.**  This Clause 27 shall be deemed to have come into force on the date falling 1 month before the earliest document to have been written or sent by the Security Trustee with reference to or in contemplation of this Agreement or a financing such as provided for by this Agreement and shall be read, looking forward, as if contained in an agreement signed on that date.

## 28      APPOINTMENT OF A NEW SECURITY TRUSTEE

28.1    **Transfer to associates.**  The Security Trustee may at any time transfer its functions to an associated company, that is, a direct or indirect parent company of the Security Trustee or a wholly-owned direct or indirect subsidiary of the Security Trustee or of its direct or indirect parent company.

28.2    **Notification of transfer.**  A transfer to an associated company shall be effected by a notice to the Borrowers, the Security Parties and the Lender signed by both the retiring Security Trustee and its successor.

28.3    **Effective date of transfer.**  The associated company's appointment becomes effective on the date specified in the notice which shall be at least 7 days after the date on which it is served.

28.4    **Resignation.**  If the Security Trustee does not intend to transfer its functions to an associated company under Clauses 28.1 to 28.3 it may at any time serve on the Lender, with copies to the Borrowers and the Security Parties a notice of its intention to resign (a "**Resignation Notice**") and in that event the following applies:

(a)     a Resignation Notice is not irrevocable unless so expressed;

(b)     a Resignation Notice only becomes effective when the appointment of the successor Security Trustee becomes effective;

(c)     if the Security Trustee serves a Resignation Notice, the Lender has the right to nominate itself or another bank or financial institution as its successor;

(d)     notwithstanding paragraph (c), the resigning Security Trustee may nominate a bank or institution as its successor if the appointment of a successor Security Trustee nominated or agreed to by the Lender has not become effective within 1 month after the date on which the resigning Security Trustee served its Resignation Notice; and

(e)     the successor Security Trustee 's appointment becomes effective on the date on which the retiring Security Trustee receives a notice in writing, addressed to the Borrowers, the Security Parties and the Lender signed by a senior officer of the successor Security Trustee and unconditionally accepting the appointment or on any later date (falling not more than 30 days after the date of the notice) which the notice specifies as the date on which the appointment will become unconditionally effective.

28.5    **Effect of appointment of successor.**  On a successor Security Trustee 's appointment becoming effective:

(a)     it becomes bound to perform the obligations of the Security Trustee under the Finance Documents and entitled to all the powers and protections which the Finance Documents or the Lender confers on the Security Trustee; and

26378423 v12

(b)     except as stated in Clause 28.7 and except for a continuing duty of confidentiality, the resigning Security Trustee is discharged from all its obligations under or in connection with the Finance Documents.

28.6    **Transfer of records etc.**  After a successor Security Trustee 's appointment becomes effective the resigning Security Trustee shall provide the successor Security Trustee with any records (or print outs of any records held in computers), papers, computer programs or other material in its possession which relate solely to its functions as Security Trustee;

28.7    **Continued protection for resigning Security Trustee.**  This Clause 28 and the other provisions of the Finance Documents shall remain in effect for the benefit and protection of the Security Trustee which has resigned and its officers, employees and agents in relation to any claim or loss which may be brought against or incurred by it or them in connection with or as a result of any act, omission, breach, neglect or other occurrence or matter relating to or arising out of any Finance Document which took place before its resignation.

28.8    **Costs of transfer.**  The resigning Security Trustee shall bear its own costs, and the other parties' proper and reasonable costs, incurred in negotiating and documenting the appointment of its successor and the transfer to its successor of the Security Interests held by it under the Finance Documents.

29      **TRANSFERS AND CHANGES IN LENDING OFFICES**

29.1    **Transfer by Borrowers.**  No Borrower may, without the consent of the Lender transfer any of its rights, liabilities or obligations under any Finance Document.

29.2    **Transfer by the Lender.**  Subject to Clause 29.4, the Lender (the **"Transferor Lender"**) may at any time, without needing the consent of any Borrower or any Security Party, cause:

(a)     all of its rights in respect of the Loan; or

(b)     all of its obligations in respect of the Commitment;

        to be (in the case of its rights) transferred to, or (in the case of its obligations) assumed by, another bank or financial institution or a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (a **"Transferee Lender"**) at no extra cost to the Borrowers.   The Lender will deliver to the Borrowers and the Security Parties a completed certificate in the form set out in Schedule 4 with any modifications approved or required by the Transferor Lender and the Transferee Lender (a **"Transfer Certificate"**) executed by the Transferor Lender and the Transferee Lender and the Security Trustee.

        However any rights and obligations of the Transferor Lender in its capacity as Security Trustee will have to be dealt with separately in accordance with Clause 26.

29.3    **Transfer Certificate, delivery and notification.**  As soon as reasonably practicable after a Transfer Certificate is delivered to the Borrowers and the Security Parties, the Borrowers and the Security Parties shall (unless they have reason to believe that the Transfer Certificate may be defective) sign the Transfer Certificate provided that the Transferee Lender shall only execute a Transfer Certificate once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations.

26378423 v12

**29.4**   **Effective Date of Transfer Certificate.**  A Transfer Certificate becomes effective on the date, if any, specified in the Transfer Certificate as its effective date, Provided that it is signed by all relevant parties on or before that date.

**29.5**   **No transfer without Transfer Certificate.**  Except as provided in Clause 29.12, no assignment or transfer of any right or obligation of the Lender under any Finance Document is binding on, or effective in relation to, any Borrower, any Security Party or the Security Trustee unless it is effected, evidenced or perfected by a Transfer Certificate.

**29.6**   **Lender re-organisation; waiver of Transfer Certificate.**  However, if the Lender enters into any merger, de-merger or other reorganisation as a result of which all its rights or obligations vest in another person (the "successor"), the Lender may, if it sees fit, by notice to the successor and the Borrowers and the Security Trustee waive the need for the execution and delivery of a Transfer Certificate; and, upon service of the Lender's notice, the successor shall become the Lender with the same Commitment as was held by the predecessor Lender or Loan amount owing to it as was owed to the predecessor Lender.

**29.7**   **Effect of Transfer Certificate.**  A Transfer Certificate takes effect in accordance with English law as follows:

(a)   to the extent specified in the Transfer Certificate, all rights and interests (present, future or contingent) which the Transferor Lender has under or by virtue of the Finance Documents are assigned to the Transferee Lender absolutely, free of any defects in the Transferor Lender's title and of any rights or equities which any Borrower or any Security Party had against the Transferor Lender;

(b)   the Transferor Lender's Commitment is discharged to the extent specified in the Transfer Certificate;

(c)   the Transferee Lender becomes the Lender with the Loan amount previously owing to the Transferor Lender or the same Commitment as was held by the Transferor Lender and as is specified in the Transfer Certificate;

(d)   the Transferee Lender becomes bound by all the provisions of the Finance Documents which are applicable to the Lender, including those about the exclusion of liability on the part of, and the indemnification of, the Security Trustee and, to the extent that the Transferee Lender becomes bound by those provisions (other than those relating to exclusion of liability), the Transferor Lender ceases to be bound by them;

(e)   any part of the Loan which the Transferee Lender advances after the Transfer Certificate's effective date ranks in point of priority and security in the same way as it would have ranked had it been advanced by the transferor, assuming that any defects in the transferor's title and any rights or equities of any Borrower or any Security Party against the Transferor Lender had not existed;

(f)   the Transferee Lender becomes entitled to all the rights under the Finance Documents which are applicable to the Lender, including but not limited to those under Clause 20, and to the extent that the Transferee Lender becomes entitled to such rights, the Transferor Lender ceases to be entitled to them; and

(g)   in respect of any breach of a warranty, undertaking, condition or other provision of a Finance Document or any misrepresentation made in or in connection with a Finance Document, the Transferee Lender shall be entitled to recover damages by reference to the loss incurred by it as a result of the breach or misrepresentation, irrespective of whether the original Lender would have incurred a loss of that kind or amount.

The rights and equities of any Borrower or any Security Party referred to above include, but are not limited to, any right of set off and any other kind of cross claim.

26378423 v12

**29.8   Sub-participation; subrogation assignment.**  The Lender may sub participate all or any part of its rights and/or obligations under or in connection with the Finance Documents without the consent of, or any notice to, any Borrower, any Security Party or the Security Trustee; and the Lender may assign, in any manner and terms agreed by it and the Security Trustee, all or any part of those rights to an insurer or surety who has become subrogated to them.

**29.9   Disclosure of information.**  The Lender may disclose to a potential Transferee Lender or sub participant any information which the Lender has received in relation to any Borrower, any Security Party or their affairs under or in connection with any Finance Document, unless the information is clearly of a confidential nature.

**29.10   Change of lending office.**  The Lender may change its lending office by giving notice to the Borrowers and the change shall become effective on the later of:

(a)   the date on which the Borrowers receive the notice; and

(b)   the date, if any, specified in the notice as the date on which the change will come into effect.

**29.11   Notification.**  On sending such a notice, the Lender shall notify the Security Trustee; and, until the Security Trustee receives such a notice, it shall be entitled to assume that Security Trustee is acting through the lending office of which the Security Trustee last had notice.

**29.12   Security over Lender's rights.**  In addition to the other rights provided to the Lender under this Clause 29, the Lender may without consulting with or obtaining consent from any Borrower or any Security Party, at any time charge, assign or otherwise create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of the Lender including, without limitation:

(a)   any charge, assignment or other Security Interest to secure obligations to a federal reserve or central bank; and

(b)   in the case of the Lender which is a fund, any charge, assignment or other Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by the Lender as security for those obligations or securities;

except that no such charge, assignment or Security Interest shall:

(i)   release the Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security Interest for the Lender as a party to any of the Finance Documents; or

(ii)   require any payments to be made by any Borrower or any Security Party or grant to any person any more extensive rights than those required to be made or granted to the Lender under the Finance Documents.

# 30   VARIATIONS AND WAIVERS

**30.1   Variations, waivers etc. by Lender.**  A document shall be effective to vary, waive, suspend or limit any provision of a Finance Document, or any Creditor Party's rights or remedies under such a provision or the general law, only if the document is signed, or specifically agreed to by fax, by the Borrowers, by the Security Trustee in its own rights and the Lender, and, if the document relates to a Finance Document to which a Security Party is party, by that Security Party.

30.2 **Exclusion of other or implied variations.** No document, and no act, course of conduct, failure or neglect to act, delay or acquiescence on the part of the Creditor Parties or any of them (or any person acting on behalf of any of them) shall result in the Creditor Parties or any of them (or any person acting on behalf of any of them) being taken to have varied, waived, suspended or limited, or being precluded (permanently or temporarily) from enforcing, relying on or exercising:

(a)     a provision of this Agreement or another Finance Document; or

(b)     an Event of Default; or

(c)     a breach by a Borrower or a Security Party of an obligation under a Finance Document or the general law; or

(d)     any right or remedy conferred by any Finance Document or by the general law,

and there shall not be implied into any Finance Document any term or condition requiring any such provision to be enforced, or such right or remedy to be exercised, within a certain or reasonable time.

31 **NOTICES**

31.1 **General.** Unless otherwise specifically provided, any notice under or in connection with any Finance Document shall be given by letter or fax; and references in the Finance Documents to written notices, notices in writing and notices signed by particular persons shall be construed accordingly.

31.2 **Addresses for communications.** A notice by letter or fax shall be sent:

(a)     to the Borrowers:                  Global Shipmanagement
                                          Avenida Francisco de Miranda,
                                          Edificio Parque Cristal
                                          Piso 13
                                          Officina 13-10
                                          Los Palos Grandes
                                          Caracas
                                          Venezuela

                                          Fax No: +58 212 216 0549

                                          Attn: Ludovico Fontana/Ron Hernandez

        with a copy to:                   Fax No: +1 281 347 5271

                                          Attn: Andy Longhurst

(b)     to a Lender:                      At the address below its name in Schedule 1 or (as the case may require) in the relevant Transfer Certificate.

(c)     to the Security Trustee:          Korea Securities Finance Corp.
                                          34-9, Yeouido-dong
                                          Yeongdeungpo-gu
                                          Seoul
                                          Korea

                                          Fax No: 82 2 3770 8244
                                          Attn: Oh, Joo Man

Copy to:

Collective Investment Company
Golden Bridge Asset Management Co., Ltd.
SF, 222, Chungjeongno3-Ga
Seodaemun-Ku
Seoul
Korea

Fax No: 82 2 360 9559

Attn: Park, In Bae

or to such other address as the relevant party may notify the others.

**31.3**    **Effective date of notices.** Subject to Clauses 31.4 and 31.5:

(a)    a notice which is delivered personally or posted shall be deemed to be served, and shall take effect, at the time when it is delivered; and

(b)    a notice which is sent by fax shall be deemed to be served, and shall take effect, 2 hours after its transmission is completed.

**31.4**    **Service outside business hours.** However, if under Clause 31.3 a notice would be deemed to be served:

(a)    (a)    on a day which is not a business day in the place of receipt; or

(b)    (b)    on such a business day, but after 5 p.m. local time,

the notice shall (subject to Clause 31.5) be deemed to be served, and shall take effect, at 9 a.m. on the next day which is such a business day.

**31.5**    **Illegible notices.** Clauses 31.3 and 31.4 do not apply if the recipient of a notice notifies the sender within 1 hour after the time at which the notice would otherwise be deemed to be served that the notice has been received in a form which is illegible in a material respect.

**31.6**    **Valid notices.** A notice under or in connection with a Finance Document shall not be invalid by reason that its contents or the manner of serving it do not comply with the requirements of this Agreement or, where appropriate, any other Finance Document under which it is served if:

(a)    the failure to serve it in accordance with the requirements of this Agreement or other Finance Document, as the case may be, has not caused any party to suffer any significant loss or prejudice; or

(b)    in the case of incorrect and/or incomplete contents, it should have been reasonably clear to the party on which the notice was served what the correct or missing particulars should have been.

**31.7**    **English language.** Any notice under or in connection with a Finance Document shall be in English.

**31.8**    **Meaning of "notice".** In this Clause 31, "notice" includes any demand, consent, authorisation, approval, instruction, waiver or other communication.

         26378423 v12

## 32   JOINT AND SEVERAL LIABILITY

**32.1**   **General.**  All liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be several and, if and to the extent consistent with Clause 32.2, joint.

**32.2**   **No impairment of Borrower's obligations.**   The liabilities and obligations of a Borrower shall not be impaired by:

(a)   this Agreement being or later becoming void, unenforceable or illegal as regards any other Borrower;

(b)   the Lender or the Security Trustee entering into any rescheduling, refinancing or other arrangement of any kind with any other Borrower;

(c)   the Lender or the Security Trustee releasing any other Borrower or any Security Interest created by a Finance Document; or

(d)   the combination of the foregoing.

**32.3**   **Principal debtors.**  Each Borrower declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and the Finance Documents and no Borrower shall in any circumstances be construed to be a surety for the obligations of any other Borrower under this Agreement.

**32.4**   **Subordination.**  Subject to Clause 32.5, during the Security Period, no Borrower shall:

(a)   claim any amount which may be due to it from any other Borrower whether in respect of a payment made, or matter arising out of, this Agreement or any Finance Document, or any matter unconnected with this Agreement or any Finance Document; or

(b)   take or enforce any form of security from any other Borrower for such an amount, or in any other way seek to have recourse in respect of such an amount against any asset of any other Borrower; or

(c)   set off such an amount against any sum due from it to any other Borrower; or

(d)   prove or claim for such an amount in any liquidation, administration, arrangement or similar procedure involving any other Borrower or other Security Party; or

(e)   exercise or assert any combination of the foregoing.

**32.5**   **Borrower's required action.**  If during the Security Period, the Lender, by notice to a Borrower, requires it to take any action referred to in paragraphs (a) to (d) of Clause 32.5, in relation to any other Borrower, that Borrower shall take that action as soon as practicable after receiving the Lender's notice.

## 33   SUPPLEMENTAL

**33.1**   **Rights cumulative, non-exclusive.**   The rights and remedies which the Finance Documents give to each Creditor Party are:

(a)   cumulative;

(b)   may be exercised as often as appears expedient; and

(c)   shall not, unless a Finance Document explicitly and specifically states so, be taken to exclude or limit any right or remedy conferred by any law.

26378423 v12

**33.2**   **Severability of provisions.**  If any provision of a Finance Document is or subsequently becomes void, unenforceable or illegal, that shall not affect the validity, enforceability or legality of the other provisions of that Finance Document or of the provisions of any other Finance Document.

**33.3**   **Counterparts.**  A Finance Document may be executed in any number of counterparts.

**33.4**   **Third party rights.**  A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

**34**   **LAW AND JURISDICTION**

**34.1**   **English law.**  This Agreement and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

**34.2**   **Exclusive English jurisdiction.**  Subject to Clause 34.3, the courts of England shall have exclusive jurisdiction to settle any Dispute.

**34.3**   **Choice of forum for the exclusive benefit of the Creditor Parties.**  Clause 34.2 is for the exclusive benefit of the Creditor Parties, each of which reserves the right:

(a)   to commence proceedings in relation to any Dispute in the courts of any country other than England and which have or claim jurisdiction to that Dispute; and

(b)   to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or without commencing proceedings in England.

Neither Borrower shall commence any proceedings in any country other than England in relation to a Dispute.

**34.4**   **Process agent.**  Each Borrower irrevocably appoints Fladgate LLP at its registered office for the time being, presently at 16 Great Queen Street, London WC2B 5DG, to act as its agent to receive and accept on its behalf any process or other document relating to any proceedings in the English courts which are connected with a Dispute.

**34.5**   **Creditor Party rights unaffected.**  Nothing in this Clause 34 shall exclude or limit any right which any Creditor Party may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

**34.6**   **Meaning of "proceedings".**  In this Clause 34, **"proceedings"** means proceedings of any kind, including an application for a provisional or protective measure and a **"Dispute"** means any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement) or any non-contractual obligation arising out of or in connection with this Agreement.

**THIS AGREEMENT** has been executed as a deed by or on behalf of parties and has, on the date stated at the beginning of this Agreement, been delivered as a deed.

26378423 v12

## SCHEDULE 1

### LENDER

| Lender | Lending Office |
|---|---|
| ShinHan Capital Co., Ltd. | 530-1 Gozan-2 Dong<br>Danwon-Gu<br>Ansansi, Korea<br>Tel: 82 2 3445 34000<br>Fax: 82 2 3445 3409<br>Attn: Noh, Hun Duk |

26378423 v12



## SCHEDULE 2

## DRAWDOWN NOTICE

To:     [Lender]
        c/o Meriel Partners

Attention: Meeyoung Choi

[●]

DRAWDOWN NOTICE

1       We refer to the loan agreement (the "Loan Agreement") dated [●] 2010 and made
        between ourselves, as Borrowers, the Lender referred to therein and Korea Securities
        Finance Corp. as Security Trustee in connection with a facility of up to US$6,000,000.
        Terms defined in the Loan Agreement have their defined meanings when used in this
        Drawdown Notice.

2       We request to borrow as follows:

(a)     Amount: US$[●];

(b)     Drawdown Date: [●]; and

(c)     Payment instructions : account in our name and numbered [●] with [●] of [●].

3       We represent and warrant that:

(a)     the representations and warranties in Clause 10 of the Loan Agreement would remain true
        and not misleading if repeated on the date of this notice with reference to the
        circumstances now existing; and

(b)     no Event of Default or Potential Event of Default has occurred or will result from the
        borrowing of the Loan.

4       This notice cannot be revoked without the prior consent of the Lender.

### [Name of Signatory]

Director
for and on behalf of
**WIESBADEN TECHNICAL DREDGING CORP.**
**REGENSBURG SHIPPING S.A.**

## SCHEDULE 3

## CONDITION PRECEDENT DOCUMENTS

## PART A

The following are the documents referred to in Clause 9.1(a) required before service of the Drawdown Notice.

1   A duly executed original of each Finance Document (and of each document required to be delivered by each Finance Document) other than the Collateral Mortgages and the Collateral Insurance Assignments and those referred to in Part B.

2   Copies of the certificate of incorporation and constitutional documents of each Borrower and each Security Party.

3   Copies of resolutions of the shareholders and directors of each Borrower and each Security Party authorising the execution of each of the Finance Documents to which that Borrower or that Security Party is a party and, in the case of a Borrower, authorising named officers to give the Drawdown Notices and other notices under this Agreement and in the case of the Borrowers ratifying the execution of the Bareboat Charter and the OTG Time Charter to which it is a party, in the case of the Bareboat Charterer ratifying the execution of the OTG Time Charter to which it is a party and in the case of OTG ratifying the execution of the Time Charter.

4   The original of any power of attorney under which any Finance Document is executed on behalf of a Borrower or a Security Party.

5   Copies of all consents which any Borrower or any Security Party requires to enter into, or make any payment under, any Finance Document, the Bareboat Charter, the OTG Time Charters or the Time Charter.

6   Evidence that the OTG Account, the Earnings Accounts and the Reserve Accounts are open.

7   A valuation of each Financed Ship, addressed to the Lender, stated to be for the purposes of this Agreement obtained in accordance with Clause 15 and showing the requirements of Clause 15 have been met.

8   Copies of the Bareboat Charter, the OTG Time Charters and the Time Charter and of all documents signed or issued by a Borrower (or any of them) under or in connection with them.

9   Such documentary evidence as the Lender and its legal advisers may require in relation to the due authorisation and execution by the Time Charterer of the Time Charter and of all documents to be executed under the Bareboat Charter, the OTG Time Charters and the Time Charter.

10  Documentary evidence that the agent for service of process named in Clause 34 has accepted its appointment.

11  Favourable legal opinions from lawyers appointed by the Lender on such matters concerning the laws of Panama, England and Venezuela and such other relevant jurisdictions as the Lender may require.

26378423 v12

12    Such documents and other evidence in such form as is requested by the Lender in order for it to comply with all necessary "know your customer" or "client acceptance" or other similar identification procedures in relation to the transactions contemplated in the Finance Documents.

13    If the Lender so requires, in respect of any of the documents referred to above, a certified English translation prepared by a translator approved by the Lender.

26378423 v12

## PART B

The following are the documents referred to in Clause 9.1(b) required before the Drawdown Date.

1     A duly executed original of the Mortgages, the Tripartite Assignment and the Multiparty Assignment (and of each document to be delivered by each of them).

2     Documentary evidence that:

(a)     each Financed Ship is provisionally registered in the name of the relevant Borrower under Panamanian flag and in the case of Morocoto also registered in the name of the Bareboat Charterer with the Venezuelan bareboat registry;

(b)     each Financed Ship is in the absolute and unencumbered ownership of the relevant Owner as the case may be save as contemplated by the Finance Documents;

(c)     each Financed Ship maintains the highest class for vessels of a similar age and type as the Financed Ship with American Bureau of Shipping free of all overdue recommendations and conditions of such Classification Society;

(d)     the Mortgage relating to each Financed Ship has been duly registered against that Financed Ship as a valid first preferred Panamanian ship mortgage in accordance with the laws of the Republic of Panama;

(e)     each Financed Ship is insured in accordance with the provisions of this Agreement and all requirements therein in respect of insurances have been complied with.

(f)     the Morocoto has been unconditionally delivered by the relevant Borrower to, and accepted by the Bareboat Charterer under the Bareboat Charter;

(g)     each Financed Ship has been unconditionally delivered to the Borrower relating to Inmaculada and the Bareboat Charterer in the case of Morocoto, and accepted by OTG under the relevant OTG Time Charter; and

(h)     each Financed Ship has been unconditionally delivered by OTG to, and accepted by, the Time Charterer under the Time Charter.

3     Documents establishing that each Financed Ship will, as from the Drawdown Date, be managed by the Approved Manager on terms acceptable to the Lender, together with:

(a)     in respect of each Financed Ship, a letter of undertaking executed by the Approved Manager in favour of the Security Trustee in the terms required by the Security Trustee agreeing certain matters in relation to the management of that Financed Ship and subordinating the rights of the Approved Manager against that Financed Ship, the relevant Borrower and the Bareboat Charterer to the rights of the Creditor Parties under the Finance Documents; and

(b)     copies of the Approved Manager's Document of Compliance and of each Financed Ship's Safety Management Certificate (together with any other details of the applicable safety management system which the Lender requires) and ISSC.

4     Evidence that there is or will be standing to the credit of each Reserve Account an amount at least equal to $423,661.50.

5       Favourable legal opinions from lawyers appointed by the Lender on such matters concerning the laws of England, Panama and Venezuela and such other relevant jurisdictions as the Lender may require.

6       A favourable opinion from an independent insurance consultant acceptable to the Lender on such matters relating to the insurances for each Ship as the Lender may require.

7       If the Lender so requires, in respect of any of the documents referred to above, a certified English translation prepared by a translator approved by the Lender.

26378423 v12

## PART C

The following are the documents referred to in Clause 11.18.

1       Documentary evidence that the Inmaculada has been unconditionally redelivered by the Time Charterer back to OTG and that the Inmaculada has been unconditionally redelivered by OTG back to the Owner of the Inmaculada.

2       A copy of the new bareboat charter entered into by the Owner of the Inmaculada and the Bareboat Charterer or such other company as approved by the Lender under Clause 11.18.

3       Documentary evidence that the Inmaculada has been unconditionally delivered by the Owner of the Inmaculada to the Bareboat Charterer or such other company as approved by the Lender under Clause 11.18 pursuant to the bareboat charter referred to in paragraph 2 above.

4       An assignment by the Bareboat Charterer or such other company as approved by the Lender under Clause 11.18 of its rights and interests in respect of the Earnings, the Insurances, any Requisition Compensation and the Time Charter and any connected security such as account security as the Lender may require in a form acceptable to the Lender acting in its absolute discretion.

5       Documentary evidence that the Inmaculada is permanently registered in the name of the Owner of the Inmaculada under Panamanian flag and also registered in the name of the Bareboat Charterer or such other company as approved by the Lender under Clause 11.18 with the Venezuelan bareboat registry.

6       Evidence that the Inmaculada continues to be insured in accordance with the provisions of this Agreement and all requirements therein in respect of insurances have been complied with.

7       Favourable legal opinions from lawyers appointed by the Lender on such matters concerning the laws of such relevant jurisdictions as the Lender may require.

Each copy document delivered under this Schedule shall be certified as a true and up to date copy by a director or the secretary (or equivalent officer) of a Borrower.

## SCHEDULE 4

## TRANSFER CERTIFICATE

**The Transferor and the Transferee accept exclusive responsibility for ensuring that this Certificate and the transaction to which it relates comply with all legal and regulatory requirements applicable to them respectively.**

To:     The Borrowers, the Security Parties, the Security Trustee and the Lender, as defined in the Loan Agreement referred to below.

[●]

1       This Certificate relates to a Loan Agreement (the "**Loan Agreement**") dated [●] 2010 and made between (1) Weisbaden Technical Dredging Corp. and Regensburg Shipping S.A. (the "**Borrowers**"), (2) the bank or financial institution named therein and (3) Korea Securities Finance Corp. as Security Trustee for a loan facility of up to US$6,000,000.

2       In this Certificate, terms defined in the Loan Agreement shall, unless the contrary intention appears, have the same meanings and:

"**Relevant Parties**" means each Borrower, each Security Party, the Security Trustee and the Lender;

"**Transferor**" means [full name] of [lending office]; and

"**Transferee**" means [full name] of [lending office].

3       The effective date of this Certificate is [●] **Provided that** this Certificate shall not come into effect unless it is signed by the Transferor, the Transferee, each Borrower and each Security Party on or before that date.

4       The Transferor assigns to the Transferee absolutely all rights and interests (present, future or contingent) which the Transferor has as Lender under or by virtue of the Loan Agreement and every other Finance Document in relation to the Loan.

5       By virtue of this Certificate and Clause 29 of the Loan Agreement, the Transferor is discharged entirely from the Commitment and the Transferee acquires the Commitment.

6       The Transferee undertakes with the Transferor and each of the Relevant Parties that the Transferee will observe and perform all the obligations under the Finance Documents which Clause 29 of the Loan Agreement provides will become binding on it upon this Certificate taking effect.

7       The Transferor:

(a)     warrants to the Transferee and each Relevant Party that:

(i)     the Transferor has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which are in connection with this transaction; and

(ii)    this Certificate is valid and binding as regards the Transferor;

(b)   warrants to the Transferee that the Transferor is absolutely entitled, free of encumbrances, to all the rights and interests covered by the assignment in paragraph 4 above; and

(c)   undertakes with the Transferee that the Transferor will, at its own expense, execute any documents which the Transferee reasonably requests for perfecting in any relevant jurisdiction the Transferee's title under this Certificate or for a similar purpose.

8   The Transferee:

(a)   confirms that it has received a copy of the Loan Agreement and each of the other Finance Documents;

(b)   agrees that it will have no rights of recourse on any ground against either the Transferor, the Security Trustee or the Lender in the event that:

   (i)   any of the Finance Documents prove to be invalid or ineffective;

   (ii)   any Borrower or any Security Party fails to observe or perform its obligations, or to discharge its liabilities, under any of the Finance Documents;

   (iii)   it proves impossible to realise any asset covered by a Security Interest created by a Finance Document, or the proceeds of such assets are insufficient to discharge the liabilities of the Borrowers or Security Party under the Finance Documents;

(c)   agrees that it will have no rights of recourse on any ground against the Security Trustee or the Transferor in the event that this Certificate proves to be invalid or ineffective;

(d)   warrants to the Transferor and each Relevant Party that:

   (i)   it has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which it needs to take or obtain in connection with this transaction; and

   (ii)   this Certificate is valid and binding as regards the Transferee; and

(e)   confirms the accuracy of the administrative details set out below regarding the Transferee.

9   The Transferor and the Transferee each undertake with the Security Trustee severally, on demand, fully to indemnify the Security Trustee in respect of any claim, proceeding, liability or expense (including all legal expenses) which they or either of them may incur in connection with this Certificate or any matter arising out of it, except such as are shown to have been mainly and directly caused by the gross and culpable negligence or dishonesty of the Security Trustee's own officers or employees.

10   The Transferee shall repay to the Transferor on demand so much of any sum paid by the Transferor under paragraph 10 as exceeds one-half of the amount demanded by the Security Trustee in respect of a claim, proceeding, liability or expense which was not reasonably foreseeable at the date of this Certificate; but nothing in this paragraph shall affect the liability of each of the Transferor and the Transferee to the Security Trustee for the full amount demanded by it.

[Name of Transferor]                          [Name of Transferee]

By:                                           By:

Date:                                         Date:

**Borrowers**

**Wiesbaden Technical Dredging Corp.**

By:

Date:

**Regensburg Shipping S.A.**

By:

Date:

**Security Parties**

By:

Date:

26378423 v12

## Administrative Details of Transferee

Name of Transferee:

Lending Office:

Contact Person

(Loan Administration Department):

Telephone:

Fax:

Contact Person

(Credit Administration Department):

Telephone:

Fax:

Account for payments:

Note:   This Transfer Certificate alone may not be sufficient to transfer a proportionate share of the Transferor's interest in the security constituted by the Finance Documents in the Transferor's or Transferee's jurisdiction.  It is the responsibility of the Lender to ascertain whether any other documents are required for this purpose.

## SCHEDULE 5

### SCHEDULE OF REPAYMENT INSTALMENTS AND INTEREST PAYMENTS

| Months after the Drawdown Date | Repayment ($) | Interest ($) | Total ($) |
|---|---|---|---|
| 1 | 222,441 | 60,000 | 282,441 |
| 2 | 224,665 | 57,776 | 282,441 |
| 3 | 226,912 | 55,529 | 282,441 |
| 4 | 229,181 | 53,260 | 282,441 |
| 5 | 231,473 | 50,968 | 282,441 |
| 6 | 233,788 | 48,653 | 282,441 |
| 7 | 236,125 | 46,315 | 282,441 |
| 8 | 238,487 | 43,954 | 282,441 |
| 9 | 240,872 | 41,569 | 282,441 |
| 10 | 243,280 | 39,161 | 282,441 |
| 11 | 245,713 | 36,728 | 282,441 |
| 12 | 248,170 | 34,271 | 282,441 |
| 13 | 250,652 | 31,789 | 282,441 |
| 14 | 253,158 | 29,282 | 282,441 |
| 15 | 255,690 | 26,751 | 282,441 |
| 16 | 258,247 | 24,194 | 282,441 |
| 17 | 260,829 | 21,611 | 282,441 |
| 18 | 263,438 | 19,003 | 282,441 |
| 19 | 266,072 | 16,369 | 282,441 |
| 20 | 268,733 | 13,708 | 282,441 |
| 21 | 271,420 | 11,021 | 282,441 |
| 22 | 274,134 | 8,307 | 282,441 |
| 23 | 276,876 | 5,565 | 282,441 |
| 24 | 279,644 | 2,796 | 282,441 |

26378423 v12

# EXECUTION PAGE

**BORROWERS**

**EXECUTED** and **DELIVERED** as a **DEED**
by

)
)
)
)
)

MYTHILY KATSARIS
ATTORNEY IN FACT

for and on behalf of
**WIESBADEN TECHNICAL
DREDGING CORP.**
in the presence of:

Wanda Heppenheimer

**EXECUTED** and **DELIVERED** as a **DEED**
by

)
)
)
)
)

MYTHILY KATSARIS
ATTORNEY IN FACT

for and on behalf of
**REGENSBURG SHIPPING S.A.**
in the presence of:

Wanda Heppenheimer

**LENDER**

**EXECUTED** and **DELIVERED** as a **DEED**
by

)
)
)
)
)

So-Young Lee
ATTORNEY IN FACT

for and on behalf of
**SHINHAN CAPITAL CO., LTD.**
in the presence of:

SARAH WILLIAMSON

**SECURITY TRUSTEE**

**EXECUTED** and **DELIVERED** as a **DEED**
by

)
)
)
)
)

So-Young Lee
ATTORNEY IN FACT

for and on behalf of
**KOREA SECURITIES FINANCE CORP.**
in the presence of:

SARAH WILLIAMSON

26378423 v12

**DRAWDOWN NOTICE**

To:    ShinHan Capital Co., Ltd.
        c/o Meriel Partners

Attention: Meeyoung Choi

Date: 25 October 2010

DRAWDOWN NOTICE

1.    We refer to the loan agreement (the "Loan Agreement") dated 25 October 2010 and made between ourselves, as Borrowers, the Lender referred to therein and Korea Securities Finance Corp. as Security Trustee in connection with a facility of up to US$6,000,000. Terms defined in the Loan Agreement have their defined meanings when used in this Drawdown Notice.

2.    We request to borrow as follows:

    (a)    Amount: US$ 6,000,000;

    (b)    Drawdown Date: 28 October 2010; and

    (c)    Payment instructions: as separately advised.

3.    We represent and warrant that:

    (a)    the representations and warranties in Clause 10 of the Loan Agreement would remain true and not misleading if repeated on the date of this notice with reference to the circumstances now existing; and

    (b)    no Event of Default or Potential Event of Default has occurred or will result from the borrowing of the Loan.

4.    This notice cannot be revoked without the prior consent of the Lender.

**Mythily Katsaris**

ATTORNEY IN FACT

for and on behalf of
**WIESBADEN TECHNICAL DREDGING CORP.
REGENSBURG SHIPPING S.A.**

## LETTER OF INSTRUCTION

To:    ShinHan Capital Co., Ltd.
       c/o Meriel Partners

Attention: Meeyoung Choi

Date:    October 2010

INSTRUCTIONS FOR DRAWDOWN

1.    We refer to the drawdown notice dated 25 October 2010 (the "Drawdown Notice") in
      relation to the loan agreement (the "Loan Agreement") dated 25 October 2010 and made
      between ourselves, as Borrowers, the Lender referred to therein and Korea Securities
      Finance Corp. as Security Trustee in connection with a facility of up to US$6,000,000 (the
      "Facility"). Terms defined in the Loan Agreement and the Drawdown Notice have their
      defined meanings when used in this letter.

2.    We request that the drawdown of the Facility be made as follows:

      (a)    an amount of US$ 4,783,500 be transferred to the client account of Watson Farley &
             Williams LLP, London for further distribution to Seabulk Towing, Inc.,
             Delaware.

      (b)    a further amount of US$ 423,661.50 be transferred to the Account Bank in Korea
             designated "Wiesbaden Technical Dredging Corp" – Reserve Account";

      (c)    a further amount of US$ 423,661.50 be transferred to the Account Bank in Korea
             designated "Regensburg Shipping S.A." – Reserve Account"; and

      (d)    the balance of the Facility in the amount of US$ 369,177 to be transferred to the
             account of Wiesbaden Technical Dredging Corp held with Shinhan Bank, Bank
             Branch: GS Tower Corporate Banking Center, Bank Address: 679, Yoeksam Dong,
             Gangnam Gu, Seoul, Korea, SWIFT Code: SHBKKRSEXXX, Account No. 180-005-
             384901.

Mythily Katsaris

MYTHILY KATSARIS
ATTORNEY IN FACT
for and on behalf of
WIESBADEN TECHNICAL DREDGING CORP.
REGENSBURG SHIPPING S.A.

## TRANSFER CERTIFICATE

This Transfer Certificate relates to the loan agreement dated October 25, 2010 by and between Wiesbaden Technical Dredging Corp. and Regensburg Shipping S.A. as borrowers (the **Borrowers"**), Shinhan Capital as lender and Korea Securities Finance Corp. as security trustee (the **"Loan Agreement"**).   Terms defined in the Loan Agreement shall have the same meanings in this Transfer Certificate.

1   Shinhan Capital Co. Ltd. (the **"Existing Lender"**) (a) confirms the accuracy of the summary of its Loan set out in the schedule to this Transfer Certificate and (b) requests Korea Securities Finance Corp. in its capacity as trustee for Golden Bridge Blue-Marine Ship Special purpose Private Fund 1 (the **"Fund"**) under the Capital Markets and Financial Investment Business Act of Korea (the **"Transferee"**) to accept the portion of its Loan specified in the schedule to this Transfer Certificate by countersigning and delivering this Transfer Certificate to the Existing Lender at its address for the service of notice in the Loan Agreement.

2   The Transferee requests the Existing Lender (on behalf of itself and the Borrowers) to accept this Transfer Certificate as being delivered to the Existing Lender pursuant to and for the purposes of Clause 31 of the Loan Agreement, so as to take effect in accordance with its terms on the date of transfer (the **"Transfer Effective Date"**).

3   The Existing Lender (on behalf of itself and the Borrower) confirms the transfer effected by this Transfer Certificate pursuant to and for the purposes of Clause 31 of the Loan Agreement.

4   The Transferee confirms:

   (a)   that it has received copies of the Loan Agreement and each of the Finance Documents and all other documentation and information required by it in connection with the transactions contemplated by this Transfer Certificate;

   (b)   that it has made and will continue to make its own assessment of the validity, enforceability and sufficiency of the Loan Agreement, the other Finance Documents and this Transfer Certificate and has not relied and will not rely on the Existing Lender or any statements made by the Existing Lender in any respect;

   (c)   that it has made and will continue to make its own credit assessment of the Borrowers and any Security Party and has not relied and will not rely on the Existing Lender or any statements made by the Existing Lender in any respect; and

   (d)   accordingly, the Existing Lender shall not have any liability or responsibility to the Transferee in respect of any of the foregoing matters.

5   Execution of this Transfer Certificate by the Transferee constitutes its representation to the Existing Lender and all other parties to the Loan Agreement that it has power to become a party to the Loan Agreement as a Lender on the terms herein and therein set out and has taken all necessary steps to authorize the execution and delivery of this Transfer Certificate.

6   The Existing Lender makes no representation or warranty and assumes no responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of the Loan Agreement or any of the other Finance Documents or any document relating thereto and assumes no responsibility for the financial condition of or for the performance and observance by any of Borrowers or any Security Party of any of its obligations under any of the Finance Documents or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

7   The Transferee hereby undertakes to the Existing Lender and each of the other parties to the Loan Agreement and the other Finance Documents that it will perform in accordance with their terms all those obligations which by the respective terms of the Loan Agreement will be assumed by it after acceptance of this Transfer Certificate by the Existing Lender and agrees to be bound by the terms of the Loan Agreement. The Transferee acknowledges that the Existing Lender has no obligation to re-purchase or re-acquire any of the rights and obligations transferred by virtue of this Transfer Certificate or to support, indemnify or compensate the Transferee for any losses suffered by the Transferee as a consequence of a transfer effected by virtue of this Transfer Certificate..

8   The Existing Lender:

   (a)   warrants to the Transferee that it has full power to enter into this Transfer Certificate and has taken all corporate action necessary to authorize it to do so;

   (b)   warrants to the Transferee that this Transfer Certificate is binding on the Existing Lender under the laws of the Republic of Korea, the country in which the Existing Lender is incorporated and the country in which its lending office is located; and

   (c)   agrees that it will execute any documents which the Transferee reasonably requests for perfecting in any relevant jurisdiction the Transferee's title under this Transfer Certificate or for a similar purpose (including without limitation, the transfer to the Transferee of the Security Interests of the Existing Lender under the Finance Documents, if necessary) no later than 2 Banking Days from the Transfer Effective Date (or such later date as may be agreed by the Transferee).

9   The Transferee acknowledges that the Existing Lender shall not be liable for any matter other than the Existing Lender's representation and warranties contained in Article 8 hereof, and that the Existing Lender shall have no obligation to indemnify or compensate Transferee or any third party against any and all losses suffered on the account of a change of circumstances after a transfer effected by virtue of this Transfer Certificate. Provided that, should the Transferee not raise any objections to the Existing Lender's representation and warranties contained in Article 8 hereof until the Transfer Effective Date, the Existing Lender shall no longer bear any liability regarding its representation and warranties contained in Article 8 hereof.

10   By execution of this Transfer Certificate on its behalf by the Existing Lender and in reliance upon the representations and warranties of the Transferee, each of the Borrowers accepts the Transferee as a party to the Loan Agreement with respect to all those rights and/or obligations which by the terms of the Loan Agreement will be

assumed by the Transferee after delivery of the executed copies of this Transfer Certificate to the Existing Lender and satisfaction of the conditions (if any) subject to which this Transfer Certificate is expressed to take effect.

11   The agreements and undertakings of the Transferee in this Transfer Certificate are given to, and for the benefit of, and made with, each of the other parties to the Loan Agreement and the Finance Documents.

12      This Transfer Certificate is governed by laws of the Republic of Korea.

## Schedule

| Amount of | Next Interest Payment Date(s) | Portion Novated |
|---|---|---|
| Loan US$ 6,000,000 | | US$ 6,000,000 |

**Administrative Details of Transferee**

Address:
Account for payments:
Telephone:
Telefax:
Attention:

**AS WITNESS** the hands of the authorised signatories of the parties hereto on the date appearing below.

<u>**EXISTING LENDER**</u>

**SHINHAN CAPITAL CO., LTD.**

Name: SO-YOUNG LEE
Title: ATTORNEY IN FACT

Sarah Williamson
Trainee Solicitor
London
EC2A 2HB

<u>**TRANSFEREE**</u>

**KOREA SECURITIES FINANCE CORP.**

Name: SO-YOUNG LEE
Title: ATTORNEY IN FACT

Sarah Williamson
Trainee Solicitor
London
EC2A 2HB

Agreed and consented to as of the date hereof,

<u>**BORROWRS**</u>

<u>**WIESBADEN TECHNICAL DREDGING CORP.**</u>

Name: MYRMILY KATSARIS
Title: ATTORNEY IN FACT

Witness: Wanda Hoppenheimer

<u>**REGENSBURG SHIPPING S.A.**</u>

Name: MYRMILY KATSARIS
Title: ATTORNEY IN FACT

Witness: Wanda Hoppenheimer

# EXHIBIT B

**VISION SANTA MARIA MIAMI INC.**
as Guarantor

– and –

**KOREA SECURITIES FINANCE CORP.**
as Security Trustee

---

## GUARANTEE

---

relating to
a Loan Agreement dated 25 October 2010

**Watson, Farley & Williams**
**London**

## INDEX

| Clause | | Page |
|---|---|---|
| 1 | INTERPRETATION | 2 |
| 2 | GUARANTEE | 2 |
| 3 | LIABILITY AS PRINCIPAL AND INDEPENDENT DEBTOR | 3 |
| 4 | EXPENSES | 4 |
| 5 | ADJUSTMENT OF TRANSACTIONS | 4 |
| 6 | PAYMENTS | 4 |
| 7 | INTEREST | 5 |
| 8 | SUBORDINATION | 5 |
| 9 | ENFORCEMENT | 5 |
| 10 | REPRESENTATIONS AND WARRANTIES | 6 |
| 11 | UNDERTAKINGS | 8 |
| 12 | JUDGMENTS AND CURRENCY INDEMNITY | 9 |
| 13 | FEES AND EXPENSES | 9 |
| 14 | SUPPLEMENTAL | 9 |
| 15 | ASSIGNMENT | 11 |
| 16 | NOTICES | 11 |
| 17 | INVALIDITY OF LOAN AGREEMENT | 12 |
| 18 | GOVERNING LAW AND JURISDICTION | 12 |

**THIS DEED OF GUARANTEE** is made on        April 2011

**BETWEEN**

(1)     **VISION SANTA MARIA MIAMI INC.**, a company incorporated in Florida whose registered office at 25 SE 2nd Ave, 730, Miami, Florida, USA, 33131 ("**Vision**"); and

(2)     **KOREA SECURITIES FINANCE CORP.**, acting through its office at 34-9 Yeouidodong, Yeongdeungpo-gu, Seoul, Korea (the "**Security Trustee**", which expression includes its successors and assigns).

**BACKGROUND**

(A)     By a loan agreement dated 25 October 2010 (the "**Loan Agreement**") and made between (i) Wiesbaden Technical Dredging Corp. and Regensburg Shipping SA as Borrowers, (ii) the Lender named therein and (iii) the Security Trustee, it was agreed that the Lender would make available to the Borrowers a facility of up to US$6,000,000.

(B)     By a notice of default, cancellation, acceleration and demand dated 2 March 2011, the Security Trustee declared the Loan, all accrued interest and all other amounts accrued or owing under the Loan Agreement and every other Finance Document immediately due and payable and demanded immediate repayment of the principal outstanding following the occurrence of a number of Events of Default.

(C)     By a notice of demand dated 16 March 2011, the Security Trustee demanded payment by the Guarantor, the Bareboat Charterer and OTG of all amounts payable by the Borrowers under the Loan Agreement and Finance Documents pursuant to certain guarantees.

(D)     By a claim issued on 18 March 2011, the Security Trustee commenced proceedings in the Commercial Court of the Queen's Bench Division of the English High Court against the Borrowers and the Guarantor, the Bareboat Charterer and OTG to recover the sums due under the Loan Agreement and the Finance Documents.

(E)     By an agreement dated        April 2011 entered into between the Borrowers, Maroil Trading Inc., OTG Shipping Corporation, Suramericana de Transporte Petrolero C.A., Global Shipmanagement C.A. and the Security Trustee, the Security Trustee agreed to stay enforcement of its rights under the Finance Documents and to provide the Borrowers with an opportunity to repay sums outstanding under the Loan Agreement and the Finance Documents on certain conditions, including the granting of this Guarantee.

(F)     Vision, being a company owned by Wilmer Ruperti the CEO and Chairman of Vision, has agreed to provide a first priority mortgage over an apartment at 1643 Brickell Avenue, Apartment 4901, Miami, Florida, FL33129, USA.

(G)     This Guarantee has been entered into pursuant to the agreement referred to in Recital (E).

**IT IS AGREED** as follows:

**1       INTERPRETATION**

**1.1     Defined expressions.**   Words and expressions defined in the Loan Agreement shall have the same meanings when used in this Guarantee unless the context otherwise requires.

**1.2     Construction of certain terms.**   In this Guarantee:

"**bankruptcy**" includes a liquidation, receivership or administration and any form of suspension of payments, arrangement with creditors or reorganisation under any corporate or insolvency law of any country;

"**Loan Agreement**" means the loan agreement dated 25 October 2010 referred to in Recital (A) and includes any existing or future amendments or supplements, whether made with Vision's consent or otherwise;

"**Property**" means the apartment described and referred to in Recital (F); and

"**Property Mortgage**" means a first priority mortgage over the Property granted or to be granted by Vision in favour of the Security Trustee.

1.3     **Application of construction and interpretation provisions of Loan Agreement.** Clauses 1.2, 1.5 and 1.6 of the Loan Agreement apply, with any necessary modifications, to this Guarantee.

2       **GUARANTEE**

2.1     **Guarantee and indemnity.**   Vision unconditionally and irrevocably:

(a)     guarantees the due payment of all amounts which are now or may from time to time hereafter be payable by the Borrowers under or in connection with the Loan Agreement and every other Finance Document;

(b)     undertakes to pay to the Security Trustee, on the Security Trustee's demand, any such amount which is not paid by the Borrowers when payable; and

(c)     fully indemnifies the Security Trustee and each other Creditor Party on the Security Trustee's demand in respect of all claims, expenses, liabilities and losses which are made or brought against or incurred by the Security Trustee or the other Creditor Party concerned as a result of or in connection with any obligation or liability guaranteed by Vision being or becoming unenforceable, invalid, void or illegal; and the amount recoverable under this indemnity shall be equal to the amount which the Security Trustee or the other Creditor Party concerned would otherwise have been entitled to recover.

2.2     **No limit on number of demands.**   The Security Trustee may serve more than one demand under Clause 2.1.

3       **LIABILITY AS PRINCIPAL AND INDEPENDENT DEBTOR**

3.1     **Principal and independent debtor.**   Vision shall be liable under this Guarantee as a principal and independent debtor and accordingly it shall not have, as regards this Guarantee, any of the rights or defences of a surety.

3.2     **Waiver of rights and defences.**   Without limiting the generality of Clause 3.1, Vision shall neither be discharged by, nor have any claim against any Creditor Party in respect of:

(a)     any amendment or supplement being made to the Finance Documents;

(b)     any arrangement or concession (including a rescheduling or acceptance of partial payments) relating to, or affecting, the Finance Documents;

(c)     any release or loss (even though negligent) of any right or Security Interest created by the Finance Documents;

(d)     any failure (even though negligent) promptly or properly to exercise or enforce any such right or Security Interest, including a failure to realise for its full market value an asset covered by such a Security Interest; or

(e)     any other Finance Document or any Security Interest now being or later becoming void, unenforceable, illegal or invalid or otherwise defective for any reason, including a neglect to register it.

## 4   EXPENSES

**4.1   Costs of preservation of rights, enforcement etc.**  Vision shall pay to the Security Trustee on its demand the amount of all expenses properly incurred by the Security Trustee or any other Creditor Party in connection with any matter arising out of this Guarantee or any Security Interest connected with it, including any advice, claim or proceedings relating to this Guarantee or such a Security Interest.

**4.2   Fees and expenses payable under Loan Agreement.**  Clause 4.1 is without prejudice to Vision's liabilities in respect of the Borrowers' obligations under clause 20 of the Loan Agreement (fees and expenses) and under similar provisions of other Finance Documents.

## 5   ADJUSTMENT OF TRANSACTIONS

**5.1   Reinstatement of obligation to pay.**  Vision shall pay to the Security Trustee on its demand any amount which any Creditor Party is required, or agrees, to pay pursuant to any claim by, or settlement with, a trustee in bankruptcy of any Borrower or of another Security Party (or similar person) on the ground that the Loan Agreement, or a payment by a Borrower or of a Security Party was invalid or on any similar ground.

## 6   PAYMENTS

**6.1   Method of payments.**  Any amount due under this Guarantee shall be paid:

(a)     in immediately available funds;

(b)     to such account as the Security Trustee may from time to time notify to Vision;

(c)     without any form of set-off, cross-claim or condition; and

(d)     free and clear of any tax deduction except a tax deduction which Vision is required by law to make.

**6.2   Grossing-up for taxes.**  If Vision is required by law to make a tax deduction, the amount due to the Security Trustee shall be increased by the amount necessary to ensure that the Security Trustee and (if the payment is not due to the Security Trustee for its own account) the Creditor Party beneficially interested in the payment receives and retains a net amount which, after the tax deduction, is equal to the full amount that it would otherwise have received.

## 7   INTEREST

**7.1   Accrual of interest.**  Any amount due under this Guarantee shall carry interest after the date on which the Security Trustee demands payment of it until it is actually paid, unless interest on that same amount also accrues under the Loan Agreement.

**7.2   Calculation of interest.**  Interest under this Guarantee shall be calculated and accrue in the same way as interest under clause 7 of the Loan Agreement.

40365308v5

7.3     **Guarantee extends to interest payable under Loan Agreement.**   For the avoidance of doubt, it is confirmed that this Guarantee covers all interest payable under the Loan Agreement, including that payable under clause 7 of the Loan Agreement.

8       **SUBORDINATION**

8.1     **Subordination of rights of Vision.**   All rights which Vision at any time has (whether in respect of this Guarantee or any other transaction) against any Borrower or any Security Party or their respective assets shall be fully subordinated to the rights of the Creditor Parties under the Finance Documents; and in particular, Vision shall not:

(a)     claim, or in a bankruptcy of any Borrower or any Security Party prove for, any amount payable to Vision by any Borrower or any Security Party, whether in respect of this Guarantee or any other transaction;

(b)     take or enforce any Security Interest for any such amount;

(c)     claim to set-off any such amount against any amount payable by Vision to any Borrower or any Security Party; or

(d)     claim any subrogation or other right in respect of any Finance Document or any sum received or recovered by any Creditor Party under a Finance Document.

9       **ENFORCEMENT**

9.1     **No requirement to commence proceedings against Borrowers.**   Neither the Security Trustee nor any other Creditor Party will need to commence any proceedings under, or enforce any Security Interest created by, the Loan Agreement or any other Finance Document before claiming or commencing proceedings under this Guarantee.

9.2     **Conclusive evidence of certain matters.**   However, as against Vision:

(a)     any judgment or order of a court in England or Florida in connection with the Loan Agreement; and

(b)     any statement or admission of the Borrowers in connection with the Loan Agreement,

        shall be binding and conclusive as to all matters of fact and law to which it relates.

9.3     **Suspense account.**   The Security Trustee and any Creditor Party may, for the purpose of claiming or proving in a bankruptcy of any Borrower or any Security Party, place any sum received or recovered under or by virtue of this Guarantee or any Security Interest connected with it on a separate suspense or other nominal account without applying it in satisfaction of the Borrowers' obligations under the Loan Agreement.

10      **REPRESENTATIONS AND WARRANTIES**

10.1    **General.**   Vision represents and warrants to the Security Trustee as follows.

10.2    **Status.**   Vision is duly incorporated and validly existing and in good standing under the laws of Florida.

10.3    **Corporate power.**   Vision has the corporate capacity, and has taken all corporate action and obtained all consents necessary for it:

(a)     to execute this Guarantee and the Property Mortgage; and

40365308v5

(b)      to make all the payments contemplated by, and to comply with this Guarantee and the Property Mortgage.

10.4     **Consents in force.**   All the consents referred to in Clause 10.3 remain in force and nothing has occurred which makes any of them liable to revocation.

10.5     **Legal validity and effective Security Interests.**   This Guarantee and the Property Mortgage do now or, as the case may be, will upon execution and delivery (and, where applicable, registration as provided for in the documentation):

(a)      constitute Vision's legal, valid and binding obligations enforceable against Vision in accordance with their respective terms and subject to any relevant insolvency laws affecting creditors' rights generally; and

(b)      create legal, valid and binding Security Interests enforceable in accordance with their respective terms over all the assets to which they, by their terms, relate.

10.6     **No third party Security Interests.**   Without limiting the generality of Clause 10.5, at the time of the execution and delivery of this Guarantee and the Property Mortgage:

(a)      Vision will have the right to create all the Security Interests which the Property Mortgage purports to create; and

(b)      no third party will have any Security Interest or any other interest, right or claim over, in or in relation to any asset to which any such Security Interest, by its terms, relates.

10.7     **No conflicts.**   The execution by Vision of the Guarantee and the Property Mortgage and its compliance with the provisions of the Guarantee and the Property Mortgage will not involve or lead to a contravention of:

(a)      any law or regulation; or

(b)      the constitutional documents of Vision; or

(c)      any contractual or other obligation or restriction which is binding on Vision or any of its assets.

10.8     **No withholding taxes.**   All payments which Vision is liable to make under this Guarantee and the Property Mortgage may be made without deduction or withholding for or on account of any tax payable under any law of any Pertinent Jurisdiction.

10.9     **No litigation.**   No legal or administrative action involving Vision has been commenced or taken or, to Vision's knowledge, is likely to be commenced or taken which, in either case, would be likely to have a material adverse effect on Vision's financial position or profitability.

11       **UNDERTAKINGS**

11.1     **General.**   Vision undertakes with the Security Trustee to comply with the following provisions of this Clause 11 at all times during the Security Period, except as the Lender may otherwise permit.

11.2     **Consents.**   Vision will maintain in force and promptly obtain or renew, and will promptly send certified copies to the Security Trustee of, all consents required:

(a)      for Vision to perform its obligations under this Guarantee and the Property Mortgage; and

(b)      for the validity or enforceability of this Guarantee and the Property Mortgage,

40365308v5

and Vision will comply with the terms of all such consents.

**11.3    Maintenance of Security Interests.**   Vision will:

(a)    at its own cost, do all that it reasonably can to ensure that this Guarantee and the Property Mortgage validly create the obligations and the Security Interests which they purport to create; and

(b)    without limiting the generality of paragraph (a) above, at its own cost, promptly register, file, record or enrol this Guarantee and the Property Mortgage with any court or authority in all Pertinent Jurisdictions, pay any stamp, registration or similar tax in all Pertinent Jurisdictions in respect of this Guarantee and the Property Mortgage, give any notice or take any other step which may be or become necessary or desirable for this Guarantee and the Property Mortgage to be valid, enforceable or admissible in evidence or to ensure or protect the priority of any Security Interest which it creates.

**11.4    Notification of litigation.**   Vision will provide the Security Trustee with details of any legal or administrative action involving Vision as soon as such action is instituted or it becomes apparent to Vision that it is likely to be instituted, unless it is clear that the legal or administrative action cannot be considered material in the context of this Guarantee.

**11.5    Maintenance of status.**   Vision will maintain its separate corporate existence and remain in good standing under the laws of Florida.

**11.6    Negative pledge.**   Vision shall not, and shall procure that none of its subsidiaries will, create or permit to arise any Security Interest over the Property.

**11.7    No disposal of assets, change of business.**   Vision will not transfer, lease or otherwise dispose of the Property.

**11.8    No merger.**   Vision shall not enter into any form of amalgamation, merger or de-merger or any form of reconstruction or reorganisation or carry out any other act, as a result of which any of its rights or liabilities would vest in, or pass to, another person.

**11.9    No change of control.**   Vision shall ensure that Wilmer Ruperti remains the legal holder and direct beneficial owner of the entire issued and allotted share capital of Vision, free from any Security Interest, except that created in favour of the Security Trustee. Vision shall not issue, allot or grant any person other than Wilmer Ruperti a right to any shares in its capital or repurchase or reduce its issued share capital.

**12      JUDGMENTS AND CURRENCY INDEMNITY**

**12.1    Judgments relating to Loan Agreement.**   This Guarantee shall cover any amount payable by the Borrowers under or in connection with any judgment relating to the Loan Agreement.

**12.2    Currency indemnity.**   In addition, clause 21.4 (currency indemnity) of the Loan Agreement shall apply, with any necessary adaptations, in relation to this Guarantee.

**13      FEES AND EXPENSES**

**13.1    Costs of negotiation, preparation etc.**   The Guarantor shall pay to the Security Trustee on its demand fifty per cent. (50%) of the amount of all expenses incurred by the Security Trustee in connection with the negotiation, preparation, execution or registration of this Deed and the Property Mortgage or any related document or with any transaction contemplated by this Deed and the Property Mortgage or any related document.

14      SUPPLEMENTAL

14.1    **Continuing guarantee.**   This Guarantee shall remain in force as a continuing security at all times during the Security Period.

14.2    **Rights cumulative, non-exclusive.**   The Security Trustee's rights under and in connection with this Guarantee are cumulative, may be exercised as often as appears expedient and shall not be taken to exclude or limit any right or remedy conferred by law.

14.3    **No impairment of rights under Guarantee.**   If the Security Trustee omits to exercise, delays in exercising or invalidly exercises any of its rights under this Guarantee, that shall not impair that or any other right of the Security Trustee under this Guarantee.

14.4    **Severability of provisions.**   If any provision of this Guarantee is or subsequently becomes void, illegal, unenforceable or otherwise invalid, that shall not affect the validity, legality or enforceability of its other provisions.

14.5    **Guarantee not affected by other security.**   This Guarantee shall not impair, nor be impaired by, any other guarantee, any Security Interest or any right of set-off or netting or to combine accounts which the Security Trustee or any other Creditor Party may now or later hold in connection with the Loan Agreement.

14.6    **Vision bound by Loan Agreement.**   Vision agrees with the Security Trustee to be bound by all provisions of the Loan Agreement which are applicable to the Security Parties in the same way as if those provisions had been set out (with any necessary modifications) in this Guarantee.

14.7    **Applicability of provisions of Guarantee to other Security Interests.**   Any Security Interest which Vision creates (whether at the time at which it signs this Guarantee or at any later time) to secure any liability under this Guarantee shall be a principal and independent security, and Clauses 3 and 17 shall, with any necessary modifications, apply to it, notwithstanding that the document creating the Security Interest neither describes it as a principal or independent security nor includes provisions similar to Clauses 3 and 17.

14.8    **Applicability of provisions of Guarantee to other rights.**   Clauses 3 and 17 shall also apply to any right of set-off or netting or to combine accounts which Vision creates by an agreement entered into at the time of this Guarantee or at any later time (notwithstanding that the agreement does not include provisions similar to Clauses 3 and 17), being an agreement referring to this Guarantee.

14.9    **Third party rights.**   A person (other than a Creditor Party) who is not a party to this Guarantee has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee.

15      ASSIGNMENT

15.1    **Assignment by Security Trustee.**   The Security Trustee may assign its rights under and in connection with this Guarantee to the same extent as it may assign its rights under the Loan Agreement.

16      NOTICES

16.1    **Notices to Vision.**   Any notice or demand to Vision under or in connection with this Guarantee shall be given by letter or fax at:

        c/o Maroil Trading Inc.
        World Trade Centre
        Marbella 53

5th Floor, Office 502
Panama City
Republic of Panama

Fax No: +1 281 347 5271
Attention: Andrew Longhurst

or to such other address which Vision may notify to the Security Trustee.

**16.2    Application of certain provisions of Loan Agreement.**  Clauses 31.3, 31.4 and 31.5 of the Loan Agreement apply to any notice or demand under or in connection with this Guarantee.

**16.3    Validity of demands.**  A demand under this Guarantee shall be valid notwithstanding that it is served:

(a)    on the date on which the amount to which it relates is payable by the Borrowers under the Loan Agreement;

(b)    at the same time as the service of a notice under clause 19.2 (events of default) of the Loan Agreement;

and a demand under this Guarantee may refer to all amounts payable under or in connection with the Loan Agreement without specifying a particular sum or aggregate sum.

**16.4    Notices to Security Trustee.**  Any notice to the Security Trustee under or in connection with this Guarantee shall be sent to the same address and in the same manner as notices to the Security Trustee under the Loan Agreement.

**17    INVALIDITY OF LOAN AGREEMENT**

**17.1    Invalidity of Loan Agreement.**  In the event of:

(a)    the Loan Agreement now being or later becoming, with immediate or retrospective effect, void, illegal, unenforceable or otherwise invalid for any other reason whatsoever, whether of a similar kind or not; or

(b)    without limiting the scope of paragraph (a), a bankruptcy of a Borrower, the introduction of any law or any other matter resulting in a Borrower being discharged from liability under the Loan Agreement, or the Loan Agreement ceasing to operate (for example, by interest ceasing to accrue),

this Guarantee shall cover any amount which would have been or become payable under or in connection with the Loan Agreement if the Loan Agreement had been and remained entirely valid, legal and enforceable, or that Borrower had not suffered bankruptcy, or any combination of such events or circumstances, as the case may be, and that Borrower had remained fully liable under it and references in this Guarantee to amounts payable by the Borrowers under or in connection with the Loan Agreement shall include references to any amount which would have so been or become payable as aforesaid.

**17.2    Invalidity of Finance Documents.**  Clause 17.1 also applies to each of the other Finance Documents to which a Borrower is a party.

**18    GOVERNING LAW AND JURISDICTION**

**18.1    English law.**  This Guarantee and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

40365308v5



18.2 **Exclusive English jurisdiction.** Subject to Clause 18.3, the courts of England shall have exclusive jurisdiction to settle any Dispute.

18.3 **Choice of forum for the exclusive benefit of the Security Trustee.** Clause 18.2 is for the exclusive benefit of the Security Trustee, which reserves the rights:

(a) to commence proceedings in relation to any Dispute in the courts of any country other than England and which have or claim jurisdiction to that Dispute; and

(b) to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or without commencing proceedings in England.

Vision shall not commence any proceedings in any country other than England in relation to a Dispute.

18.4 **Process agent.** Vision irrevocably appoints Bates Wells & Brathwaite London LLP at its registered office for the time being, presently at 2-6 Cannon Street, London, EC4M 6YH to act as its agent to receive and accept on its behalf any process or other document relating to any proceedings in the English courts which are connected with a Dispute.

18.5 **Creditor Parties' rights unaffected.** Nothing in this Clause 18 shall exclude or limit any right which any Creditor Party may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

18.6 **Meaning of "proceedings".** In this Clause 18, "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure and a "**Dispute**" means any dispute arising out of or in connection with this Guarantee (including a dispute relating to the existence, validity or termination of this Guarantee) or any non-contractual obligation arising out of or in connection with this Guarantee.

**THIS DEED OF GUARANTEE** has been executed by or on behalf to the parties and has, on the date stated at the beginning of this Deed of Guarantee, been delivered as a deed.

40365308v5

EXECUTION PAGE                          _Winter-Roberti_

**VISION**

| **EXECUTED** and **DELIVERED** | ) |
|---|---|
| as a Deed by | ) |
| for and on behalf of | ) |
| **VISION SANTA MARIA MIAMI INC.** | ) |
| in the presence of: | ) |

_Omar Keou_


**SECURITY TRUSTEE**

| **EXECUTED** and **DELIVERED** | ) |
|---|---|
| as a Deed by | ) |
| for and on behalf of | ) |
| **KOREA SECURITIES** | ) |
| **FINANCE CORP.** | ) |
| in the presence of: | ) |

40365308v5

File# 11-80049

## STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Daniel Haggerty, Esq. (772) 283-2881

**B. SEND ACKNOWLEDGEMENT TO:**
Name    Daniel Haggerty, Esq.

Address   Mariner Title Co.

Address   100 S.W. Albany Ave. #310

City/State/Zip   Stuart, FL  34994

CFN 2011R0380148
OR Bk 27717 Pg 4654; (1ps)
RECORDED 06/10/2011 10:15:13
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Vision Santa Maria Miami, Inc. | | | |

| 1.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 355 Alhambra Circle, Suite 801 | This space not available. | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | Coral Gables | FL | 33134 | U.S. |

| 1.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1.e TYPE OF ORGANIZATION | 1.f JURISDICTION OF ORGANIZATION | 1.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| N/A | | Corporation | Florida | P10000024662  ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| | This space not available. | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2.e TYPE OF ORGANIZATION | 2.f JURISDICTION OF ORGANIZATION | 2.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME  ( or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)**

| 3.a ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Korea Securities Finance Corp. | | | |

| 3.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3.c MAILING ADDRESS Line One | | | | | |
|---|---|---|---|---|---|
| 34-9 Yeouidodong | This space not available. | | | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Yeongdeungpo-gu | Seoul | | | Korea |

**4. This FINANCING STATEMENT covers the following collateral:**

All fixtures, fittings, appliances, apparatus, equipment, machinery, and articles of personal property and replacements thereof, other than those owned by lessees, now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, occupancy or operation of the improvements on the premises known as 1643 Brickell Avenue, Apartment 4901, Miami, FL 33129, also being known as Unit No. 4901 of Santa Maria, a condominium, according to the delaration of condominium recorded in O.R. Book 17791, Page 4242, Public Records of Miami-Dade County, Florida.

**5. ALTERNATE DESIGNATION (if applicable)**   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR
☐ AG. LIEN   ☐ NON-UCC FILING   ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**
☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** Mariner Title Co. File Number 11-80049

STANDARD FORM - FORM UCC-1  (REV.01/2009)         Filing Office Copy         Secretary of State, State of Florida

EXHIBIT
B

JUN-10-2011  13:66

MARINER TITLE CO.
DANIEL HAGGERTY ESQ
100 S W ALBANY AVE #310
STUART FL 34994

*Forward to LV 6/27/11*

UCC number 201104764200 has been filed with the Florida Secured Transaction Registry. The expiration date for the filing is 06/13/2016.

Complete information related to the UCC filing is available on the internet at www.FloridaUCC.com. It is your responsibility to review all information associated with this filing to ensure information has been recorded correctly.

**NOTICE OF FEE INCREASE: Pursuant to Section 24, Chapter 2009-72, Laws of Florida, beginning on July 1, 2009, the fee for the first page of an initial financing statement (UCC1) was increased from $25.00 to $35.00. The text of Section 24, Chapter 2009-72, Laws of Florida can be viewed online at: http://laws.flrules.org/files/Ch_2009-072.pdf. The text related to the fee increase is on page 18.**

Please Note: The latest versions of the UCC forms approved by the State of Florida are available for download from : www.FloridaUCC.com

If you have questions or concerns about this filing, please call FLORIDAUCC, Inc. at (850) 222-8526.

EXHIBIT
C

STATE OF FLORIDA UNIFORM COMMERCIAL CODE
FINANCING STATEMENT FORM

**FILED**

**2011 Jun 13 AM 10:15**

**\*\*\*\* 201104764200 \*\*\*\***

\*\*\*C \* 06131127818801-35.00\*\*\*35.00\*\*\*

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**
Daniel Haggerty, Esq. (772) 283-2881

**B. SEND ACKNOWLEDGEMENT TO:**
Name   Daniel Haggerty, Esq.
Address   Mariner Title Co.
Address   100 S.W. Albany Ave. #310
City/State/Zip   Stuart, FL 34994

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1.a ORGANIZATION'S NAME |
|---|
| Vision Santa Maria Miami, Inc. |

| 1.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| 355 Alhambra Circle, Suite 801 | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | Coral Gables | FL | 33134 | U.S. |

| 1.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1.e TYPE OF ORGANIZATION | 1.f JURISDICTION OF ORGANIZATION | 1.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| N/A | | Corporation | Florida | P10000024662  ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2.a ORGANIZATION'S NAME |
|---|
| |

| 2.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2.d TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2.e TYPE OF ORGANIZATION | 2.f JURISDICTION OF ORGANIZATION | 2.g ORGANIZATIONAL ID# |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME ( or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY (3a OR 3b)**

| 3.a ORGANIZATION'S NAME |
|---|
| Korea Securities Finance Corp. |

| 3.b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3.c MAILING ADDRESS Line One | | | |
|---|---|---|---|
| 34-9 Yeouidodong | This space not available. | | |

| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Yeongdeungpo-gu | Seoul | | | Korea |

**4. This FINANCING STATEMENT covers the following collateral:**

All fixtures, fittings, appliances, apparatus, equipment, machinery, and articles of personal property and replacements thereof, other than those owned by lessees, now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, occupancy or operation of the improvements on the premises known as 1643 Brickell Avenue, Apartment 4901, Miami, FL 33129, also being known as Unit No. 4901 of Santa Maria, a condominium, according to the delaration of condominium recorded in O.R. Book 17791, Page 4242, Public Records of Miami-Dade County, Florida.

| 5. ALTERNATE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR |
|---|---|---|---|
| | ☐ AG. LIEN | ☐ NON-UCC FILING | ☐ SELLER/BUYER |

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**
☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** Mariner Title Co. File Number 11-80049

STANDARD FORM - FORM UCC-1 (REV.01/2009)      Filing Office Copy      Approved by the Secretary of State, State of Florida